**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

DEBORAH MITCHELL,             :       CIVIL ACTION NO. 2:19-cv-04162
                                          :
            Plaintiff,            :
                                          :       JUDGE
       v.                                  :
                                          :       MAGISTRATE JUDGE
THE OHIO STATE UNIVERSITY,         :
                                          :
                                          :       **COMPLAINT**
                                          :
            Defendant.           :       **JURY DEMAND ENDORSED HEREON**

## I.     <u>Preliminary Statement</u>

1.     This action seeks back pay; compensatory and punitive damages; declaratory, injunctive and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of Title VII of the Civil Rights Act of 1964, Ohio's Laws Against Discrimination ORC 4112 *et seq.,* Title IX of the Education Amendments of 1972, As Amended, and breach of contract committed when Defendant pretextually moved to terminate Plaintiff, and remove her from her teaching duties with a motivating factor being her sex, and did in fact terminate Plaintiff, and in retaliation for making good faith complaints of discrimination prior to and after the Defendant issued disciplinary actions and investigations against Plaintiff for allegedly violating its conflict of interest rules. However, Defendant has allowed several similarly-situated male employees to engage in the same type of activity as Plaintiff without issuing any discipline or investigating them. Based on Defendant's actions, Plaintiff has suffered economic, emotional, and reputational injury as well as incurring substantial attorneys' fees defending herself in Defendant's internal disciplinary process.

1

## II. Jurisdiction and Venue

2. This action brings discrimination claims against Defendant The Ohio State University ("Ohio State") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., pursuant to a Charge Affidavit timely filed on October 25, 2018, with the Equal Employment Opportunity Commission, and a Right to Sue Letter was received less than 90 days ago, pursuant to 42 U.S.C. § 1981. This action also brings claims of Title IX retaliation, in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq*., and breach of contract.

3. This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); 1367 (supplemental jurisdiction).

4. Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202 and ORC 4112.

5. Compensatory and punitive damages may be awarded under Title VII, 42 U.S.C. § 1981a, and ORC 4112.

6. Costs and attorneys' fees may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(k); Title IX; 42 U.S.C. § 1988; Fed. R. Civ. P. 54; and ORC 4112.

7. Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio, where Defendant Ohio State locates its headquarters.

## III. Parties

8. Plaintiff Deborah Mitchell Ph.D. ("Dr. Mitchell") was born and raised in Columbus, Ohio, currently residing in Dublin, Ohio. Dr. Mitchell is an undergraduate alumna of Ohio State and was hired by her alma mater as a Clinical Associate Professor in the Fisher College

of Business in the Marketing & Logistics Department in March 2012—a dream job for her. Dr. Mitchell taught both undergraduate business students and graduate students working towards their Masters in Business Administration. Prior to the events leading to this Complaint, Dr. Mitchell performed her duties well, was well liked by co-workers, managers, and students, and was not subject to any work place discipline. Dr. Mitchell was voted "Outstanding Core Professor" by the graduating MBA class of 2017.

9. Defendant The Ohio State University ("Ohio State") is a public research institution with the third largest university campus in the United States and regional campuses throughout Central Ohio; employs more than 500 full-time employees; is engaged in an industry – higher education – affecting commerce; and is an employer covered by Title VII of the Civil Rights Act of 1964. Ohio State receives federal financial assistance and is also covered by Title IX of the Education Amendments of 1972, as amended.

## IV. Facts - Background

10. Dr. Mitchell earned her bachelor of science in business administration from The Ohio State University in 1980. Dr. Mitchell earned her Ph.D. in Business from the University of Chicago Booth School of Business, with concentrations in Marketing and Behavioral Science in 1991. She earned a Masters of Business Administration in 1985.

11. Prior to working for Defendant, Dr. Mitchell served as a faculty member at the University of Wisconsin-Madison, the University of Chicago, Northwestern University, Stanford University, Temple University, the University of Pennsylvania, and Cornell.

12. Dr. Mitchell has served as the Executive Director of the Center for Brand and Product Management at the University of Wisconsin-Madison.

13.     Prior to beginning her career with Ohio State, Dr. Mitchell served as the Founder and President of her own private consulting company, Cypress Consulting Ltd., which is now CypressTree Corp.

14.     Dr. Mitchell's business activities were well known to Ohio State when it hired her, and her success in the private business world were part of what made Dr. Mitchell an attractive candidate to Ohio State.

15.     Defendant was aware that Dr. Mitchell would continue to provide services for her consulting business while being employed with Ohio State.

16.     When Dr. Mitchell was hired by Defendant, she was expressly told that she could continue her private business pursuits, and was in fact encouraged to do so.

