**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH MITCHELL, Ph.D., | : | Civil Action No. 2:19-cv-04162 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Sarah D. Morrison |
| v. | : | |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| and, | : | |
| | : | |
| MICHAEL V. DRAKE, MD, | : | |
| | : | |
| and, | : | |
| | : | |
| BRUCE A. MCPHERON, Ph.D., | : | |
| | : | |
| and, | : | |
| | : | |
| ANIL MAKHIJA, Ph.D., | : | |
| | : | |
| and, | : | |
| | : | |
| WALTER ZINN, Ph.D., | : | |
| | : | |
| and, | : | |
| | : | |
| PAUL C. VELASCO, | : | **SECOND AMENDED COMPLAINT** |
| | : | |
| Defendants. | : | **JURY DEMAND ENDORSED HEREON** |

## I.    Preliminary Statement

1.    This action seeks back pay; compensatory and punitive damages; declaratory, injunctive and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, As Amended, and the Fourteenth Amendment to the United States

Constitution when the Defendants pretextually moved to terminate Plaintiff, and did in fact terminate Plaintiff, and remove her from her teaching duties with a motivating factor being her sex and in retaliation because of her making good faith complaints of discrimination prior to and after the Defendants issued disciplinary actions and investigations against Plaintiff for allegedly violating its conflict of interest rules. However, Defendants have allowed several similarly-situated male employees who had never opposed discrimination to engage in the same type of activity as Plaintiff without issuing any discipline or investigating them. Based on Defendants' actions, Plaintiff has suffered economic, emotional, and reputational injury as well as incurring substantial attorneys' fees defending herself in Defendants' internal disciplinary process.

## II.    **Jurisdiction and Venue**

2.    This action brings discrimination claims against Defendant The Ohio State University ("Ohio State") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., pursuant to a Charge Affidavit timely filed on October 25, 2018, with the Equal Employment Opportunity Commission, and a Right to Sue Letter was received less than 90 days before this action was commenced, pursuant to 42 U.S.C. §§ 1981a and 1983.  This action also brings claims of Title IX retaliation, in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq*., and  42 U.S.C. § 1983 claims against the Individuals Defendants for deprivation of Due Process and Equal Protection rights under color of law.

3.    This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); and 1343 (civil rights).

4.    Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202.

5.      Compensatory and punitive damages may be awarded under Title VII, 42 U.S.C. §
1981a and Title IX against The Ohio State University and both compensatory and punitive
damages may be awarded against the individual Defendants under 42 U.S.C. § 1983.

6.      Costs and attorneys' fees may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-
5(k); Title IX; 42 U.S.C. § 1988; and Fed. R. Civ. P. 54.

7.      Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1
because the claims arose in Franklin County, Ohio, where Defendant Ohio State locates its
headquarters.

**III.    Parties**

8.      Plaintiff Deborah Mitchell Ph.D. ("Dr. Mitchell") was born and raised in
Columbus, Ohio, currently residing in Dublin, Ohio. Dr. Mitchell is an undergraduate alumna of
Ohio State and was hired by her alma mater as a Clinical Associate Professor in the Fisher College
of Business in the Marketing & Logistics Department in March 2012—a dream job for her. Dr.
Mitchell taught both undergraduate business students and graduate students working towards their
Master's in Business Administration. Prior to the events which led to this Amended Complaint,
Dr. Mitchell performed her duties well, was well liked by co-workers, managers, and students, and
was not subject to any workplace discipline.  Dr. Mitchell was voted "Outstanding Core Professor"
by the graduating MBA class of 2017.

9.      Defendant The Ohio State University ("Ohio State") is a public research institution
with the third largest university campus in the United States and regional campuses throughout
Central Ohio; employs more than 500 full-time employees; is engaged in an industry – higher
education – affecting commerce; and is an employer covered by Title VII of the Civil Rights Act
of 1964. Ohio State receives federal financial assistance and is also covered by Title IX of the

Education Amendments of 1972, as amended. A unit of Ohio State is its business school, the Fisher College of Business.

10.     Defendant Michael V. Drake, Ph.D. ("Defendant Drake") became the fifteenth president of Ohio State University in June 2014, and he remains president as of the filing of this amended complaint. Defendant Drake served as president during the relevant period from which Dr. Mitchell's §1983 claims arose.

11.     Defendant Bruce A. McPheron, Ph.D. ("Defendant McPheron") is the current executive vice president and provost of Ohio State University. Defendant McPheron held both these positions during the relevant period from which Dr. Mitchell's §1983 claims arose.

12.     Defendant Anil Makhija, Ph.D. ("Defendant Makhija") was appointed dean of the Fisher College of Business in 2014, and he remains dean as of the filing of this amended complaint. Defendant Makhija served as dean during the relevant period from which Dr. Mitchell's §1983 claims arose.

13.     Defendant Walter Zinn, Ph.D. ("Defendant Zinn") is a professor and the current associate dean for graduate students and programs at the Fisher College of Business. Defendant Zinn held multiple administrative positions during the relevant period from which Dr. Mitchell's §1983 claims arose, including department chair of Marketing & Logistics, as well as his current role of associate dean.

14.     Defendant Paul C. Velasco ("Defendant Velasco") is no longer employed with Ohio State University. Defendant Velasco served as executive director of Executive Education at the Fisher College of Business from about April 2016 through March 2018. Defendant Velasco served under this role during most of the relevant time period from which Dr. Mitchell's §1983 claims arose.

15.    Defendants Drake, McPheron, Makhija, Zinn, and Velasco will collectively be referred to as the "Individual Defendants" as Dr. Mitchell is seeking injunctive and declaratory relief against these defendants in their official capacities, and she is seeking money damages against these defendants in their personal capacities.

## IV.    <u>Facts - Background</u>

16.    Title IX-related allegations and violations have plagued The Ohio State University for years.

17.    In 2010 the U.S. Department of Education's Office for Civil Rights launched a compliance review of Ohio State's policies involving Title IX.

18.    In May 2014, the Education Department identified OSU as one of 55 institutions facing a federal inquiry for potential Title IX violations over their handling of sexual violence cases.

19.    In 2015, the Office of Sexual Civility and Empowerment ("SCE") opened as part of OSU's stated commitment to Title IX compliance.

20.    The SCE closed three years later, after complaints of mismanagement and potential re-traumatization of survivors emerged. Ultimately an audit found that the SCE, designed to support sexual assault survivors, failed to report 57 potential felonies to law enforcement as legally required during the three years it was open.

21.    In May 2019 OSU created the Office of Institutional Equity ("OIE") to replace the SCE and improve upon OSU's stated commitment to Title IX compliance.

## <u>A History of the Toxic Environment at Fisher College of Business</u>

22.    In the early 1990s, every female faculty member in the Fisher College of Business signed a letter to the dean charging a hostile work environment.

23.     Almost a quarter of a century later, the environment has not changed.

24.     In fact, in the fall of 2014, when Fisher College of Business could no longer ignore the relentless toxicity in the workplace, it informally audited its culture and finances. Two professors, Dr. Roy Lewicki and Dr. Joseph Alutto, interviewed over 70 individuals and issued their findings in a January 10, 2015 report titled "Resource Level Setting and Culture Audit for the Fisher College of Business," hereinafter referred to as the "Audit."

25.     The Audit reported that many staff and faculty had concerns about "appropriate values being reflected in decision-making processes in the college, inadequacies of accountability that are reflected in administrative decision making and inappropriately abusive behaviors colleague to colleague."

26.     The Audit recommendations included the need to "[i]nitiate a more comprehensive cultural audit, performed by trusted professionals from outside the college, to ensure that behaviors and underlying decision-making systems reflect the college's cultural values;" and to "create and value processes through which faculty and staff can continue to speak up or voice suggestions . . . without fear of retribution or derision."

27.     But the toxic environment did not improve, and on June 10, 2015 Dr. Mitchell responded to a college-wide Climate and Culture survey by stating, "This is the most toxic environment I have ever worked in. Every week I hear about or (more usually) directly witness behavior that is illegal, unethical, inappropriate or all of the above. The vast majority of these behaviors / actions are undertaken by "leaders" (those who have power…people who have been given power). I have no confidence that the senior leadership of this college can or will turn around this situation. In fact, I'm wondering why I took the time to fill out this survey. I have taken a big risk in filling it out, when I know that the likelihood of good coming from it is near zero. You have

my email identifier, so I would not be surprised if in fact this is not a confidential research study and that in fact, I will suffer some kind of retribution for being honest here. One thing is clear... I didn't fill it out so that we could get free ice cream."

28.　　The toxic environment did not improve for female students.  In the fall of 2016, one of Dr. Mitchell's then-current undergraduate students was grabbed and kissed by a senior lecturer at Fisher. This female student was applying for the prestigious "Pace Setter Award," which is given annually to the college's top students on the bases of academic performance and demonstrated leadership ability. In order to be considered for the award, a student needs to have a sponsor, and this senior lecturer was her sponsor. At a meeting alone in his office, this senior lecturer closed his office door and blocked her exit, approached her, grabbed both of her shoulders, and open-mouthed kissed each cheek. He then asked, "isn't that how you [omitted] girls do it?" The student was able to get away, however, she dropped out of consideration for the Pace Setter Award.

29.　　The toxic environment did not improve for female staff. One faculty member witnessed a senior professor (the "Senior Professor") berating an unmarried female staffer by telling her that she, "should not be having sex outside of marriage as a single woman because she was sinning in the eyes of God and it would destroy her soul."

