**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Deborah Mitchell, Ph.D., | : | |
| | : | |
| Plaintiff, | : | Case No. 2:19-cv-04162 |
| | : | |
| v. | : | Judge Sarah D. Morrison |
| | : | |
| The Ohio State University, et.al., | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendants. | : | |

---

**DEFENDANT THE OHIO STATE UNIVERSITY'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

**DAVE YOST (0056290)**
ATTORNEY GENERAL OF OHIO

Christopher E. Hogan            (0070236)
Trial Attorney
chogan@npkhlaw.com
Amy E. Kuhlman               (0083194)
akuhlman@npkhlaw.com
Newhouse, Prophater, Kolman & Hogan, LLC
3366 Riverside Drive, Suite 103
Columbus, Ohio 43221
Telephone:    614/255-5441
Facsimile:     614/255-5446
*Outside Counsel for Defendants The Ohio State*
*University, Michael V. Drake, MD., Bruce A.*
*McPheron, Ph.D., Anil Mahkija, Ph.D., Walter*
*Zinn, Ph.D., and Paul C. Velasco*

## TABLE OF CONTENTS AND SUMMARY

I. STATEMENT OF THE CASE.......................................................................................... 2

Plaintiff, Dr. Deborah Mitchell ("Plaintiff"), brought this action after she was dismissed from her position as a non-tenured Clinical Associate Professor in The Ohio State University's ("University") Fisher College of Business ("FCB"). Plaintiff was dismissed after numerous peers, University administrators and the University's Board of Trustees all unanimously concluded that Plaintiff had engaged in grave misconduct by diverting a $1.8 million business opportunity away from the FCB and to the company she founded, CypressTree Corp.

Plaintiff filed her Second Amended Complaint on April 27, 2020. (ECF 38.) The Complaint asserts four claims: two against the University and two against some, but not all, of the University employees involved in the processes that led to her dismissal. With respect to the University, Plaintiff alleges that she was dismissed from employment at the University because of her sex in violation of Title VII and in retaliation for opposing discriminatory practices in violation of Title IX. With respect to the individual defendants, Plaintiff asserts two causes of action against each, pursuant to Section 1983, alleging that they violated her Fourteenth Amendment rights to equal protection and due process.

On September 3, 2020, the Court granted in part and denied in part Defendants' motion to dismiss, dismissing all claims except Plaintiff's claim of sex discrimination against the University under Title VII premised on circumstantial evidence. (ECF 54.)

II. STATEMENT OF MATERIAL FACTS ................................................................... 3

While serving as a faculty member and Academic Director in a Fisher College of Business Executive Education Program for the recently-created Ohio Department of Medicaid (ODM), Plaintiff became aware that ODM was in the market for additional, related services. Rather than disclosing the opportunity to the University, Plaintiff secretly performed the additional services through her private company, CypressTree Corp. Plaintiff's conversion of this business opportunity was fortuitously discovered by Executive Education personnel and disciplinary proceedings were instituted. All told, after eight layers of review under the University's disciplinary process for faculty, Plaintiff's peers, University administrators and the University's Board of Trustees all unanimously determined that Plaintiff should be dismissed from her non-tenured position, effective August 30, 2019.

A. The Executive Education Program ...................................................................... 4

B. External Activities and Conflicts of Interests ..................................................... 4

C. The Creation of the Ohio Department of Medicaid in 2013 ............................... 6

D. Doug Chaney Calls Marty Schwalbe at the FCB Looking for a "Change Management" Speaker. Schwalbe Grows the Opportunity into ODM-1 .................................. 7

E. ODM Tells Plaintiff it is Interested in Additional Services; Plaintiff Quietly Pockets the Opportunity for Her Company, CypressTree ................................................. 8

F. Paul Velasco is Hired as the New Executive Director of the EE Program on March 25, 2016. He asks Schwalbe about Opportunities to Serve Current and Former EE Program Clients. Schwalbe Stumbles across ODM-2 ..................................................... 12

G. Velasco's 04 Complaint and the 04 Process .......................................................... 13

H. Review by Plaintiff's Department Chair (OAC §3335-5-04 (C)) .................................... 15

I. Probable Cause Review by Dean Makhija (OAC §3335-5-04(D)) .................................. 15

J. Merits Review by the College Investigation Committee (CIC) (OAC §3335-5-04(E))... 16

K. Merits Decision by Dean Makhija OAC §3335-5-04(F)) .................................................. 19

L. Merits Decision by Provost McPheron OAC §3335-5-04(G) ........................................... 19

M. Appeal to the Faculty Hearing Committee (FHC) OAC §3335-5-04(H) ........................ 21

N. Review and Recommendation by Then-President Michael Drake and Decision by the Board of Trustees ................................................................................................. 23

O. Plaintiff's Eleventh-Hour OIE Complaint ...................................................................... 23

III. LAW AND ARGUMENT .............................................................................................. 24

A. Summary Judgment Standard .......................................................................................... 24

While serving as a faculty member and Academic Director in a Fisher College of Business Executive Education Program for the recently-created Ohio Department of Medicaid (ODM), Plaintiff became aware that ODM was in the market for additional, related services.  Rather than disclosing the opportunity to the University, Plaintiff secretly performed the additional services through her private company, CypressTree Corp. Plaintiff's conversion of this business opportunity was fortuitously discovered by Executive Education personnel and disciplinary proceedings were instituted.  All told, after eight layers of review under the University's disciplinary process for faculty, Plaintiff's peers, University administrators and the University's Board of Trustees all unanimously determined that Plaintiff should be dismissed from her non-tenured position, effective August 30, 2019.

B. Because Plaintiff can neither Establish a Prima Facie Case of Sex Discrimination nor Rebut the University's Legitimate, Nondiscriminatory Reason for her Discharge, the University is Entitled to Summary Judgment on Plaintiff's Claim of Sex Discrimination under Title VII ............................................................................................................. 25

Plaintiff's sole remaining claim in Count I of her Second Amended Complaint proceeds under the proof scheme articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). However, Plaintiff cannot establish a genuine issue of material fact with respect to two key elements. First, she cannot establish that a similarly situated male FCB faculty member was treated more favorably under similar circumstances. Second, even if Plaintiff could establish this critical element, her Title VII claim would still fail. The University's reason for dismissing Plaintiff (unethical conduct) is clearly a legitimate, non-discriminatory reason and not a mere pretext for intentional sex discrimination.

1. There are no Similarly-Situated FCB Faculty who were Treated More Favorably under Similar Circumstances ........................................................................ 27

2. Plaintiff Cannot Establish that the University's Legitimate, Nondiscriminatory Reason for Her Dismissal was Pretext for Intentional Sex Discrimination................ 30

C. Even if the Court Concludes that Plaintiff has Presented a Jury Issue with respect to her Dismissal, She has not Presented Sufficient Evidence to Establish that she would have been Reappointed and Therefore her Economic Damages are Limited ........................... 31

Even if Plaintiff could create an issue of fact as to whether her dismissal during the term of her non-tenured contract in August of 2019, her contract expired in August of 2020. And not a single member of Plaintiff's department supported her reappointment.

IV. CONCLUSION.............................................................................................................. 32

CERTIFICATE OF SERVICE ..................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)................................................ 24

*Blackshear v. Interstate Brands Corp.,* 495 Fed. App'x 613, 618 (6th Cir. 2012) ..................... 31

*Caratachea v. Homewood Indus.,* 2002 U.S. Dist. LEXIS 24759, *1, 2002 WL 31844997 ...... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .................................................................... 24

*Gethers v. PNC Bank*, 813 F.App'x 746, 749 (3rd Cir. 2020) ..................................................... 30

*Knox v. Neaton Auto Products Manufacturing, Incorporated,* 375 F.3d 451, 456-457 (6th
Cir. 2004) ................................................................................................................................. 26

*Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116 (6th Cir. 2001) ................ 27

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) .........................................passim

*Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1366 (7th Cir.1988) .................................... 29

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).................................................... 27

*Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1023 (6th Cir. 1993).................................................. 26

*Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008) .................................................. 26

*Schwendeman v. Marietta City Schs*, 436 F. Supp. 3d 1045 (S.D.Ohio 2020)........................... 31

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 518 (1993)......................................................... 26

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989) ......................................... 24

*White v. Baxter Healthcare Corp.,* 533 F.3d 381, 391 (6th Cir. 2008) ...................................... 26

*Yaklin v. Comerica, Inc.,* E.D.Mich. No. 06-14547, 2008 U.S. Dist. LEXIS 5062, at *9
(Jan. 24, 2008)......................................................................................................................... 30

**Other Authorities**

42 U.S.C. §2000e-(5)(e)(1)......................................................................................................... 25

42 U.S.C. sec. 2000e-2................................................................................................................ 25

Civil Rights Act of 1964 ("Title VII")................................................................................. passim

Fed. R. Civ. P. 56(c) ................................................................................................................... 24