17.     Moreover, Ohio State's Faculty Paid External Consulting policy from the Office of Academic Affairs states, "Participation by faculty members of The Ohio State University in activities of government, in industry and in other private institutions generally serves the academic interests of the university," and, "Faculty members, including administrations with faculty appointments, **are encouraged to engage in paid external consulting** to the extent that these activities are clearly related to the mission of the university and the expertise of the faculty member, provide direct or indirect benefits to the university, and do not entail a conflict of interest as defined in the Conflict of Interest Policy." (Emphasis added).

18.     It is commonplace for Ohio State Fisher College of Business faculty members to engage in paid external consulting, and in many cases maintain their own private businesses while working for the Defendant. In some instances, Ohio State employees earn hundreds of thousands, or millions of dollars per year performing external work separate from their teaching duties with Defendant.

19.     Based on knowledge and information, it is commonplace for Defendant to allow its Fisher College of Business faculty members to engage in private business arrangements for clients that the faculty member also provided services for in the scope of their duties for Ohio State.

20.     Ohio State Fisher College of Business has a unit within the college known as Fisher Executive Education ("Exec Ed"), which focuses on the development of executive-level individuals. For its teaching, Exec Ed utilizes contracts with Fisher faculty to teach on a voluntary basis. Exec Ed teaching is not part of a professor's employment duties, and compensation for his or her voluntary involvement is supplemental to the professor's salary.

### Executive Education for the Ohio Department of Medicaid

21.     During the period of July 2014 through November 2014, twenty-five employees from the Ohio Department of Medicaid ("ODM") enrolled and participated in an Exec Ed program. This program took place on Ohio State's campus and taught the employees business concepts for their professional development.

22.     The primary role of Exec Ed is to teach individual enrollees (in this case the 25 ODM employees) business education. Put another way, Exec Ed's primary focus is teaching, and teaching individuals, as opposed to developing and executing specific solutions for an entire company.

23.     Dr. Mitchell served as the Academic Director for the 2014 ODM educational program. Dr. Mitchell oversaw the creation of the program's educational curriculum, just as any professor would develop a syllabus for her course. Along with two other Fisher faculty members, Dr. Mitchell was an instructor for several of the sessions that ODM employees attended.

24.     The ODM enrollees were impressed with Dr. Mitchell's business acumen and experience.

25.     In November 2014, the Exec Ed program with ODM was completed, and Dr. Mitchell continued with her normal teaching and other academic duties for Defendant.

26.     As part of this Exec Ed program, Dr. Mitchell travelled to ODM's location in downtown Columbus, Ohio, and met with all 25 employees for two brief follow-up sessions on June 15, 2015 and July 15, 2015.

27.     Dr. Mitchell attended those sessions in her role as Academic Director.  The attendees reported on their progress and how they had attempted to apply the concepts they learned the year before.

### Private Strategic Consulting for the Ohio Department of Medicaid

28.     Sometime between July 15, 2015 and July 23, 2015, ODM's then Chief of Staff Jennifer Demory approached Dr. Mitchell regarding its organizational need for consulting services tied to strategic execution.

29.     Ms. Demory requested that Dr. Mitchell's company CypressTree Corp. create a proposal for a multi-year embedded consulting project, where Dr. Mitchell and her firm would work onsite at ODM, and ODM partner locations, and provide consulting services to ODM.

30.     The work that ODM was seeking from Dr. Mitchell's company was substantially different from the educational program delivered by Exec Ed to ODM's employees in 2014.

31.     Ohio State does not provide the types of services ODM was seeking.  What ODM sought was an embedded consulting engagement and Ohio State does not offer embedded consulting engagements. Ohio State offers educational programs, and this was not an educational program.

32. Ohio State does not, and cannot, provide the types of consulting services that ODM was requesting in the summer of 2015.

33. Ohio State would not have lost, and in fact did not lose, any business revenue or opportunity based on CypressTree's consulting with ODM.

34. The contract between ODM and CypressTree was approved by a specific process under the state of Ohio's Controlling Board which highlights the unique services CypressTree provided. Vendor purchases by government agencies (such as ODM) are typically procured by competitive bids, however, there is an exception and a waiver of competitive bids when the agency asserts the need of services which only one vendor is capable of providing (i.e., "sole source"). The Controlling Board defines "sole source" as "only one supplier that can provide the supplies or services desired by the agency."

35. In other words, ODM knew it needed services that only CypressTree could provide. The fact that ODM previously had employees attend executive-level business classes at Exec Ed reiterates that ODM knew Exec Ed's limitations and that Exec Ed could not provide these services. ODM, not CypressTree, made this determination.

36. The Ohio Controlling Board ultimately approved ODM's request on or about August 31, 2015.

37. The work that CypressTree performed for ODM included: twenty-two months in duration; approximately half a dozen job-site locations; interaction with and support of approximately 700 employees; a comprehensive assessment of the organization as a whole; the implementation of the organization's strategy for organizational change; and, the development of other confidential work products. These work products and related consulting services were designed to support organization-wide execution of ODM's strategy.