30.　　The toxic environment at Fisher was the result of a combination of inaction and active perpetuation by those in charge including but not limited to the Individual Defendants.  Prior to graduation in 2019, one of Dr. Mitchell's MBA students (different from the student above) complained to her academic counselor about the discriminatory and abusive behavior by Senior Professor. After filing her complaint, this student was later called on the phone by a newly hired professor who advised the student that she should wait until after graduation to file her complaint,

and that she should "just keep your head down and do everything [Senior Professor] assigns. You have to understand that he's very powerful. I don't have tenure and Senior Professor votes on whether I have a job."

31.     Defendant Makhija and the administration purported to be concerned about the toxic environment but failed to fully investigate the allegations or implement any changes.

32.     In fact, the annual Climate and Culture surveys that Defendant Makhija issued in 2015-2017 showed no improvement to the culture and incidents of harassment. Defendant Makhija discontinued these surveys after 2017.

33.     A female 2019 MBA graduate strongly recommended to a current Fisher professor that, during orientation, there be at least one session on diversity and inclusion. This recent graduate said this would help foster empathy and understanding toward female and under-represented minority students.

34.     The professor dismissed her suggestion and told her "we don't have time for that."

## Dr. Mitchell versus the toxic environment

35.     During her first full-week of employment in June 2012, Dr. Mitchell was warned by female faculty of which men to avoid.

36.     Dr. Shashi Matta ("Dr. Matta") was a similarly-situated male to Dr. Mitchell, holding a clinical faculty appointment in the same department.  Dr. Matta was one of the abusive male faculty members Dr. Mitchell was warned about. She was told, "Never be alone in the same room as [Dr. Matta]. If you're standing in front of the elevator and he walks up – and then the elevator doors open – do not get on the elevator with him."

37.     Upon knowledge and belief, Dr. Matta's wife fled their marital home, and the country, to get away from Dr. Matta. Dr. Matta's wife delivered a letter to Defendant Zinn (among

others within the administration) detailing Dr. Matta's abusive behavior and that she felt like a "hostage" in their home. This letter became infamous among the Fisher faculty and was referred to colloquially as "Shashi's hostage letter."

38. Defendant Zinn's response to this letter was "I know this is troublesome but he is useful to me."

39. By the end of her first semester in 2012, at least three undergraduate female students complained about Dr. Matta for his various verbal abuses. He would target female students and brought many to tears. Professor Matta called the female students "stupid cows," with "small brains." He was so abusive that students began secretly recording his classes.

40. Dr. Mitchell was told by others in her department that Dr. Matta had also behaved inappropriately with students. In one case, Dr. Mitchell learned from one senior faculty member whose office was near Dr. Matta's, that on one occasion Dr. Matta kept a student in his office for a nearly three-hour long, closed-door meeting, and the faculty member overheard sounds suggestive of sexual activity coming from inside Dr. Matta's office. Soon after this incident, the student would drop out of school.

41. Dr. Mitchell learned that an undergraduate student began living with Dr. Matta, and Dr. Matta would loan this student money.

42. Dr. Mitchell learned of yet another student, this time a graduate student, who Dr. Matta hired to clean his home. Dr. Matta made the student clean his toilets with a toothbrush. This student dropped out of school.

43. Disturbed by Dr. Matta's various behaviors and complaints she heard from her students, Dr. Mitchell reported what she knew to Defendant Zinn, who was her Department Chair at the time. Upon knowledge and belief, several parents of Fisher students also complained to

Defendant Zinn about discriminatory and harassing behavior by Dr. Matta, but Defendant Zinn failed to take meaningful action.

44.    Defendant Zinn dismissed the parents' complaints and said, "The problem with these whiny girls is that they were coddled by their parents."

45.    Frustrated with Defendant Zinn's lack of action regarding these complaints, Dr. Mitchell went to Dr. H. Rao Unnava to report Dr. Matta's issues and Defendant Zinn's lack of interest in them. No action resulted from Dr. Mitchell's discussion with Dr. Unnava.

46.    Despite his continued pattern of verbally abusing students and engaging in inappropriate conduct, Dr. Matta received a significant job promotion and accompanying increase in compensation in November 2013.

47.    In January 2014, Dr. Matta was elevated to a senior administrative position, "Faculty Director of the Full-Time MBA Program," to be served in conjunction with continued teaching responsibilities, in recognition for his "strong dedication to student success through teaching, service and industry outreach."

48.    In February 2015, Dr. Matta was promoted by Defendant Makhija again, to a new role with even broader administrative reach in addition to continued teaching responsibilities.

49.    Dr. Matta's promotion is but one example of Defendant Ohio State and the Individual Defendants' disparate treatment of male faculty—even those accused of disturbing misconduct.

50.    In April 2014, Dr. Ken Boyer, a faculty director within Fisher's MBA working professional programs, approached Dr. Mitchell for the purpose of accommodating a MBA student regarding a core course. A "core" course is designed for a full lecture hall of students (*e.g.*, 60 students per section) and is a non-elective, mandatory class required for graduation. This student

was a prominent physician at the OSU Wexner Medical Center enrolled as a working professional MBA student, who claimed that the course as scheduled was not convenient for him.

51.     Dr. Boyer asked Dr. Mitchell to teach this core course to this one student as an independent study.

52.     Dr. Mitchell protested the request, and expressed her concern that converting a core course into independent study was against school policy. She underscored the inequity to all other students who must attend core courses as scheduled by the college. Dr. Mitchell also pointed out that these core courses were not designed to be taught to a single student, and that in order for her to do so, she would have to completely redesign the course for this one person.

53.     Dr. Mitchell also notified Defendant Zinn and Dr. Greg Allenby of her concern, and she sought support for her position that such activity would violate academic integrity.

54.     Despite her denials and rejection of Dr. Boyer's request, Dr. Mitchell was nevertheless forced to take on this assignment. Dr. Mitchell was not paid for her work on this matter despite it being outside the scope of her regularly assigned teaching duties.

55.     In contrast to Defendant's treatment of Dr. Mitchell, a female professor, Ohio State's Fisher College of Business pays its male professors for any additional teaching duties not a part of his job description. Dr. Itzhak Ben-David ("Dr. Ben-David"), in a sworn deposition, testified that he is paid by Fisher about $833.33 per hour for additional teaching duties. Dr. Ben-David explicitly discusses that this type of teaching is "voluntary," "not part of [his] job description," and "with no special prep time." Dr. Ben-David also testified that the "University wants [him] to do that so they compensate [him]."

56. In Dr. Mitchell's case, not only was her assignment forced upon her over her objections, but it also entailed significant prep time and weekly instruction commitment. Dr. Mitchell was not compensated.

57. Throughout 2014, Dr. Mitchell met with Dr. Unnava about her treatment as compared to Dr. Matta. Dr. Unnava recommended that Dr. Mitchell not file anything officially with Human Resources and convinced Dr. Mitchell not to bring up any gender discrimination issues. Instead, he told Dr. Mitchell he would "look into things."

58. In the spring of 2014, a student representative of the Fisher Graduate Women in Business ("FGWIB") approached Dr. Mitchell seeking advice on how to effectively report the hostile classroom issues they were experiencing. This student told Dr. Mitchell that the female students were experiencing verbal abuse, sexist comments, and being treated differently than the male students. She told Dr. Mitchell that the perpetrators were both male professors and male students.

59. Dr. Mitchell stressed to the student that the FGWIB should conduct empirical research and collect data to document and report to the administration the sex discrimination and hostile environment these female graduate students were experiencing.

60. The FGWIB hosted two focus group sessions and interviewed about 35 female students. Once they collected the data, on or around April 27, 2015, a group of 7-8 female students presented their findings to the administration, including Defendant Makhija and Dr. Matta. Soon after their meeting with Defendant Makhija, the FGWIB then gave this presentation to Professors David Greenberger and Dr. Unnava.

61. This FGWIB presentation included a detailed proposal and timeline for how to fix these issues by utilizing a 4-phase model. Not only did Ohio State fail to implement any of these

proposals, Dr. Mitchell would later learn that most female professors were not even aware of the existence of this presentation.

62.     Between January and April 2018, Dr. Mitchell volunteered to be part of a task force initiated by Defendant Makhija, for the study and redesign of the Fisher Culture and Climate Annual Survey. Essentially, this is a faculty and staff satisfaction survey, and the task force was charged with restructuring the survey questions.

63.     Defendant Makhija blamed the questions, not the toxic environment, for the poor results from the survey.

64.     Dr. Mitchell was active and vocal throughout the task force meetings during this time period. The task force learned that, every year, Defendant Ohio State removed all of the comments naming a specific wrongdoer. This became a highly contentious issue. Dr. Mitchell took the position that the entire purpose of these surveys is to give the respondents a voice, to improve the culture by allowing their feedback. Fisher administration's position was that these surveys were not the time and place for such complaints and that such information is, and will be, "scrubbed."

## The Boys Club at Executive Education

65.     Ohio State Fisher College of Business has a unit within the college known as Fisher Executive Education ("Exec Ed"), which focuses on the teaching of executive-level individuals. For its teaching, Exec Ed utilizes contracts with Fisher faculty to teach executives on a voluntary basis. Exec Ed teaching is not part of a professor's employment duties, and compensation for his or her voluntary involvement is supplemental to the professor's salary.

66.     Dr. Mitchell did volunteer to teach and participate with Exec Ed.

67.     Dr. Mitchell found Exec Ed to be toxic and dysfunctional due to the behavior and leadership of John Rensink, Marty Schwalbe, and Defendant Paul Velasco.

68.     Mr. Rensink is a program manager within Exec Ed, although he previously held other positions within Fisher.

69.     Dr. Mitchell (and multiple staffers) consistently reported Mr. Rensink's harassment of the Exec Ed staff to Mr. Schwalbe, who at the time was the interim director of Exec Ed and Mr. Rensink's superior.

70.     For example, Mr. Rensink would sit down in the offices of female staffers and discuss their physical appearance. One day he would tell them how beautiful they looked; on another day, he would tell them they "weren't as pretty" as they were the day before.