OAC §3335-5-04 ................................................................................................... 30

OAC §3335-5-04 (A)(4) ....................................................................................... 15

OAC §3335-5-04 (B)(4) ................................................................................. 14, 20

OAC §3335-5-04 (C) ............................................................................................ 15

OAC §3335-5-04 (D) ............................................................................................ 15

OAC §3335-5-04 (D)(1) ....................................................................................... 15

OAC §3335-5-04 (D)(2) ....................................................................................... 16

OAC §3335-5-04 (D)(3) ....................................................................................... 16

OAC §3335-5-04 (E) ............................................................................................ 16

OAC §3335-5-04 (E)(1) ....................................................................................... 16

OAC §3335-5-04 (E)(2) ............................................................................ 16, 17, 19

OAC §3335-5-04 (F) ............................................................................................ 19

OAC §3335-5-04 (F)(4) ....................................................................................... 19

OAC §3335-5-04 (F)(5) ....................................................................................... 19

OAC §3335-5-04 (G) ............................................................................................ 19

OAC §3335-5-04 (G)(1) ....................................................................................... 20

OAC §3335-5-04 (G)(3) ....................................................................................... 20

OAC §3335-5-04 (G)(4) ....................................................................................... 20

OAC §3335-5-04 (H) ............................................................................................ 21

OAC §3335-5-04 (H)(1) ....................................................................................... 21

OAC §3335-5-04 (H)(5) ....................................................................................... 22

OAC §3335-5-04 (H)(8) ....................................................................................... 22

OAC §3335-5-04 (I)(1)(c) .................................................................................... 23

<u>**DEFENDANT THE OHIO STATE UNIVERSITY'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Now comes Defendant, The Ohio State University ("University"), through counsel, and hereby moves this Court, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for an order awarding it summary judgment on the sole remaining claim in Plaintiff's Second Amended Complaint. (ECF 38.) A memorandum in support is attached.

Respectfully submitted,

**DAVE YOST (0056290)**
ATTORNEY GENERAL OF OHIO

_____/s/ Christopher E. Hogan_____
Christopher E. Hogan                    (0070236)
Trial Attorney
chogan@npkhlaw.com
Amy E. Kuhlman                          (0083194)
akuhlman@npkhlaw.com
Newhouse, Prophater, Kolman & Hogan, LLC
3366 Riverside Drive, Suite 103
Columbus, Ohio 43221
Telephone:    614/255-5441
Facsimile:    614/255-5446
*Outside Counsel for Defendants The Ohio State*
*University, Michael V. Drake, MD., Bruce A.*
*McPheron, Ph.D., Anil Mahkija, Ph.D., Walter*
*Zinn, Ph.D., and Paul C. Velasco*

1

<u>**MEMORANDUM IN SUPPORT**</u>

**I.    STATEMENT OF THE CASE**

Plaintiff, Dr. Deborah Mitchell ("Plaintiff") was a Clinical Associate Professor of Marketing in The Ohio State University's ("University") Fisher College of Business ("FCB"). On August 30, 2019, the University's Board of Trustees accepted the recommendation of its committee on Academic Affairs and Student Life that Plaintiff be dismissed for having engaged in grave misconduct by diverting a $1.8 million business opportunity away from the FCB and to the company she founded, CypressTree Corp. ("CypressTree"). The committee, in turn, based its recommendation on the findings and unanimous recommendations of three University administrators and seven faculty members who reviewed the matter and concluded that Dr. Mitchell had engaged in grave misconduct.

Plaintiff initiated this action on September 19, 2019. (ECF 1.) Prior to service, Plaintiff filed an Amended Complaint on October 23, 2019. (ECF 5.) The Amended Complaint sought legal and equitable relief for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"); Title IX of the Education Amendments of 1972 ("Title IX"); and the Fourteenth Amendment to the U.S. Constitution ("Fourteenth Amendment"). Plaintiff named as defendants the University as well as a number of its current and former employees.

On December 23, 2019, all defendants moved to dismiss the claims against them, with the parties filing opposing and reply memoranda. (ECF 23, 27, and 30.) The defendants also moved to stay discovery pending a ruling on their motion to dismiss, and the parties filed opposing and reply memoranda. (ECF 24, 28, and 29.) On February 3, 2020, the Court issued an order staying discovery as to the individual defendants but permitting discovery against the University. (ECF 31, PageID 329-330.)

On March 26, 2020, the Court, granted Plaintiff leave to file a Second Amended Complaint. (ECF 36.) Plaintiff's Second Amended Complaint ("Complaint") was filed on April 27, 2020. (ECF 38.) All defendants moved to dismiss the Complaint on June 1, 2020. (ECF 44.) On September 3, 2020, the Court granted in part and denied in part the motion to dismiss. (ECF 54.) Viewing Plaintiff's Complaint against the generous motion to dismiss standard, the Court concluded that Count I of the Complaint plausibly alleged a claim of sex discrimination against the University under Title VII premised on circumstantial evidence. (ECF 54, PageID 594.) The remaining claims and parties were dismissed. (Id., PageID 609.)

Thereafter, approximately two years of discovery ensued. Plaintiff filed at least 15 public records requests; two document requests; a set of interrogatories; requests for admissions; and took 10 in person or virtual depositions and 6 depositions upon written examination.

The sole remaining potentially open discovery item is Plaintiff's request to depose Dr. Itzak Ben-David, which is a matter currently pending before this Court. The University acknowledges that the case may be stayed after the filing of this Motion or Plaintiff may require additional time to oppose this Motion should Dr. Ben-David's deposition be ordered.

## II.     STATEMENT OF MATERIAL FACTS

Plaintiff was hired in approximately 2012 to work in the FCB's Department of Marketing and Logistics as a Clinical Associate Professor of Marketing. Clinical Associate Professors are untenured faculty who are employed under multi-year contracts. (ECF 119-1: Plaintiff Dep., p. 13.) In addition to her undergraduate and graduate instructional duties, Plaintiff was a substantial contributor to the FCB's Executive Education Program ("EE Program"). It was Plaintiff's diversion of an opportunity for follow-on business presented by an EE Program client to her private company that ultimately led to her dismissal.

A.    **The Executive Education Program.**

The FCB's EE Program provides both open enrollment educational programs aimed at individual executives who seek to acquire new skills *a la carte* and leadership development and strategic planning programs for organizations. (ECF 86-1: Makhija Dep. pp. 31-48.) This matter involves the EE Program's customized programing for organizations.

EE Programs aimed at organizations are highly customized programs designed to be run in phases, often cascading down through the organization. (Id.) Ideally, new cohorts of a client's employees are run through the program as often as possible. (Id.) These EE Programs typically have an "Academic Director" to coordinate the program by finding appropriate instructors and serving as a point of contact for the client. FCB faculty who teach in specific EE Programs aimed at organizations are awarded supplemental contracts that provide additional compensation for their efforts above and beyond their normal faculty salaries. Notably, each supplemental contract contains a "no poaching" clause that provides, "participating faculty cannot solicit other training business from the [client organization] without Executive Education involvement." (ECF 126-1: Velasco Dep., pp. 79-80 and pp. Bates Nos. 505, 507-513, 515-517 of Ex. HHH thereto.) Thus, FCB faculty working in the EE Program are put on specific notice in their contracts with the EE Program that converting business opportunities presented by a current program client is prohibited, in addition to the relevant University policies and laws that apply to their work with the institution.

B.    **External Activities and Conflicts of Interests.**

To be clear, while university faculty owe their primary professional loyalty to the university, they are both permitted and in fact encouraged to use and grow their skills by engaging with the broader community, which, in turn, enriches their research and instruction. In fact, the University's Faculty Paid External Consulting Policy in effect during the timeframe material to

4

the Complaint provides that faculty may engage in limited paid, outside consulting work on

university time, provided that it does not otherwise create conflicts with their university work:

> Participation by faculty members of The Ohio State University in activities of
> government, in industry and in other private institutions generally serves the
> academic interests of the university. As a result of such activities, the people of
> Ohio benefit from the dissemination of knowledge and technology developed
> within the university and students benefit from experiences faculty bring to the
> classroom. Moreover, the professional experience and recognition that such
> participation brings to the faculty member is shared indirectly by the university.
> [***]
>
> [***]
>
> Faculty members, including administrators with faculty appointments, are
> encouraged to engage in paid external consulting to the extent that these activities
> are clearly related to the mission of the university and the expertise of the faculty
> member, provide direct or indirect benefits to the university, ***and do not entail a
> conflict of interest as defined in the Conflict of Interest Policy.***

(ECF 124-1: Noe Dep., Faculty Paid External Consulting (Office of Academic Affairs), p. 1 of Ex.
G thereto.) (emphasis added.)