7

38.     There was no substantive overlap or similarity between the courses Dr. Mitchell taught at Exec Ed for ODM employees in her capacity with Ohio State and the consulting services she performed for ODM through CypressTree.

39.     While teaching executive education for the ODM employees in her capacity with Defendant, Dr. Mitchell only worked on Ohio State's campus. While performing services for ODM in her personal capacity, Dr. Mitchell only provided services at ODM headquarters and ODM partner sites.

**Sex Discrimination and Harassment at Ohio State's Fisher College of Business**

40.     Dr. Mitchell's first interaction with verbal abuse by male faculty members came within the first few weeks of her full-time employment at Ohio State. In about June 2012, faculty member Mike Bills yelled curse words and admonished Dr. Mitchell when she attempted to provide input at a faculty meeting.

41.     By the end of her first semester in 2012, at least three undergraduate female students complained about Professor Shashi Matta for his various verbal abuses. He would target female students and brought many to tears. Professor Matta called the female students "stupid cows," with "small brains." He was so abusive that students began secretly recording his classes. Professor Matta also forced certain student teams to come to his office during the weekend and late at night. It would not be uncommon for Professor Matta to be alone in the entire building with these 1-7 students.

42.     Dr. Mitchell was outraged at this behavior and she reported this to Walter Zinn, who was the Department Chair at the time. Upon knowledge and belief, several parents of Fisher students also complained to Walter Zinn about discriminatory and harassing behavior by Matta, but Zinn failed to take meaningful action.

43.     Frustrated with Dr. Zinn's lack of action regarding these complaints, Dr. Mitchell went to Rao Unnava to report these issues of Dr. Matta and Dr. Zinn's lack of interest in them.

44.     In the fall of 2013, Dr. Mitchell was assigned to teach a full-time MBA core marketing course, divided into parts taken in successive semesters.  Part I would be taught in Fall 2013, and Part II would be taught in Spring of 2014.  Being a sequence course, the same students carry over from Part I to Part II.

45.     On December 23, 2013, Dr. Zinn notified Dr. Mitchell by phone that she would be demoted in the following ways:  she was removed from her Part II teaching duties (which were to begin in less than 10 days) and instead she would teach an undergraduate course.  Dr. Zinn further told Dr. Mitchell that Dr. Matta would be replacing her in the Part II course.

46.     This removal was humiliating for Dr. Mitchell, and she is unaware of any Fisher professor involuntarily being removed from his or her course so close to the start of the semester. Dr. Mitchell was told the reason behind the demotion was her poor Student Evaluation of Instruction ("SEI") from the Fall 2013 course.  However, Dr. Mitchell later learned that at least two other male professors received worse reviews than her but did not get demoted.  And in fact, one of those underperforming males, Dr. Matta, was her replacement.

47.     Dr. Mitchell reported to Dr. Zinn that the male professors were being treated differently than her, but Dr. Zinn refused to discuss the issue with her. Dr. Mitchell believes this incident marked a significant downturn in her relationship with Dr. Zinn, and that matters dramatically deteriorated after that time.

48.     At approximately the end of August of 2014, Dr. Mitchell met with Rao Unnava about her treatment as compared to Matta.  Unnava recommended that Dr. Mitchell not file

anything officially with Human Resources and convinced Dr. Mitchell not to bring up any gender discrimination issues.

49.     In April 2014, Dr. Ken Boyer, a faculty director within Fisher's MBA working professional programs, approached Dr. Mitchell for the purpose of accommodating a MBA student regarding a core course. A "core" course is designed for a full lecture hall of students (*e.g.*, 60 students per section) and is a non-elective, mandatory class needed for graduation. This student was a prominent physician at the OSU Wexner Medical Center enrolled as a working professional MBA student, who claimed that the course as scheduled was not convenient for him.

50.     Dr. Boyer asked Dr. Mitchell to teach this core course to this one student as independent study. Dr. Mitchell protested the request, and expressed her concern that converting a core course into independent study was against school policy. Dr. Mitchell also pointed out that these core courses were not designed to be taught to a single student, and that in order for her to do so, she would have to completely redesign the course for this one person. Dr. Mitchell also notified Dr. Zinn and Dr. Greg Allenby of her concern, and she sought support for her position that such activity would violate academic integrity.

51.     Despite her denials and rejection of Dr. Boyer's request, Defendant nevertheless forced Dr. Mitchell to take on this assignment. Dr. Mitchell was not paid for her work on this matter despite being outside the scope of her regularly assigned teaching duties.

52.     In contrast to Defendant's treatment of Dr. Mitchell, a female professor, Ohio State's Fisher College of Business pays its male professors for any additional teaching duties not a part of his job description. Dr. Itzhak Ben-David ("Dr. Ben-David"), in a sworn deposition, testified that he is paid by Fisher about $833.33 per hour for additional teaching duties. Dr. Ben-David explicitly discusses that this type of teaching is "voluntary," "not part of [his] job

description," and "with no special prep time." Dr. Ben-David also testified that the "University wants [him] to do that so they compensate [him]."