71.     A female staffer frequently complained to Mr. Schwalbe about Mr. Rensink's harassment and said that her "stomach dropped every time she saw [Mr. Rensink] coming down the hall."

72.     Despite repeated complaints about Mr. Rensink to Mr. Schwalbe and Mr. Bill Watercutter, the most senior Human Resources staff member in Fisher College of Business, nothing was ever done. Mr. Rensink was "promoted and protected" by Mr. Schwalbe, and later by Defendant Velasco who would become the permanent executive director of Exec Ed.

73.     In addition to Dr. Mitchell's reporting of Mr. Rensink's harassment, she reported other serious issues such as Mr. Rensink's unauthorized changing of teacher evaluations. In the Exec Ed program, Mr. Rensink had the ability to manually change the teacher evaluations, something not possible in SEI protocol for other departments.

74.     Dr. Mitchell reported this to Mr. Schwalbe, then Mr. Rensink's direct supervisor, but Mr. Schwalbe ignored the issue.

75. Dr. Mitchell also reported to Dr. Unnava in early 2015 that Exec Ed employees were unhappy, and that the toxic and stressful work environment was increasing the likelihood that employees would leave.

76. Dr. Mitchell was proven correct; during 2015, 2016 and 2017, Exec Ed experienced significant female staffing turnover.

77. One female Exec Ed employee blames the hostile work environment created by Mr. Rensink to have been so stressful that she suffered hair loss and negative effects to her menstrual cycle. This employee told Dr. Mitchell that she sought medical attention.

78. This employee reported his unacceptable behavior to Mr. Watercutter, but no action was taken. She subsequently resigned from Fisher in October 2015 to escape the hostile environment.

79. About six months later Defendant Velasco would be hired as the new executive director of Exec Ed. Soon after arriving, Defendant Velasco told Dr. Mitchell as well as Fisher Exec Ed staff and Fisher Executive MBA students, he would "save" Exec Ed, and everything was "going to be different."

80. However, despite the turnover, the innumerable complaints, and Defendant Velasco's assumption of leadership, Mr. Rensink's harassing behavior continued without repercussions.

81. Defendant Velasco was overheard belittling a female staffer telling her that she "didn't have any insight underneath all that hair." This staffer complained repeatedly to Human Resources about Mr. Velasco's discrimination and harassment against her that she requested a sit-down meeting between her, Mr. Watercutter and Mr. Velasco, but both men refused.

82.     Defendant Velasco's harassment of this employee escalated, and his behavior became increasingly erratic to the point where the employee feared for her life. This staffer journaled over forty pages – single spaced – documenting over two years of harassment and toxic work environment by Mr. Rensink and Mr. Velasco, and she reported her fears to every staff member, multiple professors, and Mr. Watercutter, in the event "[Mr. Velasco] comes to the office next week and murders [her]."

83.     This staffer was upset that no action was taken regarding her voluminous complaints. During her exit interview, Mr. Watercutter told the staffer he "gave the complaints to [Defendant] Makhija and it's up to him what happens with them."

## Dr. Mitchell's 969-Day Termination

84.     Dr. Mitchell earned her Bachelor of Science in business administration from The Ohio State University in 1980. Dr. Mitchell earned her Ph.D. in Business from the University of Chicago Booth School of Business, with concentrations in Marketing and Behavioral Science in 1991. She earned a Master of Business Administration in 1985.

85.     Prior to working for Defendant Ohio State, Dr. Mitchell served as a faculty member at the University of Wisconsin-Madison, the University of Chicago, Northwestern University, Stanford University, Temple University, the University of Pennsylvania, and Cornell.

86.     Dr. Mitchell has served as the Executive Director of the Center for Brand and Product Management at the University of Wisconsin-Madison.

87.     Prior to beginning her career with Ohio State, Dr. Mitchell served as the Founder and President of her own private consulting company, Cypress Consulting Ltd., which is now CypressTree Corp.

88.     Dr. Mitchell's business activities were well known to Ohio State when it hired her, and her success in the private business world was part of what made Dr. Mitchell an attractive candidate to Ohio State.

89.     Ohio State and the Individual Defendants were aware that Dr. Mitchell would continue to provide services for her consulting business while being employed with Ohio State.

90.     When Dr. Mitchell was hired by Ohio State, she was expressly told that she could continue her private business pursuits, and was in fact encouraged to do so.

91.     Moreover, Ohio State's Faculty Paid External Consulting policy from the Office of Academic Affairs states, "Participation by faculty members of The Ohio State University in activities of government, in industry and in other private institutions generally serves the academic interests of the university," and, "Faculty members, including administrations with faculty appointments, **are encouraged to engage in paid external consulting** to the extent that these activities are clearly related to the mission of the university and the expertise of the faculty member, provide direct or indirect benefits to the university, and do not entail a conflict of interest as defined in the Conflict of Interest Policy." (Emphasis added).

92.     It is commonplace for Ohio State Fisher College of Business faculty members to engage in paid external consulting, and in many cases maintain their own private businesses while working for the Defendant. In some instances, Ohio State employees earn hundreds of thousands, or millions of dollars per year performing external work separate from their academic duties with Ohio State.

93.     Based on knowledge and information, it is commonplace for Defendant Ohio State and the Individual Defendants to allow Fisher College of Business faculty members to engage  in

private business arrangements for clients that the faculty member also provided services for in the scope of their duties for Ohio State.

## Executive Education for the Ohio Department of Medicaid

94.     During the period of July 2014 through November 2014, twenty-five employees from the Ohio Department of Medicaid ("ODM") enrolled and participated in an Exec Ed program. This program took place on Ohio State's campus and taught the employees business concepts for their professional development.

95.     The primary role of Exec Ed is to teach individual enrollees (in this case the 25 ODM employees) business education. Put another way, Exec Ed's primary focus is teaching, and teaching individuals, as opposed to developing and executing specific solutions for an entire organization.

96.     Dr. Mitchell served as the Academic Director for the 2014 ODM educational program. Dr. Mitchell oversaw the creation of the program's educational curriculum, just as any professor would develop a syllabus for her course. Along with two other Fisher faculty members, Dr. Mitchell was an instructor for several of the sessions that ODM employees attended.

97.     The ODM enrollees were impressed with Dr. Mitchell's business acumen and experience.

98.     In November 2014, the Exec Ed program with ODM was completed, and Dr. Mitchell continued with her normal teaching and other academic duties for Defendant.

99.     As part of the Exec Ed program, Dr. Mitchell travelled to ODM's location in downtown Columbus, Ohio, and met with all 25 employees for two brief follow-up sessions on about June 16, 2015 and July 16, 2015.

100.     Dr. Mitchell attended those sessions in her role as Academic Director. The attendees reported on their progress and how they had attempted to apply the concepts they learned the year before.

### Private Strategic Consulting for the Ohio Department of Medicaid

101.     Sometime between July 16, 2015 and July 23, 2015, ODM's then Chief of Staff Jennifer Demory approached Dr. Mitchell regarding its organizational need for consulting services tied to strategic execution.

102.     Ms. Demory requested that Dr. Mitchell's company CypressTree Corp. create a proposal for a multi-year embedded consulting project, where Dr. Mitchell and her firm would work onsite at ODM, and ODM partner locations, and provide consulting services to ODM.

103.     The work that ODM was seeking from Dr. Mitchell's company was substantially different from the educational program delivered by Exec Ed to ODM's employees in 2014.

104.     Exec Ed does not provide the types of services ODM was seeking. What ODM sought was an embedded consulting engagement and Exec Ed does not offer embedded consulting engagements. Exec Ed offers educational programs, and this was not a business educational program.

105.     Exec Ed does not, and cannot, provide the types of consulting services that ODM was requesting in the summer of 2015.

106.     Exec Ed would not have lost, and in fact did not lose, any business revenue or opportunity based on CypressTree's consulting with ODM.

107.     The contract between ODM and CypressTree was drafted entirely by the state of Ohio, and ODM did not allow any modifications from CypressTree.

108.     The contract between ODM and CypressTree was approved by a specific process under the State of Ohio's Controlling Board which highlights the unique services CypressTree provided. Vendor purchases by government agencies (such as ODM) are typically procured by competitive bids, however, there is an exception and a waiver of competitive bids when the agency asserts the need of services which only one vendor is capable of providing (*i.e.*, "sole source"). The Controlling Board defines "sole source" as "only one supplier that can provide the supplies or services desired by the agency."

109.     In other words, ODM knew it needed services that only CypressTree could provide. The fact that ODM previously had employees attend executive-level business classes at Exec Ed reiterates that ODM knew Exec Ed's limitations and that Exec Ed could not provide these services. ODM, not CypressTree, made this determination.

110.     The State of Ohio Controlling Board ultimately approved ODM's request on or about August 31, 2015.

111.     The work that CypressTree performed for ODM included: twenty-two months in duration; approximately half a dozen job-site locations; interaction with and support of approximately 700 employees; a comprehensive assessment of the organization as a whole; the implementation of the organization's strategy for organizational change; and, the development of other confidential work products. These work products and related consulting services were designed to support organization-wide execution of ODM's strategy.

112.     There was no substantive overlap or similarity between the courses Dr. Mitchell taught at Exec Ed for ODM employees in her capacity with Ohio State and the consulting services she performed for ODM through CypressTree.

113.    In 2014 while teaching executive education for the ODM employees in her capacity with Defendant, Dr. Mitchell only worked on Ohio State's campus. While performing services for ODM in her personal capacity, Dr. Mitchell only provided services at ODM headquarters and ODM partner sites.

### The "04 Investigation"

114.    Ohio Administrative Code § 3335-5-04 details the rules by which Ohio State must abide during a complaint and investigation against its faculty members.