The Faculty Financial Conflict of Interest Policy ("COI Policy") in effect during the

timeframe material to Plaintiff's Complaint provided that, "a conflict of interest exists if financial

interests or other opportunities for tangible personal benefit may exert a substantial and improper

influence upon a faculty member or administrator's professional judgment in exercising any

institutional responsibility." (ECF 124-1: Noe Dep., Faculty Financial Conflict of Interest Policy

(Office of Research), p. 2. of Ex. AAAAAA thereto.) The COI Policy provided a non-exhaustive

list of examples of conflicts of interest, including "[u]se of one's professional expertise to provide

services that compete with services provided by an academic entity within the university." (Id.)

Finally, the COI Policy provides, "Failure to comply with this policy may result in the filing of a complaint against the faculty member under Faculty Rule 3335-5-04." (Id.)[1]

During the timeframe material to the Complaint, a faculty member could present a proposed external contracting opportunity that presented a potential conflict of interests to the relevant department chair and dean for pre-clearance, using a brief disclosure form known as "Form 201." (ECF 86-1: Makhija Dep., p. 176; ECF 120-1: Inks Dep., p. 52.)

The FCB faculty who testified on behalf of Plaintiff at her hearing before the University's Faculty Hearing Committee (FHC) said that they would always consult someone within the FCB if there was any doubt about a particular opportunity. (ECF 119-1: Plaintiff Dep., pp. 124, 342-343, 372, 375 of Ex. 31 thereto.)[2]

### C. The Creation of the Ohio Department of Medicaid in 2013.

The Ohio Department of Medicaid (ODM) was created in July 2013 as Ohio's first Executive-level Medicaid agency. Medicaid is a federal means-tested, medical assistance program that is administered at the state level. Prior to 2013, Medicaid in Ohio was administered by the

---

[1] Also relevant is The Faculty Conflict of Commitment Policy, which at the time provided, "a conflict of commitment exists when external or other activities are so substantial or demanding as to interfere with the individual's teaching, research, scholarship or service responsibilities of the university or its students." Generally, faculty can spend approximately 20% of their work time on external activities. Faculty should disclose and discuss external commitments with their department chairs and/or deans." (ECF 124-1: Noe Dep., Ex. ZZZZZ, p. 8 Bates No. OSU_022728, thereto.)

[2] Labelling oneself as a "consultant" is not dispositive of whether the services provided are truly consulting. The term is sometimes used to refer to someone who is engaged as an independent contractor. For example, a business can hire a "consultant" to teach its staff how to use Microsoft Office products. In this case, the consultant is providing instructional services as an independent contractor. If, on the other hand, a business hires a "consultant" to analyze its technological infrastructure and recommend security upgrades, the "consultant" is clearly providing a solution.

Ohio Department of Job and Family Services.[3] However, the 2010 Affordable Care Act contained incentives for states to significantly expand Medicaid eligibility. Ultimately, then-Governor Kasich elected to expand Medicaid in Ohio, effective January 1, 2014.[4] As part of the expansion, ODM was created as a new free-standing state agency to oversee the expanded program.

Consulting powerhouse Deloitte provided true operational consulting to get ODM up and running as a Medicaid entity. (ECF 125-1: Schwalbe Dep., pp. 94-95.) The FCB's EE Program was eventually tapped to upskill ODM's people by developing a custom leadership development and strategic planning programming. This program will be referred to below as ODM-1.

    **D.**    **Doug Chaney Calls Marty Schwalbe at the FCB Looking for a "Change Management" Speaker. Schwalbe Grows the Opportunity into ODM-1.**

In March of 2014, ODM employee Doug Chaney called Marty Schwalbe at the FCB looking for someone to give a talk to ODM personnel on "change management." (ECF 125-1: Schwalbe Dep., p. 90 and Ex. HH thereto.) At the time, Schwalbe held the title of Director of Growth and Learning. He, along with Program Director, Michelle Norris, was responsible for selling and supporting EE Programs. Schwalbe inventoried ODM's needs and worked with Norris to create a proposal for an "Innovation Leadership" program for ODM personnel ("ODM-1"). (ECF 125-1: Schwalbe Dep., pp. 102, 104; ECF 119-1: Plaintiff Dep., Ex. 1 thereto.) The proposal was pitched to ODM in approximately May of 2014. (ECF 125-1: Schwalbe Dep., p. 98 and Ex HH thereto; ECF 125-1: Plaintiff Dep., Ex. 1.) Prominent among the proposed deliverables were: "strategy formulation and implementation"; leadership training; leadership and learning "assessments"; "strategy mapping"; and experiential learning via "site visits." To maintain

---

[3]https://www.beaconjournal.com/story/news/state/2012/07/27/kasich-makes-ohio-s-medicaid/10616559007/

[4] See note 3, supra and https://www.ohiomh.com/resources/glossary.

momentum and stay in the mix for follow-on opportunities, the ODM-1 proposal pitched quarterly forums and periodic "check ins." (ECF 119-1: Plaintiff Dep., Ex. 1, p. 3 of attachment "ODM Innovation Leadership Program 5-7-14.pdf".)

Plaintiff agreed to serve as "Academic Director" and "innovation coach" for ODM-1. Academic directors coordinated the instruction and programming for the engagement and would serve as the point of contact. (ECF 125-1: Schwalbe Dep., pp. 50-52.) Plaintiff also understood the role of Academic Director to involve "winning" and "retaining" EE Program clients. (ECF 119-1: Plaintiff Dep., pp. 22-24 and p. 9 of Ex. 3 thereto and p. 9 of Ex. 4 thereto.) The ODM-1 proposal called for Plaintiff to "work closely" with top ODM personnel. (ECF 119-1: Plaintiff Dep., Ex. 1, p. 5 of attachment "ODM Innovation Leadership Program 5-7-14.pdf".) As innovation coach, Plaintiff would have additional contact with ODM leadership through receiving and providing feedback on the program participants' presentations at "check-in" meetings. (Id., p. 16)

Ultimately, ODM approved the ODM-1 proposal in June of 2014. (ECF 126-1: Velasco Dep., p. 66 and Ex. VVV thereto.) The first cohort consisted of the 25 most senior ODM executives. A team of FCB faculty provided training, instruction, and facilitation two days each month from July 2014 to November 2014. The quarterly forums and the three and sixth-month check-ins were replaced with check-ins on June 16 and July 16 of 2015. (ECF 119-1: Plaintiff Dep., p. 18.) At these check-in meetings, ODM personnel would present their group projects to Plaintiff, who would provide feedback.

### E. ODM Tells Plaintiff it is Interested in Additional Services; Plaintiff Quietly Pockets the Opportunity for Her Company, CypressTree.

Between the conclusion of the classroom portion of ODM-1 in November of 2014 and the first June 2015 check-in meeting, Plaintiff remained in steady contact with ODM executives through a series of off-book meetings. (ECF 119-1: Plaintiff Dep., pp. 17, 28, 29, 30, 32, 35, 37,

38, 42-43 and Exs. 6, 7, 8, 9 thereto; Ex. B Affidavit of Carlene Evans, Exhibits A, B, D, E, F, H, I, J, K and L thereto.) As early as February 26, 2015, Chaney was attempting to schedule a meeting with Plaintiff to talk about next steps with "OSU" and the "leadership program." (ECF 119-1: Plaintiff. Dep., Ex. 6 thereto.) Plaintiff also volunteered herself to deliver a forward-looking talk at ODM's April 18, 2015 All Staff meeting. (ECF 119-1: Plaintiff Dep., p. 17, and p. 26 of Ex. 14 thereto.) Chaney then looked for ways to keep Plaintiff "in the loop" for "future work," including having Plaintiff sit in on a meeting with ODM leadership to discuss next steps immediately after the first ODM-1 check in meeting on June 16, 2015. (ECF 19-1: Plaintiff Dep., p. 32 and Ex. 7 thereto.)

Although as Academic Director, Plaintiff viewed part of her role as "winning" and "retaining" business for the EE Program, including ODM-1, she never discussed the EE Program's ability to perform the contemplated "future work." (ECF 119-1: Plaintiff Dep., pp. 39, 41, 65.) Nor did she disclose the opportunity (or even that additional discussions about future opportunities had been had) to Schwalbe or anyone else in the EE Program so the opportunity could be evaluated. (ECF 119-1: Plaintiff Dep., p. 106; and pp. 45-46 of Ex. 14 thereto; ECF 125-1: Schwalbe Dep., pp. 81-84; ECF 126-1: Velasco Dep., p. Bates No. OSU_000506 of Ex. HHH thereto.) Instead, Plaintiff centered herself, stating, "I am eager to continue the work and help you carry things forward." (ECF 119-1: Plaintiff Dep., p. 35 and Ex. 7 thereto.)

As a result of Plaintiff's interactions, ODM became aware of CypressTree and its purported ability to meet all of ODM's needs. What's more, ODM somehow concluded that CypressTree was not only the lower-cost alternative to the EE Program, but was indeed the *only* option for the follow-on services it was seeking. (ECF 119-1: Plaintiff Dep., pp. 39, 45, 65-66, 82.) All this occurred *during* ODM-1.