53.     In Dr. Mitchell's case, not only was her assignment forced upon her over her objections, it also entailed significant prep time and weekly instruction commitment. But she was not compensated.

54.     In the Spring of 2014, a student representative of the Fisher Graduate Women in Business ("FGWIB") approached Dr. Mitchell seeking advice on how to formally report the hostile classroom issues they are experiencing. This student told Dr. Mitchell that the female students are experiencing verbal abuse, sexist comments, and being treated differently than the male students. She tells Dr. Mitchell that the perpetrators are both professors and male students. Dr. Mitchell stressed to the student that the FGWIB should develop quantitative data to present to the administration.

55.     The FGWIB hosted two focus group sessions and interviewed about 35 female students. Once they collected the data, on or around April 27, 2015, a group of 7-8 female students presented their findings in a meeting with Dean Makhija and Dr. Shashi Matta. Soon after their meeting with Dean Makhija, the FGWIB then gave this presentation to Professors David Greenberger and Rao Unnava.

56.     This FGWIB presentation included a detailed proposal and timeline for how to fix these issues by utilizing a 4-phase model. Not only did Ohio State fail to implement any of these proposals, Dr. Mitchell would later learn that most female professors were not even aware of the existence of this presentation.

57.     In the Fall of 2014, the toxicity in the workplace forced the school to informally audit its culture. Two professors, Dr. Roy Lewicki and Dr. Joseph Alutto, interviewed over 70

individuals and issued their findings in a January 10, 2015 report titled "Resource Level Setting and Culture Audit for the Fisher College of Business," hereinafter referred to as the "Audit."

58.    The Audit reports that many staff and faculty have concerns about "appropriate values being reflected in decision-making processes in the college, inadequacies of accountability that are reflected in administrative decision making and inappropriately abusive behaviors colleague to colleague."

59.    The Audit recommendations included the need to "[i]nitiate a more comprehensive cultural audit, performed by trusted professionals from outside the college, to ensure that behaviors and underlying decision-making systems reflect the college's cultural values;" and to "create and value processes through which faculty and staff can continue to speak up or voice suggestions . . . without fear of retribution or derision."

60.    But the toxic environment did not improve, and on June 10, 2015 Dr. Mitchell responded to a college-wide survey by stating, "This is the most toxic environment I have ever worked in. Every week I hear about or (more usually) directly witness behavior that is illegal, unethical, inappropriate or all of the above. The vast majority of these behaviors / actions are undertaken by "leaders" (those who have power…people who have been given power). I have no confidence that the senior leadership of this college can or will turn around this situation. In fact, I'm wondering why I took the time to fill out this survey. I have taken a big risk in filling it out, when I know that the likelihood of good coming from it is near zero. You have my email identifier, so I would not be surprised if in fact this is not a confidential research study - and that in fact, I will suffer some kind of retribution for being honest here. One thing is clear… I didn't fill it out so that we could get free ice cream."

61.     Between January and April 2018, Dr. Mitchell volunteered to be part of a task force for the study and redesign of the Fisher Culture and Climate Annual Survey.  Essentially, this is a faculty and staff satisfaction survey, and the task force was charged with restructuring the questions.

62.     Dr. Mitchell was active and vocal throughout the task force meetings during this time period.  The task force learned that, every year, Defendant Ohio State removed all of the comments naming a specific wrongdoer.  This became a highly contentious issue.  Dr. Mitchell took the position that the entire purpose of these surveys is to give the respondents a voice, to improve the culture by allowing their feedback. Ohio State administration's position was that these surveys were not the time and place for such complaints and that such information is, and will be, "scrubbed."

### The "04 Investigation"

63.      Ohio Administrative Code § 3335-5-04 details the rules by which Ohio State must abide during a complaint and investigation against its faculty members.

64.     Pursuant to OAC §3335-5-04, three allegations of grave misconduct were levied against Dr. Mitchell, namely: (I) she violated the Faculty Conflict of Commitment Policy; (II) she violated the Faculty Financial Conflict of Interest Policy; and (III) she violated the "no solicitation" clause in her contracts with Exec Ed (the "Complaint").

65.     There was no finding of grave misconduct as to allegations (I) and (III).  However, as to allegation (II), Dr. Mitchell was found to have violated the Faculty Financial Conflict of Interest Policy which rose to the level of grave misconduct, and under that basis, she was ultimately terminated by Defendant.

66. The Complaint against Dr. Mitchell was submitted to Dean Makhija on January 3, 2017, and nine hundred sixty-nine (969) days later she was terminated by the Ohio State Board of Trustees on August 30, 2019.