115.    Pursuant to OAC §3335-5-04, three allegations of grave misconduct were levied against Dr. Mitchell, namely: (I) she violated the Faculty Conflict of Commitment Policy; (II) she violated the Faculty Financial Conflict of Interest Policy; and (III) she violated the "no solicitation" clause in her contracts with Exec Ed (the "04-Complaint").

116.    There was no finding of grave misconduct as to allegations (I) and (III). However, as to allegation (II), Dr. Mitchell was found by Defendant Ohio State and the Individual Defendants to have purportedly violated the Faculty Financial Conflict of Interest Policy which rose to the level of grave misconduct, and under that basis, she was ultimately terminated by Ohio State.

117.    The 04-Complaint against Dr. Mitchell was submitted to Defendant Makhija on January 3, 2017, and nine hundred sixty-nine (969) days later she was terminated by the Ohio State Board of Trustees on August 30, 2019.

118.    Defendant Ohio State repeatedly and flagrantly violated the rules in OAC §3335-5-04 during these 969 days. The facts below will detail this process (the "04 Investigation").

119.    In April 2016, Defendant Ohio State hired Defendant Paul Velasco as the Carol L. Newcomb-Alutto Executive Director of Exec Ed, an endowed position.

120.     On May 9, 2016, former Interim Executive Director and former Managing Director of Exec Ed, Martin Schwalbe e-mailed Defendant Velasco a defamatory and misleading message alleging Dr. Mitchell violated contracts she had signed with Exec Ed, and purposely misled one of her clients regarding the nature of the services that she was providing to ODM.

121.     Dr. Mitchell, through CypressTree, continued to provide services to ODM for the remainder of the year, and her contract was extended with ODM based on her company's performance.

122.     Despite Defendant Velasco having Mr. Schwalbe's email on May 9, 2016, Defendant Velasco would not formally file his 04-Complaint until two hundred thirty-nine (239) days later on January 3, 2017.

123.     At no time during 2016 did anyone at Ohio State present Dr. Mitchell with any concerns regarding her work with ODM.

124.     On January 3, 2017, Defendant Velasco submitted to Ohio State Fisher College's Dean Anil Makhija his 04-Complaint alleging that Dr. Mitchell engaged in "grave misconduct" and as such was subject to Ohio State's Rule 3335-5-04.

125.     The 04-Complaint stated that Dr. Mitchell violated Ohio State Policy in regards to the work she was performing for ODM. The thrust of Defendant Velasco's complaint was that Dr. Mitchell unfairly competed with Defendant by engaging with ODM in her private capacity.

126.     No services that Dr. Mitchell performed for ODM competed in any way with services that Ohio State offers to outside entities.

127.     As part of the investigation, Ms. Jennifer Demory, ODM's chief of staff, prepared a letter wherein she affirmatively stated that Dr. Mitchell did not solicit any business from ODM.

Ms. Demory continued that the business in which Dr. Mitchell had been engaged was materially different from the work that Defendant Ohio State performed for ODM in 2014.

128.    Then-ODM Executive Director John McCarthy also provided a letter to Defendant maintaining ODM's position that Dr. Mitchell did not solicit business from it, or engage in competitive services to those that ODM could have reached out to Defendant Ohio State to provide.

129.    Pursuant to 3335-5-04(B)(5), Defendant Makhija sent the 04-Complaint to Dr. Mitchell's department chair, Dr. Tom Goldsby, for initial review. OAC § 3335-5-04(C) required Dr. Goldsby to review the 04-Complaint within 14 days and determine whether there was enough probable cause to refer the matter back to Defendant Makhija.

130.    Dr. Goldsby would later provide a signed declaration to the faculty hearing committee stating that he suffered acute appendicitis and was hospitalized during this 14-day period, and that he felt urgency to complete his review under the rules.

131.    Once he was able to review the full scope of documentation regarding Dr. Mitchell's 04 Investigation, Dr. Goldsby stated in his signed declaration, "it is my opinion that Dr. Mitchell did not violate the OSU Faculty Financial Conflict of Interest policy. I do not believe that the services performed by CypressTree competed with those offered – **or could be offered** – by Fisher Executive Education." (Emphasis added).

132.    But in 2017 as the 04-process continued up the chain, Dr. Mitchell tried to fight the allegations against her. Dr. Mitchell met with Defendant Makhija on February 20, 2017 and, in response to the allegations against her, provided him with two large binders containing substantial documentation, neatly organized with a table of contents, as well as coreboard exhibits (the "Printed Materials"). Dr. Mitchell provided these materials in hard-copy form because they contained her trade secrets and she took steps to avoid having her intellectual property  destroyed

by digital copies in the public record. These materials were clearly labeled as containing trade secrets, a fact she addressed directly with Defendant Makhija.

133.     As a follow-up to the February 20, 2017 meeting, Dr. Mitchell emailed a short letter to Defendant Makhija on March 13, 2017 and included a small number of tables in response to the allegations.

134.     Dr. Mitchell was not provided any additional information regarding the 04 Investigation's process until October 23, 2017, when Defendant Makhija informed her in person that he was turning the investigation over to the college investigation committee pursuant to OAC §3335-5-04(E) (the "Investigation Committee").

135.     The Investigation Committee was comprised of four faculty members: Dr. Raymond Noe, Dr. Itzhak Ben-David, Dr. Isel Erel, and Dr. Johnny Rungtusanatham.

136.     Dr. Mitchell did not hear from Ohio State regarding the issue again until February 26, 2018, when she received an e-mail from Dr. Noe.

137.     In the e-mail Dr. Noe informed Dr. Mitchell that the Investigation Committee had begun its investigation and he asked Dr. Mitchell for a specific document. Dr. Mitchell informed Dr. Noe that she had previously provided his requested documentation to Defendant Makhija which was contained in her Printed Materials.

138.     Dr. Noe indicated that he did not possess the document and that her file contained only a two or three page letter with a few charts attached.

139.     Defendant Makhija did not deliver the Printed Materials to the Investigation Committee. This led Dr. Mitchell to take it upon herself to print an additional four copies of the Printed Materials, one for each committee member. Dr. Mitchell had by then spent hundreds of

dollars for five copies of the Printed Materials, and the footer of each page contained a large notice and disclaimer of her protectable trade secret rights.

140.     Dr. Mitchell believed this substantial disclosure of documents complied with Dr. Noe and the Investigation Committee's request. This disclosure included two pages that Dr. Mitchell redacted, but she openly and clearly identified this redacted material in her Printed Materials' table of contents.

141.     The Investigation Committee never clarified its request to Dr. Mitchell that it sought redacted material. Dr. Mitchell would later testify that had the committee members asked her, she would have provided it to them.

142.     Despite this, the Investigation Committee found "clear and convincing" evidence that Dr. Mitchell's actions were "flagrant, egregious and willful."

143.     Dr. Noe was not clear about the documentation he was seeking.  Before Dr. Mitchell understood what Dr. Noe was seeking, committee member Dr. Ben-David contacted ODM and informed the agency that Ohio State was conducting an internal investigation and requested documents pertaining to Dr. Mitchell and CypressTree.

144.     Ohio Administrative Code §3335-5-04(E)(2) explicitly states that while the committee may obtain relevant information from other people it "shall protect the confidentiality of the proceedings."

145.     Dr. Mitchell asked Defendant Makhija to have Dr. Ben-David removed from the Investigation Committee due to his flagrant violation of her trade secrets and the Investigation Committee's breach of "04" code. Dr. Mitchell's request was denied.

146.     Dr. Mitchell would later learn that Dr. Ben-David was Defendant Makhija's hand-picked nominee and that he had volunteered for the Investigation Committee.

147.    As a result of her own public records requests, Dr. Mitchell would later learn from the Investigation Committee's emails that one committee member questioned Dr. Ben-David's actions, and Dr. Ben-David responded with "I hope it [sic] didn't mess up," and, "I hope it's OK that I emailed him. Maybe I should have consulted with the group first."

148.    The Investigations Committee recommended that Dr. Mitchell be found guilty of "grave misconduct" and recommended immediate termination on July 12, 2018.

149.    Despite the Investigation Committee's analysis that it did not matter whether Dr. Mitchell "intentionally or incidental[ly]" omitted the two pages, it found the issue "troubling" and led to the ultimate finding of clear and convincing evidence of willful and flagrant behavior.

150.    Defendant Makhija affirmed the decision on August 17, 2018.

151.    In his letter of August 17, 2018, Defendant Makhija barred Dr. Mitchell from teaching at Ohio State's Fisher School of Business, while informing her that she was still to perform her other regular duties. He did this less than two business days prior to the beginning of the academic semester.  Dr. Mitchell was scheduled to teach hundreds of MBA students, including most of Dr. Matta's course load following his abrupt and unexpected departure from Ohio State, and had already worked with most of the MBA students in a teaching capacity during their orientation sessions. Defendant Makhija offered no rationale for barring Dr. Mitchell from teaching her students.

152.    In addition, his action violated the University's 3335-5-04(A)13 rule, only the provost can temporarily and immediately reassign a faculty member in the context of a 3335-5-04 investigation, and only if the provost determines that (1) the faculty member poses a clear and present danger to persons or property, or (2) the complaint against the faculty member involves allegations of nontrivial financial fraud.

153.    A number of MBA students who had been assigned to Dr. Mitchell's classes were told false and defamatory reasons why she would not be teaching, ranging from "she was fired" to "she had an opportunity to do high-priced consulting, and chose to pursue that opportunity rather than teach you."

154.    Dr. Mitchell appealed Defendant Makhija's judgment for immediate dismissal to Provost Bruce McPheron on September 5, 2018.

155.    On November 19, 2018 Provost McPheron affirmed Defendant Makhija's decision. Dr. Mitchell appealed Provost McPheron's decision, and attended and presented evidence at a hearing on April 29, 2019.