Although Plaintiff maintains that she never "solicited" business from ODM, by early July 2015, Chaney was checking on the "status of the [CypressTree] proposal." (ECF 119-1: Plaintiff Dep., pp. 37-38, and Ex. 8 thereto; Ex. B Evans Aff., Exhibit H thereto.) On the morning of the July 16, 2015, before the last check-in meeting and while ODM was still an EE Program client, Plaintiff emailed Chaney CypressTree's proposal to perform the next steps in the ODM leadership program ("ODM-2"). (ECF 119-1: Plaintiff Dep., pp. 43-44, and Ex. 10 thereto; Ex. B Evans Aff., Exhibit M thereto.) ODM-2 involved cascading elements of ODM-1 down through middle management. (ECF 119-1: Plaintiff Dep., pp. 72-74, 76 and Ex. 18 thereto.)

Like ODM-1, ODM-2 featured "assessments" and "strategy mapping" but with the next lower level of supervisors. Two additional phases were also foreshadowed, with all the phases flowing from the foundational work the EE Program did in ODM-1. (ECF 119-1: Plaintiff Dep., p. 18 and Ex. 23 thereto.) Due to its size, $1.8 million engagement was presented to the Ohio Controlling Board in three pieces: one smaller no-bid contract and two larger amendments. (ECF 119-1: Plaintiff Dep., pp. 56, 64, and Exs. 15 and 16 thereto; Ex. B Evans Aff., Exhibits P, S and X thereto.)

With some minor revisions, the initial CypressTree ODM-2 proposal was attached to a no-bid contract, which became effective September 4, 2015. (ECF 119-1: Plaintiff Dep., pp. 56, 58, and Ex. 15 thereto; Ex. B Evans Aff., Exhibits O and P thereto.) The initial contract amount for ODM-2 was $189,000.00. (Id.) So eager was Plaintiff to seize this opportunity for CypressTree that she repeatedly made a number of false statements and certifications when she executed the contract and its amendments. (ECF 119-1: Plaintiff Dep., pp. 58, 59, 60, 62, 63, 64, and Exs. 15 and 16 thereto; Ex. B Evans Aff., Exhibits P, S and X thereto.) In fact, by law, CypressTree could not perform ODM-2, as it was not authorized to do business in Ohio. (ECF 119-1: Plaintiff Dep.,

pp. 58-59, 63-64.) Nor was CypressTree even able to appropriately staff the contract at the time it was signed. (ECF 119-1: Plaintiff Dep., pp. 62-63.)

On January 14, 2016, ODM and CypressTree signed the first amendment and centerpiece installment of ODM-2, titled "Medicaid University." (Ex. B Evans Aff., Exhibit S thereto.) The contracted amount was $972,000.00. (Id., p. 1.) The slide deck describing Medicaid University called for "education" and "training" to equip middle managers with leadership skills. (ECF 119-1: Plaintiff Dep., pp. 8, 9, and Exhibit 15 thereto; Ex. B Evans Aff., Exhibit S thereto.) The curriculum aligns with the recollection of ODM's then-Executive Director, John McCarthy, who indicated that ODM's human resources department wanted its middle managers trained on "how to manage." (ECF 119-1: Plaintiff Dep., p. 81, and Ex. 20 thereto.)[5] Indeed, a cursory review of the syllabus for Medicaid University reveals bread-and-butter management topics that one could find in any MBA program. Other elements included guest speakers and experiential learning via "site visits," two programming elements of ODM-1. Participants would then "graduate" from the program, just like the alumni of ODM-1. (ECF 119-1: Plaintiff Dep., pp. 27, 94, 95, 101; Ex. B Evans Aff., Exhibit U thereto.)[6]

Having won over a million dollars in business for CypressTree, Plaintiff continued to phase herself out of the EE Program by refusing to participate in new RFPs and prohibiting anyone in

---

[5] Notably, CypressTree never conducted an analysis of an operational unit and issued a report dictating recommended steps, actions, or best practices. Instead, Medicaid University sought to "equip" ODM managers with "competencies," a hallmark of training and instruction. (ECF 119-1: Plaintiff Dep., p. 93 and Ex. 23 thereto; Ex. B Evans Aff., Exhibits T, U and V thereto.) While CypressTree used Tammy Thayer to conduct industry-standard leadership and personality testing, the EE Program also contracted out for those services for its clients and had used Thayer in the past. (ECF 119-1: Plaintiff Dep., p. 97.)

[6] In the past, the EE Program had created "University" programs for its clients, including "Textron University" and "Nationwide Marketing University," (ECF 125-1: Schwalbe Dep., Ex.MM thereto, p. Bates No. OSU-CTC-000104.)

11

the EE Program from using her materials. (ECF 119-1: Plaintiff Dep., pp. 67-71, and Ex. 17 thereto.) She also began hiring former EE Program employees to staff Medicaid University. (ECF 119-1: Plaintiff Dep., pp. 91-92.) On November 23, 2015, ODM Chief of Staff, Jennifer Demory, emailed Plaintiff to ask "How should I go about getting a second round of our leadership training scheduled?" (ECF 119-1: Plaintiff Dep., p. 75, and Ex. 19 thereto; Ex. B Evans Aff., Exhibit R thereto.) Plaintiff replied that the launch would not be until early 2016. (ECF 119-1: Plaintiff Dep., p. 77, and Ex. 19 thereto; Ex. B Evans Aff., Exhibit R thereto.)

On January 21, 2016, Demory sent an email to the ODM managers who had been selected to participate in the "ODM Strategic Leadership Development Program," that is, ODM-2 or Medicaid University. (ECF 119-1: Plaintiff Dep., pp. 90-92; Ex. B Evans Aff., Exhibit T thereto.) This was the exact same name that was used by the EE Program in Plaintiff's supplemental contracts for ODM-1. (ECF 119-1: Plaintiff Dep., pp. 91-92.) The welcome guide for the program, like the syllabus, left no doubt that the program was educational in nature and designed to "equip" supervisors with "competencies" in communications and leadership skills. (ECF 119-1: Plaintiff Dep., p. 93, and Ex. 23 thereto.) Demory, an alumnus of ODM-1, closed the selection email by stating, "I hope you enjoy this opportunity as much as we did when we went through the program." (Ex. B Evans Aff., Exhibit T thereto.)

### F. Paul Velasco is Hired as the New Executive Director of the EE Program on March 25, 2016. He asks Schwalbe about Opportunities to Serve Current and Former EE Program Clients. Schwalbe Stumbles across ODM-2.

Experiential learning through "site visits" was a staple of ODM-1 and is used in other EE Programs. During ODM-1, one site visit involved ODM leadership taking a field trip a local nonprofit to hear from its Executive Director. Schwalbe happened to sit on the board of this nonprofit. Consistent with cascading ODM-1 programming do lower levels of management,

12

CypressTree included this non-profit in the Medicaid University portion of ODM-2. Fortuitously, the Executive Director of the nonprofit told Schwalbe that he was happy to once again be participating in the EE Program for ODM. (ECF 126-1: Velasco Dep., p. 47; ECF 125-1: Schwalbe Dep., pp. 80-83, and Ex. HH thereto.) This surprised Schwalbe, since the EE Program was not running programming for ODM at the time. (ECF 86-1: Makhija Dep., Ex. A thereto; ECF 125-1: Schwalbe Dep., p. 81.)

Schwalbe reported this development to the new Executive Director of the EE Program, Paul Velasco, as the two had recently been discussing the status and potential of current and former EE Program clients, including ODM. (ECF 125-1: Schwalbe Dep., pp. 80-84; ECF 126-1: Velasco Dep., p. 45.) Velasco resolved to take a further look at the CypressTree transaction. Because ODM was a public agency, Velasco was easily able to pull the initial CypressTree contract and the first amendment for Medicaid University from the Ohio Controlling Board's website. (ECF 126-1: Velasco Dep., p. 48.)

Velasco presented the matter to FCB Dean, Anil Makhija, who found the matter concerning, but indicated that any formal action to address misconduct would have to proceed through the University's disciplinary process for faculty, known as the "04 process" as discussed below. (ECF 126-1: Velasco Dep., pp. 48-49.)

### G. Velasco's 04 Complaint and the 04 Process.

Because faculty members have a property interest in their employment and are entitled to due process in disciplinary matters, the University has established a formal disciplinary procedure that is set forth in Faculty Rule 3335-5-04, titled "Hearing Procedures for Complaints Against Faculty Members," and which is commonly referred to as the "04 process." Because the University is a state institution, its rules are codified in the Ohio Administrative Code (OAC)—in this case,

Chapter 3335-5 of the OAC.[7] As noted above, the 04 process is the only path by which faculty members may be formally disciplined for alleged violations of the policy or law, including violations of the University's COI Policy.