67. Defendant Ohio State repeatedly and flagrantly violated the rules in OAC §3335-5-04 during these 969 days. The facts below will detail this process (the "04 Investigation").

68. In April 2016, Defendant hired Paul Velasco ("Velasco") as the Carol L. Newcomb-Alutto Executive Director of Exec Ed, an endowed position.

69. On May 9, 2016, former Interim Executive Director and former Managing Director of Exec Ed, Martin Schwalbe ("Schwalbe") e-mailed Executive Director Velasco a defamatory and misleading message alleging Dr. Mitchell violated contracts she had signed with Exec Ed, and purposely misled one of her clients regarding the nature of the services that she was providing to ODM.

70. Dr. Mitchell, through CyprusTree, continued to provide services to ODM for the remainder of the year, and her contract was extended with ODM based on her company's performance.

71. Despite Velasco having Schwalbe's email on May 9, 2016, Velasco would not formally file his Complaint until two hundred thirty-nine (239) days later on January 3, 2017.

72. At no time during 2016 did anyone at Ohio State present Dr. Mitchell with any concerns regarding her work with ODM.

73. On January 3, 2017, Velasco submitted to Ohio State Fisher College's Dean Anil Makhjia his Complaint alleging that Dr. Mitchell engaged in "grave misconduct" and as such was subject to Ohio State's Rule 3335-5-04.

14

74.     The Complaint stated that Dr. Mitchell violated Ohio State Policy in regards to the work she was performing for ODM. The thrust of Velasco's complaint was that Dr. Mitchell unfairly competed with Defendant by engaging with ODM in her private capacity.

75.     No services that Dr. Mitchell performed for ODM competed in any way with services that Ohio State offers to outside entities.

76.     As part of the investigation, Defendant obtained a letter from Ms. Demory, ODM's chief of staff, wherein she affirmatively stated that Dr. Mitchell did not solicit any business from ODM. Ms. Demory continued that the business in which Dr. Mitchell had been engaged was materially different from the work that Defendant Ohio State performed for ODM in 2014.

77.     Then ODM Executive Director John McCarthy also provided a letter to Defendant maintaining ODM's position that Dr. Mitchell did not solicit business from it, or engage in competitive services to those that ODM could have reached out to Defendant Ohio State to provide.

78.     Pursuant to 3335-5-04(B)(5), Dean Makhija sent the Complaint down to Dr. Mitchell's department chair, Dr. Tom Goldsby, for initial review.   OAC §3335-5-04(C) required Dr. Goldsby to review the Complaint within 14 days and determine whether there was enough probable cause to refer the matter back to Dean Makhija.

79.     Dr. Goldsby would later provide a signed declaration to the faculty hearing committee stating that he suffered acute appendicitis and was hospitalized during this 14-day period, and that he felt urgency to complete his review under the rules.

80.     Once he was able to review the full scope of documentation regarding Dr. Mitchell's 04 Investigation, Dr. Goldsby stated in his signed declaration, "it is my opinion that Dr. Mitchell did not violate the OSU Faculty Financial Conflict of Interest policy. I do not believe that

the services performed by CypressTree competed with those offered – or could be offered – by Fisher Executive Education."

81.    But as the process continued up the chain, Dr. Mitchell tried to fight the allegations against her. She met with Dean Makhija on February 20, 2017 and, in response to the allegations against her, provided him with two binders containing substantial documentation, neatly organized with a table of contents, as well as coreboard exhibits (the "Printed Materials"). Dr. Mitchell provided these materials in hard-copy form because they contained her trade secrets and she was desperately trying to avoid having her intellectual property destroyed by digital copies in the public record.

82.    As a follow-up, she emailed a short letter to Dean Makhija on March 13, 2017 and included a small number of tables in response to the allegations.

83.    Dr. Mitchell was not provided any additional information regarding the 04 Investigation's process until October 23, 2017, when Dean Makhija informed her in person that he was turning the investigation over to the college investigation committee" pursuant to OAC §3335-5-04(E) (the "Investigation Committee").

84.    The Investigation Committee was comprised of four faculty members: Dr. Raymond Noe, Dr. Ben-David, Dr. Isel Erel, and Dr. Johnny Rungtusanatham.

85.    Dr. Mitchell did not hear from Ohio State regarding the issue again until February 26, 2018, when she received an e-mail from Dr. Noe.

86.    In the e-mail Dr. Noe informed Dr. Mitchell that the Investigation Committee had begun its investigation, and he asked Dr. Mitchell for some specific documents. Dr. Mitchell informed Dr. Noe that she had already provided his requested documentation which were contained in her Printed Materials.

87.     Dr. Noe indicated that he did not possess the documents and that her file contained only a two or three page letter with a few charts attached.

88.     Dean Makhija did not deliver the Printed Materials to the Investigation Committee. This led Dr. Mitchell to take it upon herself to print an additional four copies of the Printed Materials, one for each committee member.  Dr. Mitchell had by then spent hundreds of dollars for five copies of the Printed Materials, and the footer of each page contained a large notice and disclaimer of her protectable trade secret rights.