156.    Dr. Mitchell was denied the opportunity to cross-examine, confront, or question the complainant/Defendant Paul Velasco, Martin Schwalbe, or any of the witnesses against her at the April 29, 2019 hearing.

157.     At the hearing, Dr. Mitchell presented evidence that she did not engage in misconduct consisting of three signed declarations, two letters, three live witnesses and a substantial written submission. Ohio State did not call a single witness and, in fact, did not present any evidence against Dr. Mitchell at the hearing.

158.    To support a finding of grave misconduct, Ohio State's own policy requires proof with "clear and convincing evidence."

159.    However, despite not calling a single witness nor presenting any evidence against Dr. Mitchell in the face of three witnesses and documentary evidence contradicting Ohio State's proof of the alleged violation, Ohio State still moved ahead with a recommendation for termination.

160.    The next step in the 04 Investigation process was for Defendant Drake to determine whether he would recommend a finding of grave misconduct to the Board of Trustees. Then-department chair Thomas Goldsby requested an interview with Defendant Drake to discuss Dr. Mitchell's innocence. However, Dr. Drake refused to meet with Dr. Goldsby.

161.    Moreover, Professor Lewicki wrote a letter to Defendant Drake in support of Dr. Mitchell's innocence and wrote, "I unequivocally state that I do not believe that [Dr. Mitchell's] conduct rises to the judgment of either 'willful' or 'grave' misconduct. I believe the [Defendant] has made an unsupportable mistake in recommending her termination." Defendant Drake never responded to Dr. Lewicki's communications.

162.    By letter dated July 31, 2019, Defendant Drake recommended to the Board of Trustees termination of Dr. Mitchell's clinical appointment and employment with Ohio State.

163.    On August 30, 2019, the Ohio State Board of Trustees approved President Drake's recommended termination of Dr. Mitchell's employment with the university.

164.    The duration of Dr. Mitchell's 04 Investigation lasted 969 days which far exceeded the rules of the Ohio Administrative Code.

165.    The 04 Investigations for male professors are significantly shorter, such as Dr. Giorgio Rizzoni's recent investigation that began in December 2017 and ended in March 2018, a period of only four months.

166.    Based on knowledge and information, several other male Ohio State Fisher College of Business professors engage and have engaged in substantially similar private business conduct as Dr. Mitchell.

166.    These employees, all of whom were subject to the same policies Dr. Mitchell allegedly violated, include but are not limited to the following: Joseph Alutto (Distinguished Professor, Emeritus, Management and Human Resources); Marc Ankermann (Senior Lecturer,

Management and Human Resources); Bruce Barnes (Senior Lecturer, Accounting and Management Information Systems); Itzhak Ben-David (Professor of Finance; Neil Klatskin Chair in Finance and Real Estate; Academic Director, OSU Center for Real Estate); W.C. Benton (Edwin D. Dodd Professor of Management, Professor of Operations and Supply Chain Management); Charles Buchanan (Senior Director, Fisher Leadership Initiative; Senior Lecturer, Management and Human Resources); James (Jay) Dial (Clinical Professor (Management and Human Resources); Greenberger, David (Associate Dean, Staff, Human Resources and Administration (through 2017); Professor (Management and Human Resources); Richard Guba (Senior Lecturer, Management Sciences); Robert Heneman (Faculty Emeritus, Management and Human Resources); Lawrence Inks (Clinical Associate Professor, Management and Human Resources); Scott LaCross (Senior Lecturer, Marketing & Logistics); Douglas Lambert (Professor, Marketing & Logistics); Michael Leiblein (Associate Professor, Management and Human Resources); Roy Lewicki (Co-Academic Director, BRIGHT New Leaders for Ohio Schools Program; Irving Abramowitz Memorial Professor Emeritus (Management and Human Resources); Defendant Anil Makhija (Dean, Fisher College of Business; John W. Berry Sr. Chair in Business); Shashi Matta (Faculty Director of MBA Programs; Clinical Associate Professor, Marketing & Logistics); Waleed Muhanna (Professor, Accounting & Management Information Systems); Ray Noe (MHRM Program Director, Robert and Anne Hoyt Designated Professor of Management and Human Resources); Dan Ogleve (Academic Director, Fisher Executive MBA Program (EMBA); Senior Lecturer, Finance); Bill Rives (Senior Lecturer, Finance); Anthony (Tony) Rucci (Co-Academic Director, BRIGHT New Leaders for Ohio Schools Program; Clinical Professor; University Distinguished Teaching Professor); Martin Schwalbe (Lecturer, Marketing and Logistics; Director, Learning and Growth, Fisher Executive Education); Oded Shenkar (Ford Motor Company Chair in Global Business Management, Professor); Rene Stulz (Professor of Finance; Everett D.

Reese Chair of Banking and Monetary Economics; Director, Dice Center for Research in Financial Economic); Mark Sullivan (Senior Lecturer, Management and Human Resources); and, David Veech (Senior Lecturer, Management Sciences).

167.    The immediate supervisor of each faculty member above would have been his department chair; each department chair's supervisor is Defendant Makhija, who reported to Defendant McPheron and then ultimately Defendant Drake. Defendants Makhija, McPheron, and Drake were also the decisionmakers who made the decision to investigate, and ultimately terminate, Dr. Mitchell.

168.    The policies Dr. Mitchell allegedly violated also applied to the faculty members listed in Paragraph 166 above regardless whether they were assigned to general, Exec Ed, or other departments or units or in tenure-track or clinical faculty positions.

169.    The custom at Fisher was for faculty to engage in private business to supplement their Ohio State compensation and become known within the business community for their practical knowledge and expertise, making them more attractive to students, applicants to join the faculty, and donors, and serving as an incentive for them to remain at Ohio State.

170.    None of the similarly-situated male employees have been accused of engaging in any misconduct, let alone grave misconduct. None of the similarly-situated male employees have had a 3335-5-04 complaint filed against them.

171.    No male employee of Fisher College of Business has been recommended for termination or stripped of their ability to teach for engaging in similar conduct as Dr. Mitchell.

172.    The investigation and findings against Dr. Mitchell purported to be concerned that she did not disclose her company's contract with ODM through Form 201, Ohio State's Paid External Consulting Approval Form.

173.    However, virtually no similarly-situated male Fisher employee has filed a Form 201

for paid external consulting, from 2012 through the date the Investigation Committee found Dr. Mitchell to be guilty of grave misconduct.

174. For example, Dr. Ben-David provided external consulting services as an expert witness in 2013 and 2014, and he did not disclose either of these through a Form 201.

175. However, Dr. Ben-David did file his first-ever Form 201, for his expert witness consulting, on July 24, 2018, twelve days after ruling Dr. Mitchell was guilty of grave misconduct.

176. In addition to Dr. Ben-David, other male employees who did not file a Form 201 but were in fact subject to the same Form 201 policy Dr. Mitchell allegedly violated include but are not limited to the following: Joseph Alutto (Distinguished Professor, Emeritus, Management and Human Resources); Marc Ankermann (Senior Lecturer, Management and Human Resources); Bruce Barnes (Senior Lecturer, Accounting and Management Information Systems); W.C. Benton (Edwin D. Dodd Professor of Management, Professor of Operations and Supply Chain Management); Charles Buchanan (Senior Director, Fisher Leadership Initiative; Senior Lecturer, Management and Human Resources); James (Jay) Dial (Clinical Professor (Management and Human Resources); Greenberger, David (Associate Dean, Staff, Human Resources and Administration (through 2017); Professor (Management and Human Resources); Richard Guba (Senior Lecturer, Management Sciences); Robert Heneman (Faculty Emeritus, Management and Human Resources); Lawrence Inks (Clinical Associate Professor, Management and Human Resources); Scott LaCross (Senior Lecturer, Marketing & Logistics); Douglas Lambert (Professor, Marketing & Logistics); Michael Leiblein (Associate Professor, Management and Human Resources); Roy Lewicki (Co-Academic Director, BRIGHT New Leaders for Ohio Schools Program; Irving Abramowitz Memorial Professor Emeritus (Management and Human Resources); Defendant Anil Makhija (Dean, Fisher College of Business; John W. Berry Sr. Chair in Business); Shashi Matta (Faculty Director of MBA Programs; Clinical Associate Professor,

Marketing & Logistics); Waleed Muhanna (Professor, Accounting & Management Information Systems); Ray Noe (MHRM Program Director, Robert and Anne Hoyt Designated Professor of Management and Human Resources); Dan Ogleve (Academic Director, Fisher Executive MBA Program (EMBA); Senior Lecturer, Finance); Bill Rives (Senior Lecturer, Finance); Anthony (Tony) Rucci (Co-Academic Director, BRIGHT New Leaders for Ohio Schools Program; Clinical Professor; University Distinguished Teaching Professor); Martin Schwalbe (Lecturer, Marketing and Logistics; Director, Learning and Growth, Fisher Executive Education); Oded Shenkar (Ford Motor Company Chair in Global Business Management, Professor); Rene Stulz (Professor of Finance; Everett D. Reese Chair of Banking and Monetary Economics; Director, Dice Center for Research in Financial Economic); Mark Sullivan (Senior Lecturer, Management and Human Resources); and, David Veech (Senior Lecturer, Management Sciences).

177.    The immediate supervisor of each faculty member above would have been his department chair; each department chair's supervisor is Defendant Makhija, who reported to Defendant McPheron and then ultimately Defendant Drake. Defendants Makhija, McPheron, and Drake were also the decisionmakers who made the decision to investigate, and ultimately terminate, Dr. Mitchell.

178.    The Form 201 policy Dr. Mitchell allegedly violated did not differentiate based on whether faculty members were assigned to general, Exec Ed, or other departments or units or in tenure-track or non-tenure track positions, including clinical faculty positions.