In contrast to top-down, commercial or industrial employer-employee relationships, the 04 process is an expression of shared governance, with up to eight steps of review of specific allegations depending on the severity of the matter. As such, the 04 process affords respondent faculty a number of procedural protections and up to two opportunities for peer review before a final decision is made. Critically, in line with basic principles of fairness, faculty members must be put on notice of the allegations against them from the outset of any such proceeding, and the rule makes it clear that only allegations set forth in the complaint may be considered during the course of the proceedings. OAC §3335-5-04 (B)(4).

On January 3, 2017, Velasco presented Makhija with an 04 complaint. Velasco's 04 complaint provided a detailed set of allegations in line with the requirements of the 04 rule, challenged a specific transaction (ODM-2) as violative of university policy and Plaintiff's contractual obligations, and expressly invoked the 04 process. (ECF 126-1: Velasco Dep., Ex. HHH thereto.) Attaching the initial ODM-2 contract and the first amendment for Medicaid University, Velasco alleged that the CypressTree engagement for ODM-2 violated: (1) the University's Faculty Conflict of Commitment Policy, which prohibits faculty from engaging in activities that interfere with their University responsibilities, given that the scope of the engagement seemed to eclipse Dr. Mitchell's duties as a University employee; (2) the University's COI Policy, which prohibits faculty from engaging in behavior that creates conflicts of interest

---

[7] Attached as Exhibit A hereto is a version of the 04 Rule that was in effect at the time material to Plaintiff's Complaint. The rule has since been amended.

with the University, including using one's own personal services to compete with the University; and (3) the no solicitation clauses of the contracts Plaintiff signed as part of her participation in the EE Program's delivery of ODM-1. (ECF 126-1: Velasco Dep., Ex. HHH, pp 2-3.)

Velasco's complaint stated that, if true, Dr. Mitchell's conduct could constitute "grave misconduct," a serious offense potentially punishable by termination of employment. "Grave misconduct" is defined in division (A)(4) of OAC §3335-5-04, as: "[…] flagrant, egregious, and willful misbehavior in violation of the law or established university rules or policies. Allegations of grave misconduct shall be judged on the basis of acts or omissions which seriously impair the effectiveness of a faculty member to meet his or her obligations as a faculty member."

### H. Review by Plaintiff's Department Chair (OAC §3335-5-04 (C)).

Once an 04 complaint is filed, a crucial initial step is a probable cause review by the subject's department chair. OAC §3335-5-04 (C). In this case, Plaintiff was a member of the FCB's department of Marketing and Logistics. (ECF 38, ¶8.) Her department chair was Dr. Tom Goldsby. (Id., ¶229.) Goldsby reviewed Mr. Velasco's complaint and spoke with both Plaintiff and Velasco. On February 10, 2017, Goldsby informed Makhija that ODM-2 involved "some degree of education and training" and that further proceedings were warranted to determine whether a violation occurred. (ECF 86-1: Makhija Dep., Ex. B thereto, Id., ¶129.) [8]

### I. Probable Cause Review by Dean Makhija (OAC §3335-5-04(D)).

Upon receipt of a probable cause determination from the department chair, the dean of the relevant college must meet with the parties and conduct his or her own independent probable cause determination. OAC §3335-5-04(D)(1) & (2). If the dean finds "probable cause to believe that the

---

[8] Goldsby much later attempted to retract his probable cause determination and was not sued by Plaintiff.

allegations are true" and further determines that an informal resolution is not appropriate, he or she must refer the matter to the "college investigation committee" (CIC). *See* OAC §3335-5-04(D)(2).[9] The CIC, which is discussed more fully in the section immediately below, is a committee of tenured faculty created by the relevant college within the University to hear disciplinary complaints against faculty in that college. See OAC §3335-5-04(E)(1).

After receiving Goldsby's probable cause determination, Makhija met with Plaintiff on February 20, 2017. On October 23, 2017, Makhija concurred with Goldsby's determination that there was probable cause for further proceedings. Because the matter involved an allegation of grave misconduct, informal resolution was not an option and the matter was required to be evaluated by the CIC. *See* OAC §3335-5-04(D)(3).[10].

**J.    Merits Review by the College Investigation Committee (CIC) (OAC §3335-5-04(E)).**

The CIC in this case was drawn from an existing pool of FCB faculty. OAC §3335-5-04(E)(1). The CIC "shall meet with the complainant and the respondent" and "review any documentary evidence provided by these parties." The CIC may also "obtain relevant information

---

[9] The CIC is a committee of tenured faculty created by the relevant college within the University to hear disciplinary complaints against faculty in that college. See OAC §3335-5-04(E)(1). The CIC is required to meet with the complainant and respondent, investigate the allegations (which may include gathering evidence from those individuals and "other persons"), issue findings under the clear and convincing evidence standard, and, if a violation is found, recommend an appropriate sanction. See OAC §3335-5-04(E)(2).

[10] To prevent allegations of serious misbehavior, including grave misconduct, from being buried at a lower level of the University, such allegations under the 04 rule in effect at the time, were required to be forwarded to the next level of review stopping with Provost's decision after peer review by the CIC. Thus, while a department chair had some latitude to dismiss 04 complaints, allegations of grave misconduct must be forwarded to the dean. *See* OAC §3335-5-04(C)(3). Similarly, the dean is required to forward allegations of grave misconduct to the CIC. *See* OAC §3335-5-04(D)(3). After receiving the findings and recommendations of the CIC, the dean may make a decision but must also refer the matter to the Provost if it involves an allegation of grave misconduct. *See* OAC §3335-5-04(F)(4). There are no mandatory escalations beyond the Provost level. *See* OAC §3335-5-04(G)(3).

from other persons[.]" OAC §3335-5-04(E)(2). After the CIC concludes its review, it makes a recommendation to the dean as to the merits and a proposed sanction, if any. (Id.)

In this case, the CIC that reviewed the allegations against Plaintiff was composed of four of her peers from the FCB, three men and one woman. (ECF 124-1: Noe Dep., pp. Bates Nos. OSU_022721, OSU_022725 of Ex. ZZZZZ thereto.)[11] For months, the CIC gathered evidence and interviewed various people, including Plaintiff. (ECF 124-1: Noe Dep., pp. Bates Nos. OSU_022726 – OSU_022727 of Ex. ZZZZZ thereto.)

The CIC interviewed Plaintiff on May 16, 2018. During the interview, Dr. Isil Erel, a female member of the CIC, returned again and again to the timing of the CypressTree involvement. (ECF 119-1: Plaintiff Dep., Ex. 14, pp. 29-30, 34-35, 41-43, 74-75, 78-81.) In response, Plaintiff stated only that she had received a random call from Demory seeking to engage CypressTree weeks after the last check-in meeting on July 16, 2015. (ECF 119-1: Plaintiff Dep., pp. 47, 49-51, 53 and Exs. 11, 12, 13 thereto; p. 31 of Ex. 14 thereto.) Plaintiff told the CIC that when she left ODM after the July 16 check-in meeting, "there was no notion of consulting." (ECF 119-1: Plaintiff Dep., pp. 54-55, and p. 41 of Ex. 14 thereto.)[12] Plaintiff conceded to the CIC that the EE Program

---

[11] When one woman recused herself because she was from Plaintiff's department, CIC Chair Noe proposed, and Makhija agreed, that another female FCB faculty member (Dr. Isil Erel) be seated. (ECF 124-1: Noe Dep., pp. 137-138 and p. Bates No. OSU_022725 of Ex. ZZZZZ thereto.)

[12] Neither Velasco nor subsequent recommenders were aware of the nature and extent to which Plaintiff had cultivated ODM as a CypressTree client prior to the last July 16, 2015 check-in meeting. Despite marshalling binders of alleged evidence at every stage of the 04 proceeding, Plaintiff claims to have somehow forgot about CypressTree's July 16, 2015 proposal. (ECF 119-1: Plaintiff Dep., pp. 54-56.) However, the recommenders were aware that Plaintiff claimed to have received a call out of the blue from Demory "a couple weeks" after the conclusion of ODM-1. (ECF 119-1: Plaintiff Dep., p. 41 of Ex. 14 thereto.)

would have been interested in bidding on ODM-2. (ECF 119-1: Plaintiff Dep., pp. 106-107, and pp. 35, 45-46 of Ex. 14 thereto.)

In an extensive report issued on July 12, 2018, the CIC unanimously concluded that through the CypressTree engagement for ODM-2 Plaintiff had: (1) violated the University's COI Policy and that this constituted grave misconduct; (2) violated the Faculty Conflict of Commitment Policy but that her conduct did not rise to the level of grave misconduct; and (3) not violated the "no solicitation" clauses in her Exec. Ed. contract by a level of clear and convincing evidence." (ECF 124-1: Noe Dep., Bates No. OSU_022724 of Ex. ZZZZZ thereto.) Based on the severity of the offense, the CIC recommended to Makhija that Plaintiff immediately be dismissed from employment at the University. (Id., Bates No. OSU_022739. Of Ex. ZZZZZ thereto.)