89.     Dr. Mitchell believed this substantial disclosure of documents complied with Dr. Noe and the Investigation Committee's request. This disclosure included one page that Dr. Mitchell redacted, but she openly and clearly identified this redacted material in her Printed Materials' table of contents.

90.     The Investigation Committee never clarified its request to Dr. Mitchell that it sought redacted material.  Dr. Mitchell would later testify that had the committee members asked her, she would have provided it to them.

91.     Despite this, the Investigation Committee found "clear and convincing" evidence that Dr. Mitchell's actions were "flagrant, egregious and willful."

92.     Before Dr. Mitchell understood what Dr. Noe was seeking, committee member Dr. Ben-David contacted ODM and explicitly told the agency that Ohio State was conducting an internal investigation and requested documents pertaining to Dr. Mitchell and CypressTree.

93.     Ohio Administrative Code §3335-5-04(E)(2) explicitly states that while the committee may obtain relevant information from other people it "shall protect the confidentiality of the proceedings."

94.    Dr. Mitchell asked Dean Makhija to have Dr. Ben-David removed from the Investigation Committee due to his flagrant violation of her trade secrets and Investigation Committee's breach of "04" code.  Dr. Mitchell's request was denied.

95.    Dr. Mitchell will later learn that Dr. Ben-David was Dean Makhija's hand-picked nominee and that he had volunteered for the Investigation Committee.

96.    As a result of her own public records requests, Dr. Mitchell would later learn from the Investigation Committee's emails that one committee member questioned Dr. Ben-David's actions, and Dr. Ben-David responded with "I hope it [sic] didn't mess up," and, "I hope it's OK that I emailed him. Maybe I should have consulted with the group first."

97.    The Investigations Committee recommended that Dr. Mitchell be found guilty of "grave misconduct" and recommended immediate termination on July 12, 2018.

98.    Despite the Investigation Committee's analysis that it did not matter whether Dr. Mitchell "intentionally or incidental[ly]" omitted the two pages, it found the issue "troubling" and led to the ultimate finding of clear and convincing evidence of willful and flagrant behavior.

99.     Dean Makhjia affirmed the decision on August 17, 2018.

100.    In his letter of August 17, 2018, Dean Makhija barred Dr. Mitchell from teaching at Ohio State's Fisher School of Business.  He did this less than two business days prior to the beginning of the academic semester.  Dr. Mitchell was scheduled to teach hundreds of MBA students, including most of Dr. Matta's course load following his abrupt and unexpected departure from Ohio State, and had already worked with most of them in a teaching capacity during their orientation sessions.  Dean Makhija gave no rationale for barring Dr. Mitchell from teaching.

101.    In addition, his action violated the University's 3335-5-04(A)13 rule, only the provost can temporarily and immediately reassign a faculty member in the context of a 3335-5-04

investigation, and only if the provost determines that (1) the faculty member poses a clear and present danger to persons or property, or (2) the complaint against the faculty member involves allegations of nontrivial financial fraud.

102.    A number of MBA students who had been assigned to Dr. Mitchell's classes were told false and defamatory reasons why she would not be teaching, ranging from "she was fired" to "she had an opportunity to do high-priced consulting, and chose to pursue that opportunity rather than teach you."

103.    As part of Ohio State's Faculty Rule 3335-5-04 process for complaints against faculty, Dr. Mitchell appealed Dean Makhija's judgment for immediate dismissal to Provost Bruce McPheron on September 5, 2018.

104.    On November 19, 2018 Provost McPheron affirmed Dean Makhija's decision. Dr. Mitchell appealed Provost McPheron's decision, and attended and presented evidence at a hearing on April 29, 2019.

105.    Dr. Mitchell was denied the opportunity to cross-examine, confront, or question the complainant Paul Velasco, Martin Schwalbe, or any of the witnesses against her at the April 29, 2019 hearing.

106.    At the hearing, Dr. Mitchell presented evidence that she did not engage in misconduct consisting of three signed declarations, two letters, three live witnesses and a substantial written submission. Ohio State did not call a single witness and did not present any evidence against Dr. Mitchell at the hearing.

107.    To support a finding of grave misconduct, Ohio State's own policy requires proof with "clear and convincing evidence."

108.    However, despite not calling a single witness nor presenting any evidence against Dr. Mitchell in the face of three witnesses and documentary evidence contradicting Ohio State's proof of the alleged violation, the Defendant still moved ahead with a recommendation for termination.

109.    By letter dated July 31, 2019, Ohio State President Michael V. Drake recommended to the Board of Trustees termination of Dr. Mitchell's clinical appointment and employment with Ohio State.

110.    On August 30, 2019, the Ohio State Board of Trustees approved President Drake's recommended termination of Dr. Mitchell's employment with the university.