179.    None of the male employees who did not timely file a Form 201 were investigated or disciplined for failing to do so.

180.    None of the similarly-situated male employees have been accused of engaging in any misconduct, let alone grave misconduct. None of the similarly-situated male employees have had a 3335-5-04 complaint filed against them.

181. No male employee of Fisher College of Business has been recommended for termination or stripped of their ability to teach for engaging in similar conduct as Dr. Mitchell.

182. The investigation and findings against Dr. Mitchell purported to be concerned with, as Defendant Makhija wrote, "the substantial monies involved."

183. However, many male Fisher faculty earn substantial income from paid interests outside of their employment and primary duties with Defendant.

184. For instance, Dr. Ben-David, one of the four members of the Investigation Committee, is a co-founder of a hedge fund managing over $10,000,000.00 in assets.

185. In addition to Dr. Ben-David, other male employees who earned significant monies from personal consulting and were subject to the same policies Dr. Mitchell allegedly violated include, but are not limited to the following: Joseph Alutto (Distinguished Professor, Emeritus, Management and Human Resources); Marc Ankermann (Senior Lecturer, Management and Human Resources); Bruce Barnes (Senior Lecturer, Accounting and Management Information Systems); W.C. Benton (Edwin D. Dodd Professor of Management, Professor of Operations and Supply Chain Management); Charles Buchanan (Senior Director, Fisher Leadership Initiative; Senior Lecturer, Management and Human Resources); James (Jay) Dial (Clinical Professor (Management and Human Resources); Greenberger, David (Associate Dean, Staff, Human Resources and Administration (through 2017); Professor (Management and Human Resources); Richard Guba (Senior Lecturer, Management Sciences); Robert Heneman (Faculty Emeritus, Management and Human Resources); Lawrence Inks (Clinical Associate Professor, Management and Human Resources); Scott LaCross (Senior Lecturer, Marketing & Logistics); Douglas Lambert (Professor, Marketing & Logistics); Michael Leiblein (Associate Professor, Management and Human Resources); Roy Lewicki (Co-Academic Director, BRIGHT New Leaders for Ohio Schools Program; Irving Abramowitz Memorial Professor Emeritus (Management and Human

Resources); Defendant Anil Makhija (Dean, Fisher College of Business; John W. Berry Sr. Chair in Business); Shashi Matta (Faculty Director of MBA Programs;  Clinical Associate Professor, Marketing & Logistics); Waleed Muhanna (Professor, Accounting & Management  Information Systems); Ray Noe (MHRM Program Director, Robert and Anne Hoyt Designated  Professor  of Management and Human Resources); Dan Ogleve (Academic Director, Fisher Executive MBA Program (EMBA); Senior Lecturer, Finance); Bill Rives (Senior Lecturer, Finance); Anthony (Tony) Rucci (Co-Academic  Director,  BRIGHT  New Leaders  for  Ohio Schools Program; Clinical Professor;  University Distinguished  Teaching  Professor); Martin Schwalbe (Lecturer, Marketing and Logistics; Director, Learning and Growth, Fisher Executive Education); Oded Shenkar (Ford Motor Company Chair in Global Business Management, Professor); Rene Stulz (Professor of Finance; Everett D. Reese Chair of Banking and Monetary Economics; Director, Dice Center for Research in Financial Economic); Mark Sullivan (Senior Lecturer, Management and Human Resources); and, David Veech (Senior Lecturer, Management Sciences).

186. The immediate supervisor of each faculty member above would have been his department chair; each department chair's supervisor is Defendant Makhija, who reported to Defendant McPheron and then ultimately Defendant Drake.  Defendants Makhija, McPheron, and Drake were also the decisionmakers who made the decision to investigate, and ultimately terminate, Dr. Mitchell.

187. There is no written policy that establishes a specific "threshold" for how much money an employee may earn in their consulting jobs.  Moreover, no policy exists regarding Dr. Mitchell's alleged violations that would distinguish between faculty assigned to general, Exec Ed, or other departments or units or in tenure-track or non-tenure track positions, including clinical faculty positions.

188. The custom at Fisher was for faculty to earn significant monies from personal

consulting to supplement their Ohio State compensation and become known within the business community for their practical knowledge and expertise, making them more attractive to students, applicants to join the faculty, and donors and serving as an incentive for them to remain at Ohio State.

189.    None of the male faculty who earned significant monies from personal consulting were investigated or disciplined for doing so.

190.    The investigation and findings against Dr. Mitchell purported to be concerned that she provided service for a former client of Ohio State or Fisher Exec Ed.

191.    In the 04 Investigation, Defendant Makhija admonished Dr. Mitchell for consulting with a former Ohio State client.  However, Dr. Mitchell filed a Form 201 in 2018 for her paid external consulting with a private sector corporation that was a former Exec Ed client.  Both Dr. Goldsby and Defendant Makhija approved her Form 201 and paid engagement with the client, despite Dr. Mitchell being in the midst of a 3335-5-04 investigation of which both were well-aware.

192.    There are many similarly-situated Fisher male employees who privately consult with former or current Ohio State or Exec Ed clients.

193.    Based on knowledge and information, at least a dozen male faculty members provide or have provided such outside consulting services to former or current Ohio State or Exec Ed clients.

194.    For example, Defendant Makhija has earned significant monies from his personal consulting with former and current Exec Ed clients, including in 2015, the same time of Dr. Mitchell's alleged grave misconduct.

195.    In addition to Defendant Makhija, male Fisher employees who privately consult or

have consulted with former or current Ohio State or Exec Ed clients include but are not limited to: Marc Ankermann (Senior Lecturer, Management  and Human Resources); Bruce Barnes (Senior Lecturer, Accounting and Management Information Systems); W.C. Benton (Edwin D. Dodd Professor  of Management, Professor of Operations and Supply Chain Management); James (Jay) Dial (Clinical Professor (Management and Human Resources); David Greenberger (Associate Dean,  Staff,  Human Resources and Administration (through 2017);  Professor (Management and Human  Resources); Richard Guba (Senior Lecturer, Management  Sciences); Robert Heneman (Faculty Emeritus, Management and Human Resources); Lawrence Inks (Clinical Associate Professor, Management and Human  Resources); Roy Lewicki (Co-Academic  Director, BRIGHT New Leaders  for  Ohio Schools Program;  Irving  Abramowitz  Memorial Professor  Emeritus (Management   and  Human  Resources); Shashi Matta (Faculty Director of MBA Programs; Clinical Associate Professor, Marketing & Logistics); Ray Noe (MHRM Program Director, Robert and Anne Hoyt Designated  Professor  of Management and Human Resources); and Anthony (Tony) Rucci (Co-Academic  Director,  BRIGHT  New Leaders  for  Ohio Schools Program; Clinical Professor;  University Distinguished  Teaching  Professor.

196.    The immediate supervisor of each faculty member above would have been his department chair; each department chair's supervisor is Defendant Makhija, who reported to Defendant McPheron and then ultimately Defendant Drake.  Defendants Makhija, McPheron, and Drake were also the decisionmakers who made the decision to investigate, and ultimately terminate, Dr. Mitchell.

197.    The policies Dr. Mitchell allegedly violated did not differentiate based on whether faculty members were assigned to general, Exec Ed, or other departments or units or in tenure-track or non-tenure track positions, including clinical faculty positions.

198.    The custom at Fisher was for faculty to engage in private business consulting,

including on occasion with former or current Ohio State or Exec Ed clients, to supplement their Ohio State compensation and become known within the business community for their practical knowledge and expertise, making them more attractive to students, applicants to join the faculty, and donors and serving as an incentive for them to remain at Ohio State.

199.    None of the similarly-situated male employees have been accused of engaging in <u>any</u> misconduct, let alone grave misconduct. None of the similarly-situated male employees have had a 3335-5-04 complaint filed against them, and none were otherwise investigated or disciplined for doing so.

200.    No male employee of Fisher College of Business has been recommended for termination or stripped of their ability to teach for engaging in similar conduct as Dr. Mitchell.

201.    The faculty members listed in paragraphs 166, 176, 185 and 194  above did what they were permitted and encouraged by Defendant to do and did not violate policy, which is precisely what Dr. Mitchell did.  She did not violate policy but Defendants illegally used her private consulting as pretense for her termination.

### <u>Defendant Zinn and the Reappointment Process</u>

202.     Dr. Mitchell's faculty appointment at the Fisher College of Business is that of a full-time "clinical" faculty member. Clinical faculty members are not tenured or tenure-track faculty, but rather are employed on long-term contracts that come up periodically for renewal.

203.    Clinical faculty members are not required to engage in or publish academic research; their primary focus is meant to be on teaching, service, involvement with the business community and related activities.

204.    Within Dr. Mitchell's department, clinical faculty members (*e.g.*, Dr. Mitchell and Dr. Matta) were similar in their assigned teaching activities. For example, both she and Dr. Matta rotated between teaching fulltime and working professional MBA students; they both taught

several sections of a marketing course required of all undergraduate marketing majors; and they both taught elective marketing courses to MBA students.

205.     Undergraduate students would often enroll in Dr. Matta's course, but then transfer to Dr. Mitchell's section of the same course in the same semester.

206.     In the fall of 2013, Dr. Mitchell was assigned to teach a full-time MBA core marketing course, divided into parts taken in successive semesters. Part I would be taught in fall 2013, and Part II would be taught in spring of 2014. Being a sequence course, the same students carry over from Part I to Part II.

207.     On December 23, 2013, Defendant Zinn notified Dr. Mitchell by phone that she would be demoted in the following ways: she would be removed from her Part II teaching duties (which were to begin in less than 10 days) and instead she would teach undergraduate courses. Defendant Zinn further told Dr. Mitchell that Dr. Matta would be replacing her in the Part II course.