With respect to Plaintiff's violation of the University's COI Policy, the FCB faculty on the CIC, most of whom had taught in EE Programs, found overlap between EE Program offerings and ODM-2/Medicaid University. (ECF 124-1: Noe Dep., Bates Nos. OSU_022732 – OSU_022733 of Ex. ZZZZZ thereto.) In fact, the CIC found that portions of the Medicaid University proposal were identical to EE Program offerings. (ECF 124-1: Noe Dep., Bates No. OSU_022732 of Ex. ZZZZZ thereto.) The CIC concluded:

> Regarding violating the Faculty Financial Conflict of Interest Policy and because of the reasoning above, the 04 Committee agrees that there is clear and convincing evidence that Mitchell's behavior constitutes misconduct.
>
> More importantly, the 04 Committee extensively discussed whether or not this misconduct constitutes grave misconduct, which requires evidence of ". . . flagrant, egregious, and willful misbehavior in violation of . . . established university rules or policies." The 04 Committee concluded this misconduct is flagrant, egregious, and willful for several reasons. First, Mitchell offered services for ODM II involving elements (content and delivery) clearly in competition with Fisher EE and because Mitchell should have reasonably known (based on prior experiences) to at least seek consultation from Fisher before proceeding. Second, Mitchell removed Slides 24 and 28 in materials submitted to the 04 Committee for evaluation – slides which provided important information about the nature of ODM II,

especially the extent to which it overlapped with services that Fisher EE could provide. Third, Mitchell did not use her role as Academic Director for ODM I to help Fisher EE retain ODM. Instead, Mitchell allowed her Fisher EE to be confounded with her consulting practice to land the ODM II contract. (ECF 124-1: Noe Dep., Bates Nos. OSU_022736 – OSU_022737 of Ex. ZZZZZ thereto.)

The CIC's findings and recommendation were then presented to Makhija—this time for a review and decision on the merits. *See* OAC §3335-5-04(E)(2).

### K.    Merits Decision by Dean Makhija OAC §3335-5-04(F)).

Makhija reviewed the findings and recommendations of the CIC. In a letter dated August 17, 2018, Makhija informed Plaintiff that he concurred with the CIC's findings and recommendation that Plaintiff engaged in grave misconduct and should be dismissed. (ECF 86-1: Makhija Dep., pp. 2-3 of Ex. O thereto.) Among other things, Makhija agreed that there was sufficient evidence that Plaintiff had directly competed with the EE Program by surreptitiously "diverting" the ODM-2 opportunity to CypressTree, thereby denying the EE Program an opportunity to tender a bid for the follow-on services. (ECF 86-1: Makhija Dep., pp. 93-94 and p. 3 of Ex. O thereto.) In light of the finding of grave misconduct by Plaintiff's peers on the CIC and his concurrence with their recommendation of termination, Makhija assigned Plaintiff to non-teaching duties during the remainder of the 04 process, though she was still free to perform her other duties during this time. (Id.)

Importantly, Makhija's determination was ultimately advisory in nature, because grave misconduct cases must be referred to the University's Provost, then Dr. Bruce McPheron, for further review irrespective of the finding. *See* OAC §3335-5-04(F)(4).

### L.    Merits Decision by Provost McPheron OAC §3335-5-04(G).

Although the allegation of grave misconduct against Plaintiff was required to be reviewed by McPheron, *see* OAC §3335-5-04(F)(4), Plaintiff also filed an appeal as permitted by OAC §3335-5-04(F)(5), which provides for a general right of appeal. An appeal to the Provost does not

entail a reinvestigation of the merits. Instead, the Provost's review is limited to the "allegations in the 04 complaint" and "the record" generated in the proceedings below. *See* OAC §3335-5-04(B)(4) & (G)(1). The Provost may take a range of actions from dismissing a complaint to imposing a harsher sanction. *See* OAC §3335-5-04(B)(4) & (G)(1).

Vice Provost Kay Wolf assisted McPheron with his review by compiling the record discussing the matter with him to assist him in making his decision, and then working on a draft letter for his review to memorialize that decision. (ECF 121-1: McPheron Dep., pp. 30, 52, 57; ECF 127-1: Wolf Dep., pp. 9-11, 15-16, 18, 20.) Thereafter, McPheron would be presented with a draft written decision. (ECF 127-1: Wolf. Dep., p. 46.) On November 19, 2018, McPheron upheld Makhija's decision. (ECF 127-1: Wolf Dep., p. 8 and Ex. S thereto.)

The Provost's decision is final unless the respondent appeals to the Faculty Hearing Committee (FHC). OAC §3335-5-04(G)(3) & (4). Plaintiff appealed McPheron's decision on December 7, 2018.

While the 04 rule does not entitle Plaintiff to submit any arguments or additional materials at this stage of review, Plaintiff nonetheless provided several binders worth of documentation to the Provost, which Wolf reviewed. Included in this information was a copy of a Charge of Discrimination Plaintiff had recently filed with the Equal Employment Opportunity Commission. (ECF 121-1: McPheron Dep., p. 50 and Ex. R. thereto.) However, McPheron was constrained by the 04 rule to look only at the "record" of the prior proceedings in connection with Velasco's ethics complaint, he had no authority under this rule to conduct an independent investigation into allegations of gender discrimination. See OAC §3335-5-04(B)(4) ("Only allegations stated in the complaint shall be considered at the various stages of deliberation."). Instead, on December 12, 2018, in accordance with the then-current version of the University's Affirmative Action, Equal

Employment Opportunity, and Non-Discrimination/Harassment policy, Wolf informed Plaintiff

that she would have to pursue other processes to raise such a claim, and invited her to do so.

Specifically, in forwarding the case to Dr. Caroline Clark, the Chair of the Faculty Senate Hearing

Committee, who would convene a panel to hear Plaintiff's appeal, Wolf wrote to Clark and

Plaintiff:

> Note that Professor Mitchell alleges in her appeal an inequity in gender-based
> discrimination. We do not believe that this claim is relevant to the merits of the
> complaint filed or the findings made against Professor Mitchell with respect to that
> complaint. Rather, should Professor Mitchell believe that she has been
> discriminated by the College, I would refer her to the University policy on
> Affirmative Action, Equal Employment Opportunity & Non-
> Discrimination/Harassment (https://hr.osu.edu/wp-
> content/uploads/policy110.pdf). As set forth in that policy, she can file a complaint
> of discrimination with the Office of Human Resources (https://hr.osu.edu/wp-
> content/uploads/form-discrimination-harassment-complaint.pdf). I have copied
> Professor Mitchell and included the appropriate links.

(ECF 127-1: Wolf Dep., pp. 30-31 and Ex. OOOOOO thereto.) Plaintiff tellingly never filed a

complaint with the University's Office of Human Resources to allege the gender discrimination

claims that she raises in this suit, even after receiving this specific, detailed information on how to

do so. The 04 complaint did proceed to the FHC, however.

**M.  Appeal to the Faculty Hearing Committee (FHC) OAC §3335-5-04(H).**

Upon receipt of an appeal, the FHC is charged with convening a de novo hearing on the

matter—in other words, a complete reinvestigation of the allegations in the form of a hearing.

OAC §3335-5-04(H)(1). Unlike CICs, which are created by the relevant college within the

University, an FHC panel is composed of faculty from across the University who are selected by

the University Senate's Faculty Council. (ECF 123-1: Clark Dep., pp. 62-64.) In this case, the FHC

convened to hear Plaintiff's appeal was composed of two women and one man, with one alternate.

(ECF 123-1: Clark Dep., pp. 57-58, 129, and p. 2 of Ex. OOOO thereto.)

The FHC is not "bound by the findings of the college investigation committee or the executive vice president and provost." OAC §3335-5-04(H)(8). The FHC is empowered to "receive testimony and other evidence as it deems to be material and relevant to the issues before it." OAC §3335-5-04(H)(5). At the conclusion of the hearing, the FHC submits its findings and recommended sanction to the University's President, who, at the time, was Dr. Michael Drake.