111.    Based on knowledge and information, several other male Ohio State Fisher College of Business professors engage and have engaged in substantially similar private business conduct as Dr. Mitchell.

112.    None of the similarly-situated male employees have been accused of engaging in any misconduct let alone grave misconduct.  None of the similarly-situated male employees have had a 3335-5-04 complaint filed against them.

113.    No other male employee of Ohio State has been recommended for termination or stripped of their ability to teach for engaging in similar conduct as Dr. Mitchell.

114.    The investigation and findings against Dr. Mitchell purported to be concerned that she did not disclose her company's contract with ODM through Form 201, the school's Paid External Consulting Approval Form.

115.    However, virtually no similarly-situated male employee has filed a Form 201 for paid external consulting from 2012 through the date the Investigation Committee found her to be guilty of grave misconduct.

116.    For example, Dr. Ben-David provided external consulting services as an expert witness in 2013 and 2014, and he did not disclose either of these through a Form 201.

117.    However, Dr. Ben-David did file a Form 201 for his expert witness consulting on July 24, 2018, twelve days after ruling Dr. Mitchell was guilty of grave misconduct.

118.     The investigation and findings against Dr. Mitchell purported to be concerned that she provided service for a former client of Ohio State or Exec Ed.

119.    However, there are many similarly-situated male employees who privately consult with former or current Ohio State or Exec Ed clients.

120.    Dr. Mitchell is aware of at least a dozen male professors who provide such outside consulting services.

121.    Even Dean Makhija provided personal consulting for a client of Ohio State's in 2015, the same time of Dr. Mitchell's alleged grave misconduct.

122.    In the 04 Investigation Dean Makhija admonished Dr. Mitchell for consulting with a former Ohio State client.  However, Dr. Mitchell did file a Form 201 in 2018 for her consulting with a private sector corporation who was a former Ohio State client.  Both Dr. Goldsby and Dean Makhija approved her 201 submission despite Dr. Mitchell being in the midst of an 04-investigation of which both were well aware.

123.    The investigation and findings against Dr. Mitchell purported to be concerned with, as Dean Makhija wrote, "the substantial monies involved."

124.    However, many male faculty earn substantial income from interests outside of their employment and primary duties with Defendant.

125.    For instance, Dr. Ben-David, one of the four members of the Investigation Committee, is a co-founder of a hedge fund managing over $10,000,000.00 in assets.

126.    Dean Makhija also earned significant monies from his personal consulting with former and current Ohio State clients.

127.    Dr. Mitchell was subjected to this harsh treatment and punishment based on her gender and in retaliation for her valid complaints of sex discrimination and harassment at Ohio State's Fisher College of Business.

128.    As a proximate result of Defendant's actions, Dr. Mitchell has suffered, and continues to suffer irreparable harm and economic damages that she cannot replace.

129.    As a proximate result of Defendant's actions, Dr. Mitchell has suffered and continues to suffer from severe emotional and physical distress.

130.    As a proximate result of Defendant's actions, Dr. Mitchell has suffered and continues to suffer from significant reputational injury.

131.    As a proximate result of Defendant's actions, Dr. Mitchell has lost contracts in her private business.

## V.    Claims for Relief

### Count I
### Discrimination in Violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. §2000e *et seq.*

132.    Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1-131 as if set forth fully herein.

133.    By recommending her termination, stripping her ability to teach, and subjecting her to more harsh discipline than any male employee for engaging in substantially similar conduct, Defendant has committed sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

**Count II**
**Discrimination in Violation of the Ohio Laws Against Discrimination**
**ORC § 4112**

134.     Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1-133 as if set forth fully herein.

135.     By recommending her termination, stripping her ability to teach, and subjecting her to more harsh discipline than any male employee for engaging in substantially similar conduct Defendant has committed sex discrimination in violation of the Ohio Laws Against Discrimination.

**Count III**
**Violation of Title IX of the Education Amendments of 1972, As Amended – Retaliation**
**20 U.S.C. § 1681 *et seq*.**

136.     Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1-135 as if set forth fully herein.

137.     Ohio State has, at all relevant times, received and continues to receive federal financial assistance.

138.     Dr. Mitchell engaged in protected activity by bringing numerous instances of sex discrimination and harassment against herself, other female employees, and female students to the attention of Ohio State and otherwise participating in the Title IX complaint process. Defendant knew that Plaintiff engaged in this protected activity and subsequently took serious action to her detriment, including instituting an "04 Investigation" based on alleged conduct that similarly-situated male professors engaged in without similar scrutiny or consequences, failing to follow Ohio law and University policy in conducting the "04 Investigation," denying Plaintiff the Due Process and procedural fairness demanded by law, imposing discriminatory workplace conditions

such as uncompensated additional teaching duties not imposed on male professors, and terminating her employment with Defendant for improper and pretextual reasons.  A retaliatory animus substantially motivated Defendant to take these adverse actions.