208.     This removal was humiliating for Dr. Mitchell and damaging to her reputation. She is unaware of any Fisher professor involuntarily being removed from his or her course so close to the start of the semester. Dr. Mitchell was told the reason behind the demotion was her poor Student Evaluations of Instruction ("SEIs") from the fall 2013 course. However, Dr. Mitchell later learned that at least two other male professors received the same or worse reviews than her but did not get demoted. And in fact, one of those underperforming males, Dr. Matta, was her replacement.

209.     Dr. Mitchell reported to Defendant Zinn that the male professors were being treated differently than her, and in particular Dr. Matta who had worse reviews and was surrounded by troubling allegations, but Defendant Zinn refused to discuss these issues with her. Dr. Mitchell believes this incident marked a significant downturn in her relationship with Defendant Zinn, and that matters dramatically deteriorated after that time.

210.     On June 20, 2014, Dr. Mitchell received her first written performance review since

her employment began in March 2012. This review, written and signed by Defendant Zinn, indicated that her scholarly performance had been rated "below the norm," despite also being rated "substantially beyond the norm" for her consistent voluntary contributions to Exec Ed.

211.    Dr. Mitchell formally protested this evaluation.

212.    Mr. Watercutter informed Dr. Mitchell that a copy of her written protest of the annual evaluation would be placed in her College personnel file.  Years later, when a public records request of her College personnel file was made, Dr. Mitchell learned the protest documentation was not there.

213.    In addition to having a copy of her protest in her College personnel file, Dr. Mitchell submitted the written protest to Defendant Zinn, then her department chairman, and requested that it be placed in her department personnel file.  Years later, when a copy of the department personnel file was requested, she learned that the protest documentation was not there.

## **Reappointment I**

214.    Dr. Mitchell's initial reappointment was to be held in early September 2015.

215.     Dr. Mitchell was to be given the opportunity to assemble a dossier that would be submitted to department faculty as consideration for her reappointment.

216.    By departmental and Fisher rules, the preparation of the dossier was to be by Dr. Mitchell alone, with input from an assigned "Procedural Oversight Designee" (the "POD"), in this case a senior female faculty member within Dr. Mitchell's department.

217.    However, Defendant Zinn did not follow this protocol.

218.    Instead, Defendant Zinn unilaterally and without notice supplemented Dr. Mitchell's dossier with unauthorized material.

219.    Defendant Zinn did not consult with Dr. Mitchell regarding the additions, and he did not consult with the POD either.

220.    The POD determined that Defendant Zinn's additions should never have been included in Dr. Mitchell's dossier.

221.    In the POD's report in September 2015, the POD found "procedural irregularities" by Defendant Zinn and further noted a "consistent history of oversight and disregard of college and department policies characterized Professor Mitchell's time at OSU." The POD wrote that Defendant Zinn's actions might "not be as consequential if there had not been a sustained pattern of procedural irregularities in Professor Mitchell's brief career so far at OSU."

222.     The POD further found that Defendant Zinn's additions seemed "punitive and perhaps retaliatory."

223.    During this time period of August-September 2015, Dr. Mitchell reported her concerns of this reappointment process to David Greenberger, then-Associate Dean for Staff, Human Resources and Administration in the Fisher College. She had requested the meeting because she was being discriminated against and was fearful that her contract would not be renewed. She wished to report her fears, and examples of the discriminatory treatment she was (and had been) experiencing, particularly in contrast to the asymmetric, positive treatment and job promotions that Dr. Shashi Matta had experienced during the same time.

224.    At the meeting. Dr. Mitchell detailed actions, events and outcomes experienced by her, as well as what she had seen, heard and been told about Dr. Matta. She expressed grave concern about her department's upcoming reappointment vote, and whether her contract would be

renewed.  She asked whether she should file "something formal with HR" to try and protect herself, given the sex discrimination.

225.     Dr. Greenberger expressed sympathy for Dr. Mitchell's situation but advised against filing anything formal.

226.     The POD also wrote to Dr. Mitchell about being "wary of making [Defendant Zinn] too defensive and giving him reasons to perhaps retaliate in the future. You don't want several years of misery down the road."

227.     Dr. Mitchell's initial reappointment was renewed by unanimous vote, however, Defendant Zinn reduced her contract from the standard five years down to three. This reduction was not contemplated in Dr. Mitchell's contract, and he offered no other explanation other than "we're going to see how you do."

### Reappointment II

228.     Dr. Mitchell's second reappointment was scheduled for the spring of 2019.

229.     In fall 2018, Dr. Mitchell submitted an updated dossier for reappointment to her position of Clinical Associate Professor. She requested of her then-department chair, Dr. Tom Goldsby, that this time the consideration for reappointment would be for the originally-promised five years in length, rather than the three years she had received previously. Dr. Goldsby readily agreed that the consideration would be for a five-year renewal of Dr. Mitchell's contract.

230.     Dr. Mitchell was assured by Dr. Goldsby, and ultimately it was reiterated by Defendant Makhija in an April 2019 meeting, that the reappointment process would be completely independent of any 3335-5-04 investigation of Dr. Mitchell that might be occurring during the reappointment process. Rather, the decision to reappoint would be based solely on Dr. Mitchell's job performance and record during the contract period under consideration.

231. Dr. Mitchell received three "meets/exceeds expectations" ratings, superb and glowing written evaluations, and commensurate sizeable increases in her annual compensation during each of the three years of the contract period under consideration. She also won a teaching award, for "Outstanding Core Professor" as award by MBA students in 2017 during the period.

232. In fact, Dr. Mitchell was notified in the summer of 2019 that she would receive a substantial raise in compensation based on exemplary performance. This raise was to take effect on September 1, 2019.  However, the Board of Trustees rubber-stamped Dr. Mitchell's termination for grave misconduct two days prior.

233. In any event, on April 30, 2019, Dr. Mitchell's voting faculty members within her department voted zero (0) to renew, two (2) not to renew, and nine (9) abstentions regarding whether her contract should be renewed.

234. This distribution of this vote is unheard of within academia. No rationale was provided for the 9 abstentions.

235. Dr. Mitchell's chair, Dr. Goldsby, implored Defendant Makhija to not simply look at the department vote, but rather examine Dr. Mitchell's outstanding record of exemplary teaching and service in deciding whether to renew Dr. Mitchell's contract.

236. Defendant Makhija ignored the nine abstentions, and instead stated "two voted no and zero voted yes, so your contract will not be renewed."

237. The rationale provided by the department for not reappointing Dr. Mitchell focused on two issues: (i) that Dr. Mitchell's external consulting commitments did not "directly enhance the national/international reputation of the department and university," and (ii) the department faculty were not able to evaluate her "effectiveness in [teaching a] full-time core class."

238.     To the latter point, Dr. Mitchell was not teaching in a core class because Defendant Makhija abruptly removed her from the courses two days prior to the start of classes. This was not Dr. Mitchell's choice, and she was fully prepared and willing to teach the courses.

239.     While the department chose not to vote for Dr. Mitchell's contract to be renewed, and in discussion brought out certain pretextual points that are not consistent with her employment record—the department chose to hire a young male professor who had only earned his PhD six years prior.

240.     This new hire did not bring any enhancement to the "national/international reputation" to Ohio State. He also had no experience teaching the core marketing course to fulltime MBA students, or any type of core marketing course to any type of graduate students.

241.     Moreover, this new professor did not have a degree in marketing. The position for which he was hired was a clinical faculty member in marketing.

242.     Dr. Mitchell was held to a different standard than Fisher's newest hire, a male professor.

243.     Dr. Mitchell did appeal the decision to the Committee on Academic Freedom and Responsibility (CAFR).

244.     CAFR found, by a 5-0 vote, that her appeal should be considered by the Hearing Committee because the reappointment faculty did not follow proper process.

245.     CAFR found that nine abstentions out of eleven voting members does not constitute a quorum.

246.     CAFR met and voted two weeks prior to the Ohio State Board of Trustees' rubber-stamping of Dr. Mitchell's termination.

247.     Dr. Mitchell was subjected to this harsh treatment and punishment based on her sex and in retaliation for her valid complaints of sex discrimination and harassment at Ohio State's Fisher College of Business; but for her valid complaints, she would not have been targeted for retaliation, and at least a motivating factor in her negative treatment was her sex.

248.     As a proximate result of Defendant Ohio State and the Individual Defendants' actions, Dr. Mitchell has suffered, and continues to suffer irreparable harm and economic damages that she cannot replace.

249.     As a proximate result of Defendant Ohio State and the Individual Defendants' actions, Dr. Mitchell has suffered and continues to suffer from severe emotional and physical distress.

250.     As a proximate result of Defendant Ohio State and the Individual Defendants' actions, Dr. Mitchell has suffered and continues to suffer from significant reputational injury.

251.     As a proximate result of Defendant Ohio State and the Individual Defendants' actions, Dr. Mitchell has lost contracts in her private business.

## V.     Claims for Relief

### Count I
### Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §2000e *et seq*
(Against Defendant Ohio State)

252.     Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1-251 as if set forth fully herein.

253.     By recommending her termination, stripping her ability to teach, and subjecting her to more harsh discipline than any male employee for engaging in substantially similar conduct, Defendant has committed sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

**Count II**
**Violation of Title IX of the Education Amendments of 1972, As Amended –**
**Retaliation**
**20 U.S.C. § 1681 *et seq*.**
(Against Defendant Ohio State)

254. Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1-253 as if set forth fully herein.