Plaintiff presented her case before the FHC on April 29, 2019, a mutually-agreed upon date, and presented three witnesses on her behalf in addition to herself. The FHC independently and unanimously concluded that Plaintiff's private engagement with the ODM had violated the University's COI Policy and that the violation constituted grave misconduct. In addition, the FHC independently and unanimously recommended to Drake that Plaintiff be immediately dismissed from the University. (ECF 123-1: Clark Dep., p. 4 of Ex. OOOO thereto.) Among other things, the Committee found that the evidence adduced by Plaintiff undercut her case. For example, the letter Plaintiff had commissioned from Demory suggested that ODM was in the market for additional services, although not the "exact same" services. (ECF 123-1: Clark Dep., Ex. OOOO, p. 3.) What's more, the witnesses Plaintiff called in her defense all testified that they would err on the side of disclosing proposed transactions to address potential conflicts of interest. ECF 119-1: (Plaintiff Dep., Ex. 31 thereto, pp. 122-124, 334, 342-343, 372, 375.)[13] On or around May 1, 2019,

---

[13] Plaintiff retained a court reporter to transcribe the proceedings before the FHC. A manuscript of the proceedings is Exhibit 31 to Plaintiff's deposition.

the FHC delivered its findings of fact and recommendation, along with a record of the proceeding to the University's then-President Dr. Michael Drake.[14]

### N. Review and Recommendation by Then-President Michael Drake and Decision by the Board of Trustees.

Drake reviewed the FHC's findings and recommendations and, in a letter dated July 31, 2019, recommended to the University's Board of Trustees that Plaintiff be dismissed from employment. (*See* OAC §3335-5-04(I)(1)(c); Ex. C Affidavit of Jessica Eveland, Exhibit A thereto.) On August 30, 2019, the Academic Affairs and Student Life Committee of the University's Board of Trustees recommended the full Board that Plaintiff's employment be terminated. (Ex. C Eveland Aff., Exhibit B thereto.) The full Board accepted the Committee's recommendation the same day. (Id., at Ex. C.)

### O. Plaintiff's Eleventh-Hour OIE Complaint.

On or about July 29, 2019, over 7 months after Wolf had provided Plaintiff with information on how to file a discrimination complaint, a faculty member contacted the University's newly created Office of Institutional Equity (OIE) to relay that Plaintiff had made an allegation of sex discrimination in the context of her failure to be reappointed. (ECF 119-1: Plaintiff Dep., p. 144.) When contacted by OIE investigator Martha Phillips in early August 2019, Plaintiff indicated that she wanted the business dealings of a number of male faculty investigated. (ECF 122-1: Phillips Dep., p. 71.) However, unlike the 04 Complaint against her, Plaintiff simply made conclusory assertions that other faculty were "consulting." She was not able to identify a specific

---

[14] Separately, on May 3, 2019, Goldsby informed Makhija that Plaintiff's department had not recommended that her faculty contract be renewed when it expired on August 31, 2020. Of the eleven members of Plaintiff's department, nine faculty members abstained and two voted not to reappoint. (ECF 86-1: Makhija Dep., p. 195, and Ex. BB thereto.) Sensing a "strong lack of support" from Plaintiff's colleagues, Makhija informed Plaintiff on May 31, 2019 that he was not going to renew her contract. (ECF 86-1: Makhija Dep., pp. 192-193.)

transaction involving direct competition with the EE Program over a current client's need for training and educational services. Moreover, Phillips had no way to investigate the private business dealings of faculty. (Id., pp. 169-170.) (ECF 122-1: Phillips Dep., pp. 135, 169-170.)[15] Phillips ultimately determined that Plaintiff's allegations did not meet the University's policy definition of harassment and closed the matter.

## III.  LAW AND ARGUMENT

### A.  Summary Judgment Standard.

Summary judgment is appropriate in those cases where the moving party establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) Although the Court must draw all reasonable inferences in favor of the non-moving party, the Court may grant summary judgment if that party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

To defeat a motion for summary judgment, the opposing party must come forward with "more than just some metaphysical doubt as to the material facts." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Where the record in its entirety would not lead a jury to find for the non-movant, a genuine issue of material fact does not exist. *Id.* at 1478.

Material facts are those which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). Mere allegations of a factual dispute are not sufficient to meet this standard. *Id.*

---

[15] CypressTree's contract with ODM was a matter of public record.

In this case, the sworn testimony and admissible documentary evidence establishes there is no genuine issue of material fact which would prevent granting summary judgment on the sole remaining claim in this action—that is, Count I of the Complaint.

**B.    Because Plaintiff can neither Establish a Prima Facie Case of Sex Discrimination nor Rebut the University's Legitimate, Nondiscriminatory Reason for her Discharge, the University is Entitled to Summary Judgment on Plaintiff's Claim of Sex Discrimination under Title VII.**

Count I of Plaintiff Complaint purports to set forth a cause of action for sex discrimination against the University under Title VII. (ECF 38, PageID 419, ¶¶252-253.) Title VII prohibits covered employers from, among other things, discriminating against an individual in the terms and conditions of employment on the basis of sex. See 42 U.S.C. sec. 2000e-2. Title VII requires an aggrieved person to file a charge within 300 days from the alleged unlawful occurrence. See 42 U.S.C. §2000e-(5)(e)(1). Counting 300 days back from Plaintiff's first EEOC Charge, filed on October 29, 2018 (ECF 119-1: Plaintiff Dep., Ex. 12 thereto.), only events occurring on or after January 2, 2018 are actionable.[16]

Discriminatory intent can be proven with either direct or circumstantial evidence. Where, as here, a plaintiff cannot point to direct evidence of discrimination, a plaintiff may nonetheless attempt to raise an inference of discriminatory intent under Title VII using the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To establish a prima facie case of gender discrimination under Title VII using the *McDonnell Douglas* proof scheme, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4)

---

[16] Plaintiff filed a second EEOC Charge on February 4, 2020.

others, similarly situated and outside the protected class, were treated differently. *Knox v. Neaton Auto Products Manufacturing, Incorporated,* 375 F.3d 451, 456-457 (6th Cir. 2004).

Once the prima facie case is established, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 391 (6th Cir. 2008). If the defendant meets its burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but [was] merely a pretext for discrimination." Id. at 391-92. To prove as much, the plaintiff must show that: (1) the defendant's stated reason had no basis in fact; (2) the defendant's stated reason was not its actual motivation for the adverse employment action at issue; or (3) the defendant's stated reason was insufficient to motivate the adverse action. *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008).

To survive summary judgment, the plaintiff must produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination and to instead conclude that the plaintiff's protected characteristic played a determinative role in the adverse employment decision. *Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1023 (6th Cir. 1993).

The United States Supreme Court has made it clear that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 518 (1993). Moreover, the Court held that "it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id*. at 519.

For the purposes of this motion, the University assumes *arguendo* that Plaintiff can create a genuine issue of material fact as to prongs one through three of a prima facie case of sex discrimination under Title VII using the *McDonnell Douglas* proof scheme. That is, Plaintiff is a

female; but for her grave misconduct, she was qualified for the position she held; and that her dismissal with one year left on her terminal contract was an adverse employment action. Count I nonetheless fails for two independent reasons. First, Plaintiff cannot establish a genuine issue of material fact with respect to the fourth prong of a prima facie case of sex discrimination under the *McDonnell Douglas* proof scheme—that is, she cannot establish that a similarly situated male FCB faculty member was treated more favorably under similar circumstances. Second, even if Plaintiff could establish a prima facie case of sex discrimination, her claim would still fail. As explained below, a reasonable jury simply could not conclude on this record that the University's reason for Plaintiff's dismissal was a mere pretext for intentional sex discrimination. These two fatal flaws are discussed in turn.

### 1. There are no Similarly-Situated FCB Faculty who were Treated More Favorably under Similar Circumstances.

Simply put, there are no similarly situated male FCB faculty members in this case. Plaintiff's conduct was singularly egregious. To be considered "similarly-situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992). Moreover, to avoid summary judgment, the plaintiff must "establish that those other employees . . . committed errors with the same 'severity and frequency" as Plaintiff. *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116 (6th Cir. 2001). Plaintiff cannot point to a male FCB faculty member who engaged in similar conduct and was treated more favorably or faced an 04 process for similar conduct and was treated more favorably.

Here Plaintiff leveraged her introduction to ODM through the EE Program and her role as Academic Director to directly compete against the EE Program for the opportunity to provide a current EE Program client additional services. These additional services involved "assessments," "training," "education," and "instruction," which either built upon the ODM-1 engagement or were staples of the EE Program. (ECF 124-1: Noe Dep., Ex. ZZZZZ thereto; ECF 86-1: Makhija Dep., Ex. O thereto; ECF 127-1: Wolf Dep., Ex. S thereto; ECF 123-1: Clark Dep., Ex. OOOO; Ex. C Eveland Aff., Exhibits A-C thereto.) ODM-2's $1,823,000.00 scope of work was clearly something that would make financial sense for the EE Program to bid on in whole or part. And Plaintiff conceded that the EE Program would have wanted to tender a proposal. (ECF 119-1: Plaintiff Dep., pp. 39, 106, and pp. 45-46 of Ex. 14 thereto.) There is no one who so brazenly hijacked an EE Program client for personal gain.