139.   Defendant's differential treatment of Plaintiff is a direct and proximate result of the Title IX protected activity she undertook.

140.   Plaintiff has suffered and will continue to suffer harm including loss of future employment and business opportunities, humiliation, embarrassment, reputational harm, emotional distress, and other economic and non-economic damages.

141.   Plaintiff is entitled to all equitable and legal remedies available under Title IX including but not limited to compensatory damages, reasonable attorneys' fees and costs, and other equitable and legal relief.

**Count IV**
**Breach of Contract**

142.   Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 141 as if set forth fully herein.

143.   At all relevant times, a contractual relationship existed between Dr. Mitchell and Ohio State.

144.   Ohio State's Policy covering the process for investigating and adjudicating complaints of misconduct by members of the faculty was a part of that contract.

145.   Ohio State breached this contract with Dr. Mitchell by failing to comply with its Policy in several ways, including the following:

      a.      Denying Dr. Mitchell the right to question or cross-examine her accusers;

      b.      Repeatedly failing to apply the "clear and convincing evidence" standard to allegations of grave misconduct;

    c.     Failing to maintain Dr. Mitchell's confidentiality;

    d.     Intentionally interfering with Dr. Mitchell's business associations and contractual relationships during the "04 Investigation" process;

    e.     Terminating Dr. Mitchell for legitimate business activity that did not meet the grave misconduct standard; and

    f.     Otherwise conducting a pretextual, arbitrary, and capricious "04 Investigation" process in violation of established policies.

146.    Dr. Mitchell has been seriously and irreparably harmed in countless ways including loss of future employment and business opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, and other economic and non-economic damages.  Dr. Mitchell will suffer a permanent reduction in lifetime earnings and will most likely never attain an equivalent position within higher education, her chosen profession.

147.    Every contract includes an implied covenant of good faith and fair dealing that requires the parties to fulfill their contractual duties in good faith.

148.    Ohio State violated the covenant of good faith and fair dealing implicit in its contract with Dr. Mitchell for all the reasons stated in this Count above.

149.    Ohio State further violated the covenant of good faith and fair dealing by terminating Dr. Mitchell for improper and pretextual reasons.

150.    Ohio State further violated the covenant of good faith and fair dealing by terminating Dr. Mitchell in retaliatory fashion as a result of her valid complaints of sex discrimination and harassment.

151.    Dr. Mitchell's damages are the direct and proximate result of Ohio State's breach of contract.

152.    Consequently, Ohio State is liable to Dr. Mitchell for any and all damages arising out of its breach.

<b>Declaratory Relief Allegations</b>

153.    Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 152 as if set forth fully herein.

154.    An actual and present controversy exists between Plaintiff and Defendant concerning their rights and respective duties.  Plaintiff contends that Defendant has violated her rights under federal and state anti-discrimination laws.  Plaintiff believes that the Defendant denies these allegations.  Declaratory relief is therefore necessary and appropriate.

<b>Injunctive Relief Allegations</b>

155.    Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 154 as if set forth fully herein.

156.    No plain, adequate, or complete remedy at law is available to the Plaintiff to redress the wrongs addressed herein.

157.    If the Court does not grant the injunctive relief sought herein, the Plaintiff will be irreparably harmed.

**VI.    Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

a.    declare that Defendant has violated Title VII, Title IX, and/or the Ohio Laws Against Discrimination;

b.    order such injunctive and equitable relief as will make Plaintiff whole for Defendant's violations, including reinstatement with full back pay and benefits, and pre- and post-judgment interest;

c.      award compensatory damages;

d.      award punitive damages;

d.      award reasonable attorneys' fees and costs; and

e.      grant such other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff demands a jury trial on all issues in this Complaint so triable.

Respectfully submitted,

/s/ Nicholas C. Vesha

Nicholas C. Vesha (0085760)
Vesha Law Firm, LLC
38 South High Street
Dublin, Ohio 43017
Office: (614) 376-0266
Fax:  (614) 467-3807
nicholas@veshalaw.com

/s/ John S. Marshall

John S. Marshall (0015160)
jmarshall@marshallforman.com
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, OH 43215
(614) 463-9790
Fax: (614) 463-9780

/s/ Matthew J. Mueller

Matthew J. Mueller
Wiand Guerra King PA
5505 West Gray Street
Tampa, Florida 33609
Office: (813) 347-5100
MMueller@wiandlaw.com
*Pro Hac Vice Motion Forthcoming*

COUNSEL FOR PLAINTIFF

27

**CERTIFICATE OF SERVICE**


It is hereby certified that a true and correct copy of the foregoing document was filed and served, via the Court's CM/ECF system on September 19, 2019.


/s/ Nicholas C. Vesha
Nicholas C. Vesha (0085760)