255. Ohio State has, at all relevant times, received and continues to receive federal financial assistance.

256. Dr. Mitchell engaged in protected activity by bringing numerous instances of sex discrimination and harassment against herself, other female employees, and female students to the attention of Ohio State and otherwise participating in the Title IX complaint process. Defendant knew that Plaintiff engaged in this protected activity and subsequently took serious action to her detriment, including instituting an "04 Investigation" based on alleged conduct that similarly-situated male professors engaged in without similar scrutiny or consequences, failing to follow Ohio law and University policy in conducting the "04 Investigation," denying Plaintiff the Due Process and procedural fairness demanded by law, imposing discriminatory workplace conditions such as uncompensated additional teaching duties not imposed on male professors, and terminating her employment with Defendant for improper and pretextual reasons. But for Dr. Mitchell's protected activity, Defendant would not have taken adverse actions against her.  A retaliatory animus substantially motivated Defendant to take these adverse actions.  Ohio State acted with deliberate indifference to Dr. Mitchell's right to be free from retaliation for reporting about individuals and practices which she sincerely and reasonably believed to be discriminatory in violation of Title IX.

257. Defendant's differential treatment of Plaintiff is a direct and proximate result of the Title IX protected activity she undertook.

258. Plaintiff has suffered and will continue to suffer harm including loss of future employment and business opportunities, humiliation, embarrassment, reputational harm, emotional distress, and other economic and non-economic damages.

259. Plaintiff is entitled to all equitable and legal remedies available under Title IX including but not limited to compensatory damages, reasonable attorneys' fees and costs, and other equitable and legal relief.

**Count III**
**Violation of Procedural and Substantive Due Process under the Fourteenth**
**Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983**
(Against the Individual Defendants in their official capacities for injunctive and declaratory relief and in their personal capacities for money damages)

260. Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 259 as if set forth fully herein.

261. Individual Defendants are state actors who owed and continue to owe to Dr. Mitchell protections pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

262. Individual Defendants acted, or failed to act, under color of law, to deprive Dr. Mitchell of the rights and privileges guaranteed to her by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution ("Due Process rights").

263. Individual Defendants violated Dr. Mitchell's protected property interest in continued and future employment by Defendant Ohio State by subjecting her to an arbitrary, capricious, and fundamentally unfair investigation and review process, referred to herein as the "04 Investigation."

264. Individual Defendants further violated Dr. Mitchell's Due Process rights by depriving her of review by a sex-neutral and impartial decision-making process in that no similarly-

situated male professor was subjected to even remotely similar conduct by the Individual Defendants.

265.    Individual Defendants further violated Dr. Mitchell's Due Process rights in at least the following ways:

    a.  Failing to follow Ohio State's Policy covering the process for investigating and adjudicating complaints of misconduct by members of the faculty;

    b.  Denying Dr. Mitchell the right to question or cross-examine her accusers;

    c.  Repeatedly failing to apply the "clear and convincing evidence" standard to allegations of grave misconduct;

    d.  Failing to maintain Dr. Mitchell's confidentiality;

    e.  Intentionally interfering with Dr. Mitchell's business associations and contractual relationships during the "04 Investigation" process;

    f.  Terminating Dr. Mitchell for legitimate business activity that did not meet the grave misconduct standard;

    g.  Terminating Dr. Mitchell for improper and pretextual reasons;

    h.  Terminating Dr. Mitchell in retaliatory fashion as a result of her valid complaints of sex discrimination and harassment; and

    i.  Otherwise conducting a pretextual, arbitrary, and capricious "04 Investigation" process in violation of established policies.

266.    Individual Defendants' conduct alleged herein evidenced an intentional and reckless disregard for Dr. Mitchell's Due Process rights, lacked any rational basis, and was not justified by any legitimate governmental interest.

267. Individual Defendants' conduct alleged herein was an arbitrary abuse of executive power so egregious that it shocks the conscience of the public.

268. Plaintiff has been seriously and irreparably harmed in countless ways including loss of future employment and business opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, and other economic and non-economic damages. If the Court does not grant the injunctive relief sought herein, Dr. Mitchell will suffer a permanent reduction in lifetime earnings and will most likely never attain an equivalent position within higher education, her chosen profession.

269. Individual Defendants' "04 Investigation" and termination of Dr. Mitchell fundamentally deprived her of liberty and property interests protected by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution in the first instance and by depriving her of any meaningful post-deprivation Due Process rights.

270. Individual Defendants had actual or constructive knowledge they engaged in conduct creating a pervasive and unreasonable risk of deprivation of Dr. Mitchell's Due Process rights.

271. Individual Defendants knew, and a reasonable person would have known, that Dr. Mitchell had a clearly established right to a fair investigation and review process and it was reasonably foreseeable to Individual Defendants that failing to apply those standards of review would violate Dr. Mitchell's Due Process rights.

272. Plaintiff is entitled to injunctive and declaratory relief in light of Individual Defendants' unlawful actions.

273. Plaintiff is entitled to damages from the Individual Defendants in their personal capacities in light of Individual Defendants' unlawful actions.

**Count IV**
**Violation of the Equal Protection Clause of the Fourteenth Amendment**
**to the U.S. Constitution pursuant to 42 U.S.C. §1983**
(Against the Individual Defendants in their official capacities for injunctive and declaratory
relief and in their personal capacities for money damages)

274. Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 273 as if set forth fully herein.

275. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution ("Equal Protection Clause") prohibits discrimination on the basis of sex.

276. Individual Defendants are state actors who owed and continue to owe to Dr. Mitchell protections pursuant to the Equal Protection Clause.

277. Individual Defendants acted, or failed to act, under color of law, to deprive Dr. Mitchell of the rights and privileges guaranteed to her by the Equal Protection Clause.

278. Individual Defendants, by recommending Dr. Mitchell's termination, stripping her ability to teach, subjecting her to more harsh discipline than any male employee for engaging in substantially similar conduct, and ultimately terminating her via a constitutionally-deficient "04 Investigation" process, committed sex discrimination in violation of the Equal Protection Clause.

279. Individual Defendants' sex discrimination lacked any rational basis and was not justified by any legitimate governmental interest, and but-for Dr. Mitchell's sex would not have been inflicted on her.

280. Individual defendants who relied on input from subordinates actually knew or should have known that the input was tainted by the sex discrimination and sexist attitudes of the subordinates and submitted by them in order to secure Dr. Mitchell's termination, demotion, and/or other adverse treatment; yet, those individual defendants did not conduct an independent investigation to confirm the accuracy of the input and even rejected entreaties from disinterested,

reliable witnesses regarding differential treatment.

281.    Plaintiff has been seriously and irreparably harmed in countless ways including loss of future employment and business opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, and other economic and non-economic damages. If the Court does not grant the injunctive relief sought herein, Dr. Mitchell will suffer a permanent reduction in lifetime earnings and will most likely never attain an equivalent position within higher education, her chosen profession.

282.    Plaintiff is entitled to injunctive and declaratory relief in light of Individual Defendants' unlawful actions.

283.    Plaintiff is entitled to damages from the Individual Defendants in their personal capacities in light of Individual Defendants' unlawful actions.

## Declaratory Relief
## Allegations

284.    Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 283 as if set forth fully herein.

285.    An actual and present controversy exists between Plaintiff and Defendants concerning their rights and respective duties. Plaintiff contends that Defendants have violated her rights under federal anti-discrimination laws and the U.S. Constitution. Plaintiff believes that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

## Injunctive Relief
## Allegations

286.    Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1- 285 as if set forth fully herein.

287.    No plain, adequate, or complete remedy at law is available to the Plaintiff to redress the wrongs addressed herein.

288.   If the Court does not grant the injunctive relief sought herein, the Plaintiff will be irreparably harmed.

289.   Reinstatement will enable Dr. Mitchell to maintain her teaching skills and levels of research and public service, while monetary remedies alone will not make her whole for the interruption in her teaching, research, and public service caused by the wrongs addressed herein.

290.   The blemish on her curriculum vitae and career caused by the wrongs addressed herein render, in combination with her age and diminished hiring at universities and colleges, her unable, despite the exercise of reasonable diligence, to secure employment comparable to her position at Ohio State, and reinstatement is, therefore, essential to making her whole.

291.   Dr. Mitchell enjoys teaching, researching, and public service as a faculty member and the fulfillment she receives from those activities is difficult to measure economically, though quite valuable to her, and reinstatement is necessary to make her whole for losing that fulfillment.

## V.     **Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court:

a.      declare that Defendant Ohio State has violated Title VII and Title IX;

b.      declare that the Individual Defendants have violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution;

c.      order such injunctive and equitable relief as will make Plaintiff whole for Defendants' violations, including without limitation reinstatement with full back pay, benefits, and pre- and post-judgment interest;

d.      award compensatory damages to which Dr. Mitchell is entitled;

e.      award punitive damages to which Dr. Mitchell is entitled;

f.      award reasonable attorneys' fees and costs; and

g.      grant such other relief as the Court may deem appropriate.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues in this Amended Complaint so triable.

Respectfully submitted,

/s/ Nicholas C. Vesha
Nicholas C. Vesha (0085760)
Vesha Law Firm, LLC
38 South High Street
Dublin, Ohio 43017
Office: (614) 376-0266
Fax:  (614) 467-3807
nicholas@veshalaw.com


/s/ John S. Marshall
John S. Marshall (0015160)
jmarshall@marshallforman.com
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, OH 43215
(614) 463-9790
Fax: (614) 463-9780


/s/ Matthew J. Mueller
Matthew J. Mueller
Wiand Guerra King PA
5505 West Gray Street
Tampa, Florida 33609
Office: (813) 347-5100
MMueller@wiandlaw.com
*Admitted Pro Hac Vice*


COUNSEL FOR PLAINTIFF
DEBORAH MITCHELL

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on April 27, 2020 which caused it to be served on the Court and the parties of record.

*/s/ Matthew J. Mueller*
Matthew J. Mueller
Counsel for Plaintiff Deborah Mitchell