Rather than advancing an alleged comparator who similarly converted a business opportunity, Plaintiff alleges that numerous other male FCB faculty engaged in "consulting" without drawing an 04 complaint. However, Plaintiff was not dismissed for generically offering training and education services to the general public that could conceivably be performed by the EE Program. ODM-2 was a specific opportunity to perform related services that arose during ODM's engagement with the EE Program. In fact, Plaintiff herself engaged in "consulting" activities both before and after Velasco's 04 complaint challenging ODM-2, without incident. (ECF 119-1: Plaintiff Dep., pp. 13-14.) Thus, male FCB faculty who provide "consulting" services to the general public are not apt comparators in this case.

Plaintiff is likely to suggest that if the University had only investigated the scores of male FCB faculty she alleged were "consulting," the University might have turned up a similar transaction. However, there's no authority for this proposition, and it's not an element of the

*McDonnell Douglas* proof scheme. To create a triable issue on the "similarly situated" prong, a plaintiff must prove that the employer knowingly treated another employee outside plaintiff's protected class more favorable under similar circumstances. *Caratachea v. Homewood Indus.,* 2002 U.S. Dist. LEXIS 24759, *1, 2002 WL 31844997 ("[I]t would be illogical to sustain employer liability for disparate treatment when the employer was unaware of any other misconduct."); *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1366 (7th Cir.1988) ("The plaintiffs have not, however, provided any specific facts that even arguably suggest that the police knew that minority or female recruits were engaged in acts against the employer of 'comparable seriousness,' to the acts of plaintiffs."). Discriminatory intent is inferred from what an employer knows at the time.

To require an employer to stop in its tracks and investigate every other employee before enforcing a rule against one employee is not legally required and is unrealistic. That's particularly true here where Plaintiff misapprehended the issue as one of "consulting" and repeatedly said that the private consulting work "completed by my male colleagues is also <u>not in competition</u> with Fisher Executive Education. Neither they, nor I, have competed with Fisher College of Business. Neither they, nor I, have done anything wrong." (ECF 119-1: Plaintiff Dep., p. 123, and pp. Bates Nos. MITCHELL 000251, MITCHELL 000253 of Ex. 29 thereto.) Rather than pointing to a specific transaction, Plaintiff simply asserted to the effect that, "if I did something wrong, then they did something wrong." (ECF 127-1: Wolf Depo, pp. 61-63 and Exs. Q and R thereto.) Not only does this assertion fail to account for the nature of Plaintiff's misconduct (conversion v. consulting), it also fails to acknowledge the detailed analysis and due process considerations that attend faculty conflict of interest determinations. These specialized determinations should be given deference.

As set forth above, faculty have extensive due process rights in disciplinary investigations in accordance with the OAC-codified faculty rules, and any potential discipline can only occur through a formal, complaint-initiated process, wherein specific allegations are set forth that the faculty member has the ability to respond to and rebut at various stages of review. See OAC §3335-5-04.

Plaintiff can hardly complain, then, that she was the only faculty member to face discipline, when she herself failed to pursue allegations against others she believed were acting wrongfully. And, without going through that process, it is impossible to determine whether the university would have acted similarly in response to specific allegations made in the 04 process against a comparable faculty member (if one actually even exists).

Therefore, Plaintiff cannot establish a prima facie case of sex discrimination under the *McDonnell Douglas* proof scheme. Accordingly, the University is entitled to summary judgment on Plaintiff's sole remaining claim of sex discrimination in violation of Title VII in Count I of the Complaint.

### 2. Plaintiff Cannot Establish that the University's Legitimate, Nondiscriminatory Reason for Her Dismissal was Pretext for Intentional Sex Discrimination.

Even if Plaintiff could establish a genuine issue of material with respect to a prima facie case of sex discrimination under Title VII, which she cannot, the University is still entitled to summary judgment on Count I. It is beyond dispute that the University has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. A violation of an employer policy is a legitimate, nondiscriminatory reason for terminating an employee's employment. *See Gethers v. PNC Bank*, 813 F.App'x 746, 749 (3rd Cir. 2020); *see also Yaklin v. Comerica, Inc.*, E.D.Mich. No. 06-14547, 2008 U.S. Dist. LEXIS 5062, at *9 (Jan. 24, 2008) (unethical behavior is a "legitimate" and "nondiscriminatory" reason for termination of employment); *see also*

*Schwendeman v. Marietta City Schs*, 436 F. Supp. 3d 1045 (S.D.Ohio 2020) (violation of express policy a legitimate, non-discriminatory reason); *Blackshear v. Interstate Brands Corp.,* 495 Fed. App'x 613, 618 (6th Cir. 2012).

Plaintiff's mindboggling conduct easily meets this minimal burden of production. At the risk of repetition, as the Academic Director, Plaintiff was the face of the ODM-1 Program and ODM's point of contact for next steps. In traveling to ODM as its keynote speaker at its All Staff meeting in April of 2015 and presiding over the June and July 2015 check-in meetings, Plaintiff occupied positions of prominence and trust. However, the facts are clear that Plaintiff began functioning in a dual capacity, going so far as to meet with ODM personnel to position CypressTree as a future vendor, *while* at ODM on University business. Indeed, before the start of the last ODM-1 check-in meeting, Plaintiff had already created and transmitted a proposal on behalf of CypressTree to be discussed that very day. Plaintiff's conversion of a 1.8 million-dollar opportunity is certainly serious enough to warrant dismissal.

For the reasons set forth above, Plaintiff's egregiously unethical behavior was the actual reason for her discharge and there's not even a whisper of evidence that her gender played a role in the decision. Therefore, the University is entitled to summary judgment on Plaintiff's sole remaining claim in Count I of the Complaint for this second, independent reason.

**C.    Even if the Court Concludes that Plaintiff has Presented a Jury Issue with respect to her Dismissal, She has not Presented Sufficient Evidence to Establish that she would have been Reappointed and Therefore her Economic Damages are Limited.**

Because Plaintiff has failed to raise a triable issue as to whether her dismissal was the product of intentional sex discrimination, the questions surrounding Plaintiff's reappointment are moot. However, if the Court concludes that Plaintiff's dismissal presents a jury issue, Plaintiff has failed to create an issue of fact as to whether she would have been reappointed.

As noted above, not a single member of Plaintiff's department supported her reappointment, and there's no evidence that Makhija based his decision on anything other the lack of support demonstrated by Plaintiff's colleagues. Nor can Plaintiff point to a similar case where a faculty member was treated more favorably.

While Plaintiff may allege that the pending 04 proceedings against her influenced her colleagues' judgment, there's no evidence to support such conjecture. Nor is there any reason to believe that the 04 proceedings were initiated in bad faith or based on Plaintiff's sex. The University's Board of Trustees did not make its decision terminating Plaintiff's employment until after Plaintiff's non-reappointment decision had been made. (ECF 38 PageID. 403; ECF 86-1: Makhija Dep., Ex. BB thereto.)

Plaintiff was dismissed, effective August 30, 2019. (ECF 38 PageID. 403.) Her contract at the time was set to expire on August 31, 2020. (April 2019 Email Exchange, Ex. D hereto.) Consequently, should the Court order a trial, the University is entitled to summary judgment on Plaintiff's claims for economic damages beyond the pay and benefits that she would have earned had she remained employed for the last year of her faculty contract. This includes Plaintiff's claims for reinstatement as set forth in her prayer for relief. (ECF 38 PageID 427.)

## IV.    CONCLUSION.

Accordingly, the University is entitled to summary judgment on Plaintiff's sole remaining claim of sex discrimination in violation of Title VII in Count I of the Complaint.

Respectfully submitted,

**DAVE YOST (0056290)**
ATTORNEY GENERAL OF OHIO

_____/s/ Christopher E. Hogan_____

Christopher E. Hogan             (0070236)
Trial Attorney
chogan@npkhlaw.com
Amy E. Kuhlman                   (0083194)
akuhlman@npkhlaw.com
Newhouse, Prophater, Kolman & Hogan, LLC
3366 Riverside Drive, Suite 103
Columbus, Ohio 43221
Telephone:    614/255-5441
Facsimile:    614/255-5446
*Outside Counsel for Defendants The Ohio State*
*University, Michael V. Drake, MD., Bruce A.*
*McPheron, Ph.D., Anil Mahkija, Ph.D., Walter*
*Zinn, Ph.D., and Paul C. Velasco*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 28, 2023 the foregoing was filed with

the Clerk of Court via CM/ECF, which will also send such notification to:

Matthew J. Mueller
Fogarty, Mueller, Harris, PLLC
501 Kennedy Blvd., Suite 790
Tampa, FL 33602
*Counsel for Plaintiff*

Nicholas C. Vesha
Vesha Law Firm, LLC
38 South High Street
Dublin, Ohio 43017
*Counsel for Plaintiff*

John S. Marshall
Samuel M. Schlein
Marshall & Forman, LLC
250 Civic Center Drive, Suite 480
Columbus, Ohio 43215
*Counsel for Plaintiff*

_____/s/ Christopher E. Hogan_____
Christopher E. Hogan             (0070236)

33