# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH MITCHELL, Ph.D., | : | Civil Action No. 2:19-cv-04162 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Sarah D. Morrison |
| v. | : | |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (ECF 135)**

# __Table of Contents__

I. **Introduction**..................................................................................................... 1

Plaintiff Deborah Mitchell opposes the Motion for Summary Judgment (the "Motion") filed by Defendant The Ohio State University ("Ohio State") because a reasonable jury could infer from the factual record that at least one factor motivating Ohio State's termination of Dr. Mitchell was her sex. The decision-makers who prosecuted and terminated Dr. Mitchell at the Fisher College of Business knew that comparable male professors were engaged in profitable outside business substantially similar and sometimes identical to the services offered by Fisher College of Business—the very thing Dr. Mitchell was accused of and allegedly terminated for. Dr. Mitchell even prepared detailed written summaries showing all the outside business activities she could find that her male colleagues had engaged in and presented this evidence of other potential financial conflicts of interest to Anil Makhija (Dean of the Fisher College of Business), Provost Bruce McPheron, the Faculty Hearing Committee panel, President Drake, and Martha Phillips (Office of Institutional Equity). Surprisingly, no formal investigations were instituted against any of the comparable male professors. The comparable male professors were governed by the same conflict-of-interest standards as Dr. Mitchell and subject to the same Fisher College governance and administrators but faced no inquiry or discipline for what was outside consulting activity—very much like that consulting work done by Dr. Mitchell.

A rational jury could reasonably conclude that the only justification for the fact that no comparable male was treated adversely for engaging in similar work was discrimination based on sex. For that reason, Ohio State's Motion must fail.

II. **Statement of Facts**...................................................................................... 3

A. BACKGROUND ....................................................................................... 3
1. Plaintiff, Deborah J. Mitchell, PhD........................................................ 3
2. OSU Faculty Financial Conflict of Interest Policy ............................... 6
a. *Dr. Mitchell Terminated for a Purported Violation of Policy* ............... 6
b. *Form 201 Policy's Written Parameters* ................................................ 9
c. *Upon an alleged violation of this policy, an 04-process would begin* ................. 11

B. A THOROUGHLY CRAFTED COMPLAINT ....................................... 11
1. The Purported Timeline of the Complaint Against Dr. Mitchell ....................... 11
2. Dean Makhija's Standards for Applying the Policy............................... 13
3. Dean Makhija "Had No Choice" But To Proceed With Investigation (see Dep. at 113:2-17)................................................................................................ 14

C. DR. MITCHELL'S COMPLAINANT REFUTES MAKHIJA'S TIMELINE ....... 14

ii

1. The Conversation That Launched An Investigation ........................................... 14
2. Makhija's Misleading Testimony ........................................................................ 17

D. DR. MITCHELL'S "MERE ACCUSATIONS" ................................................. 18
1. Male Professors at Fisher Performed Comparable Outside Work ..................... 18
2. Dr. Mitchell's Extensive History of Her Own Complaints ................................ 21
   a. *Makhija Applies Different Standard for Dr. Mitchell's Complaints* ............... 25
   b. *The Other Woman* ........................................................................................ 28

E. THE COMPARABLES ....................................................................................... 29
1. The Thresholds of Policy ................................................................................... 29
2. OSU Asserts Amorphous "Unwritten Policies" ................................................ 33
3. Nobody Did Anything Wrong ............................................................................ 33

F. EIGHT LAYERS OF REVIEW MASK PRETEXT .......................................... 35

G. BEHIND THE CURTAIN: EXTENSIVE INVOLVMENT OF OSU LEGAL ..... 39
1. An Orchestrated Assault on Dr. Mitchell ......................................................... 39

H. OHIO STATE DOES NOT KNOW WHY IT FIRED DR. MITCHELL .............. 42
1. Dr. Inks and His Interpretation of What Constitutes a Conflict of Interest ........ 42
2. Clear Confusion Regarding Duty to Report ...................................................... 45
3. Form 201s – More "Spotty" Issues ................................................................... 47
4. FHC Contradicts CIC Finding ........................................................................... 50
5. Unintentional versus Flagrant, Egregious, and Willful ...................................... 50

**III. Law & Argument** .................................................................................................. 51

A. Dr. Mitchell has established a prima facie case and evidence from which a jury
could infer discrimination because of sex. ................................................................. 53

Dr. Mitchell has demonstrated that similarly situated male professors were treated more favorably than her when they engaged in outside consulting and other business ventures without investigation or termination. Having done so, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). OSU has failed to offer a legitimate, non-discriminatory reason for investigating and terminating Dr. Mitchell, but even if the Court finds OSU has triggered the *McDonnell Douglas* burden-shift, Dr. Mitchell can still establish a genuine issue of material fact by showing either that (1) OSU's stated reason had no basis in fact; (2) OSU's stated reason was not its actual motivation for investigating and terminating her; or (3) OSU's stated reason was insufficient to motivate the adverse action. *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008). The evidence here establishes that OSU's purported reasons were pretextual. Pretext may be

established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White*, 533 F.3d at 393 (citing *Burdine*, 450 U.S. at 256).

B.   Ohio State's comparability argument is both factually flawed and wrong as a matter of law. ........................................................................................................... 55

To defeat summary judgment, Dr. Mitchell need not prove by a preponderance of the evidence that the male professors were similarly situated to her.  Instead, she need only create a genuine issue of material fact on this issue, that is, one on which a reasonable juror might find in her favor.  For starters, she has three witnesses with tremendous insight and experience who will opine that her behavior was in fact similarly situated.  Beyond that, she has admissions from male professors that they engaged in conduct which, applying the standards applied to her, reflected a conflict of interest and/or ignored the reporting requirement.  "A court's formulation of the similarly situated inquiry should not be exceedingly narrow." *Lynch v. ITT Ed. Servs., Inc.*, 571 Fed.Appx. 440, 444 (6th Cir. 2014). "[T]he requirements for finding a similarly situated comparator are not so onerous." *Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019). A plaintiff is not required to show "an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In each case, a court must make "an individualized determination of which factors are relevant based on the factual context of the case." *Lynch*, 571 Fed.Appx. at 444.

Dr. Mitchell has articulated specific facts that refute the aggravating or mitigating circumstances that would render the other Fisher College faculty who engaged in outside consulting work and were not even charged dissimilar comparators. More to the point, whether a non-protected employee is similarly situated is a jury question of fact. *Jones v. Johnson, 801 Fed.Appx.* 338, 349 (6th Cir. 2020) (citing *Bobo*); *Dawson v. Assured Partners*, NL, LLC, No. 1:17-CV-00676, 2021 WL 1854884, at *8 (S.D. Ohio May 10, 2021) ("[The Court finds that Plaintiff demonstrates that there is a genuine issue of material fact as to whether Ms. Howard and Ms. Jeffries are apt comparators, as they had similar job titles, responsibilities, expectations, and each reported to Ms. Bach."). Under Title VII, there can be difference in some respects without eliminating sex as a motivating factor in Dr. Mitchell's termination. Consequently, that similarly situated male professors were never even charged despite engaging in conduct similar to hers is telling. "[W]hat is at issue in this case is [the comparator's] lack of punishment." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 611 (6th Cir. 2019) (emphasis in original).

C.  Dr. Mitchell's evidence of differential treatment withstands summary judgment on the issue of pretext................................................................................................... 63

Ohio State's Motion should be denied because a reasonable jury could infer that Ohio State's proffered explanations for terminating her were merely a pretext for unlawful discrimination. A rational trier of fact could find that Ohio State discriminated against an outspoken female professor when numerous male professors were clearly laboring under potential conflicts of interest with no consequences.  Her tremendous success combined with her open denunciation of the hostile environment made her a woman too big for her britches.  One reasonable inference that a trier of fact could make from the facts is that all the male professors discussed above may have been violating the same policy as Dr. Mitchell, yet Ohio State did nothing about it.  Ohio State deviated from both how its policies were customarily enforced and, to find distinguishing aspects, what the policies actually said.  Deviations are probative evidence of a forbidden animus.  As the Supreme Court explained in *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) (emphasis added), "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering.  Of course, a conflict or inconsistency may be ***persuasive circumstantial evidence*** tending to show racial predomination, but there is no rule requiring challengers to present this kind of evidence in every case." *See also Adamov v. U.S. Bank Nat'l Ass'n*, 681 Fed.Appx. 473, 480-81 (6th Cir. 2017) (circumstantial evidence included employer's deviation from how it had treated wire transfers).

Simply put, comparable male employees were leniently treated, a fact that a jury could use to draw an inference of sex discrimination. The very fact that male faculty who engaged in private consulting under circumstances similar to her private consulting were never even investigated—much less charged—raises an inference of discrimination. *Bobo*, 665 F.3d at 752. The key relevant decisionmakers were the Dean and others who decided whether to initiate an investigation at all. The ostensible differences between the comparable male professors and Dr. Mitchell were not, according to the Dean, "in fact relevant to the Department's disciplinary decisions." *Strickland*, 995 F.3d at 513 .

D.  Genuine issues of material fact exist with respect to Dr.  Mitchell's reappointment process and, in any event, a ruling on damages is premature. ........ 68

Because plaintiff's damages are substantial, she contests material facts surrounding her reappointment and termination, and she asserts any ruling would be premature, defendant's argument that partial summary judgment should be entered on damages should be denied.

**IV. CONCLUSION**................................................................................................... 69

v

## TABLE OF AUTHORITIES

### Cases

*Adamov v. U.S. Bank Nat'l Ass'n*, 681 Fed.Appx. 473, 480-81 (6th Cir. 2017) ........... 65

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) ........................................................ 51, 52

*Arnold v. City of Columbus*, 515 Fed.Appx. 524, 532 (6th Cir. 2013) ............................... 59

*Asmo v. Keane, Inc.,* 471 F.3d 588 (6th Cir. 2006) ............................................................. 65

*Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) ................. 65

*Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 586–87 (6th Cir. 2022) ........................................................................................................................................ 59

*Bobo v. United Parcel Service*, 655 F.3d 741, 751 (6th Cir. 2012) ............................ passim

*Carter v. Toyota Tsusho Am., Inc.,* 529 Fed.Appx. 601, 609 (6th Cir. 2013 ................. 66

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ............................................................. 51

*Cf. Burwell v. City of Lansing, MI*, 7 F.4th 456, 475 (6th Cir. 2021) ............................... 62

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012) .................... 60, 61

*Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) ...................................... 66

*Coburn v. Rockwell Automation, Inc.*, 238 Fed.Appx. 112, 126 (6th Cir. 2007) ........... 65

*Dawson v. Assured Partners*, NL, LLC, No. 1:17-CV-00676, 2021 WL 1854884, at *8 (S.D. Ohio May 10, 2021) ................................................................................................... 60

*DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed.Appx. 387, 393 (6th Cir. 2005) ............. 65

*Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1023 (6th Cir. 2000) ............................................. 53

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) .... 57, 58

*Farmer v. Brennan*, 511 U.S.825, 843 n. 8 (1994) .............................................................. 62

*Fuentes v. Perskie,* 32 F.3d 759, 765 (3rd Cir. 1994) ........................................................ 66

*Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255–56 (6th Cir. 2023) ........................ 58

*Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) .................................................. 66

*Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396–97 (6th Cir. 2008) ........... 52, 58

*Jones v. Johnson, 801 Fed.Appx.* 338, 349 (6th Cir. 2020) ............................................... 60

*Lynch v. ITT Ed. Servs., Inc.*, 571 Fed.Appx. 440, 444 (6th Cir. 2014) ........................... 57

*Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) ... 58

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 (1976) .......................... 66, 67

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................ 54, 67

*Miles v. S. Cen. Hum. Res. Agency, Inc.*, 946 F.3d 883, 892 (6th Cir. 2020) ................. 53

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ............................................ 59

*Moffat v. Wal–Mart Stores, Inc.*, 620 Fed.Appx. 453, 349 (6th Cir. 2015) ..................... 66

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ................................... 61

*Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) ............................................. 54

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) ....................... 57

*Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019) ..52, 57, 60

*Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008) ........................................ 54

*Skalka v. Fernald Envtl. Restoration Mgmt. Co.*, 178 F.3d 414, 422 (6th Cir. 1999)65

*Strickland v. City of Detroit*, 995 F.3d 495, 514 (6th Cir. 2021) ............................. 52, 59, 67

*United States v. Matthews*, 31 F.4th 436, 445 (6th Cir. 2022) ......................................... 62

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ....................................... 57, 58

Statutes

42 U.S.C. § 2000e-2(a)(1) ................................................................................ 52
42 U.S.C. § 2000e-2(m) .................................................................................. 60
OAC § 3335-5-04.................................................................................... 28, 48

Rules

Fed.R.Evid. 701 .............................................................................................. 43

I.    **Introduction**

Plaintiff Deborah Mitchell opposes the Motion for Summary Judgment (the "Motion") filed by Defendant The Ohio State University ("Ohio State") because a reasonable jury could infer from the factual record that at least one factor motivating Ohio State's termination of Dr. Mitchell was her sex. The "undisputed facts" identified by Ohio State are actually replete with disputed facts. Ohio State pins its case on the faulty premise that because the Fisher College of Business has never instituted an inquiry into the outside business activities of its male professors, there are no comparators to Dr. Mitchell for Title VII purposes. But this circular reasoning lacks a foundation in fact. Indeed, Ohio State's Motion collapses entirely under the standard the Court must employ at the summary judgment stage.

The decision-makers who prosecuted and terminated Dr. Mitchell at the Fisher College of Business knew that comparable male professors were engaged in profitable outside business substantially similar and sometimes identical to the services offered by Fisher College of Business—the very thing Dr. Mitchell was accused of and allegedly terminated for. Dr. Mitchell even prepared detailed written summaries showing all the outside business activities she could find that her male colleagues had engaged in and presented this evidence of other potential financial conflicts of interest to Anil Makhija (Dean of the Fisher College of Business), Provost Bruce McPheron, the Faculty Hearing Committee panel, President Drake, and Martha

Phillips (Office of Institutional Equity). Surprisingly, no formal investigations were instituted against any of the comparable male professors.

The comparable male professors were governed by the same conflict-of-interest standards as Dr. Mitchell and subject to the same Fisher College governance and administrators but faced no inquiry or discipline for what was outside consulting activity—very much like that consulting work done by Dr. Mitchell. Their consulting work and consulting businesses were, like Dr. Mitchell's, related to their teaching and research. Any differences between what Dr. Mitchell and the comparable male professors did do not eliminate the role of sex as a motivating factor in the College's differential treatment of her.

Of critical importance, any differences do not preclude a jury's reasonable inference that sex was such a motivating factor. The very fact that the College initiated inquiries and disciplinary proceedings against a female professor while acquiescing, at times encouraging, similar conduct by male professors is damning rather than exculpatory.

Ohio State's discriminatory investigation and termination of Dr. Mitchell was rife with pretext. The allegation that the work her consulting company CypressTree performed for the Ohio Department of Medicaid contained an "education" component such that she was improperly competing with the university's Executive Education unit does not withstand scrutiny. The reality is that numerous male professors conducted outside business activity, including activity that would be considered "education" under Ohio State's standard, yet were never challenged much less fired

2

over it. Male Fisher College of Business professors, such as Lawrence Inks, admitted to conducting outside business that included work that would in all material respects be considered "executive education" that Ohio State could have performed. Yet neither Inks nor any other male professors were investigated or accused by Ohio State of diverting business opportunities away from the Executive Education unit.

Even after Dr. Mitchell affirmatively complained in writing with supporting evidence that these male professors were engaging in consulting that was inherently educational and most assuredly conflicted with the Executive Education unit, the decision-makers within Ohio State did nothing. A rational jury could reasonably conclude that the only justification for the fact that no comparable male was treated adversely for engaging in similar work was discrimination based on sex. For that reason, Ohio State's Motion must fail.

## II. Statement of Facts
### A. BACKGROUND
#### 1. Plaintiff, Deborah J. Mitchell, PhD

Dr. Mitchell earned her Bachelor of Science in business administration from The Ohio State University in 1980. Dr. Mitchell earned her Ph.D. in Business from the University of Chicago Booth School of Business, with concentrations in Marketing and Behavioral Science in 1991. She earned a Master of Business Administration in 1985. Prior to working for OSU, Dr. Mitchell served as a faculty member at the University of Wisconsin-Madison, the University of Chicago, Northwestern University, Stanford University, Temple University, the University of Pennsylvania,

and Cornell. She also served as the Executive Director of the Center for Brand and Product Management at the University of Wisconsin-Madison. (See generally, ECF 119-1: Plaintiff Dep. pp. 9-12).

As an undergraduate alumna of Ohio State, Dr. Mitchell was excited to return to her alma mater as a Clinical Associate Professor in the Fisher College of Business in the Marketing & Logistics Department in March 2012, where she worked until she was terminated in August 2019. Prior to her termination, Dr. Mitchell was regarded as a "well-performing" professor who taught both undergraduate business students and graduate students working towards their MBA degrees. (ECF 86-1: Makhija Dep.) Unfortunately, she quickly found the school's environment, particularly towards women, unwelcoming and toxic.

Fisher College of Business had a reputation for being a toxic work environment and Dr. Mitchell was a vocal critic about these issues, particularly how they affected the women of the school. In 2014, Dr. Roy Lewicki and Dr. Joseph Alutto audited Fisher's culture and financial, interviewing over 70 individuals and issued their findings in a January 10, 2015 report titled "Resource Level Setting and Culture Audit for the Fisher College of Business," (the "Audit"). ECF 146-1: Pl. Decl., Ex. 1. The Audit reported that many staff and faculty had concerns about "appropriate values being reflected in decision-making processes in the college, inadequacies of accountability that are reflected in administrative decision making and inappropriately abusive behaviors colleague to colleague." The Audit recommendations included the need to "[i]nitiate a more comprehensive cultural

audit, performed by trusted professionals from outside the college, to ensure that behaviors and underlying decision-making systems reflect the college's cultural values;" and to "create and value processes through which faculty and staff can continue to speak up or voice suggestions . . . without fear of retribution or derision." *Id.*

But the toxic environment did not improve and on June 10, 2015, Dr. Mitchell responded to a college-wide Climate and Culture survey by writing,

> "This is the most toxic environment I have ever worked in. Every week I hear about or (more usually) directly witness behavior that is illegal, unethical, inappropriate or all of the above. The vast majority of these behaviors / actions are undertaken by "leaders" (those who have power…people who have been given power). I have no confidence that the senior leadership of this college can or will turn around this situation. In fact, I'm wondering why I took the time to fill out this survey. I have taken a big risk in filling it out, when I know that the likelihood of good coming from it is near zero. You have my email identifier, so I would not be surprised if in fact this is not a confidential research study, and that in fact, I will suffer some kind of retribution for being honest here. One thing is clear… I didn't fill it out so that we could get free ice cream."

ECF 146-2: Pl. Decl, Ex. 2.

Prior to beginning her career with Ohio State, Dr. Mitchell served as the Founder and President of her own private consulting company, Cypress Consulting Ltd., which is now CypressTree Corp. ("CypressTree"). Through CypressTree, Dr. Mitchell consulted externally before, during, and after her employment with OSU. (*See* ECF 119-1: Plaintiff Dep. p. 13:16-14:2). Dr. Mitchell's business activities were well known to OSU when it hired her, and her success in the private business world was part of what made Dr. Mitchell an attractive candidate to Ohio State. ECF 146-

3: Pl. Decl., Ex. 3. OSU was well-aware that Dr. Mitchell would continue to provide services for her consulting business while being employed with Ohio State. When Dr. Mitchell was hired by Ohio State, she was expressly told that she could continue her private business pursuits, and in line with the school's written policy, was in fact encouraged to do so.

### 2. OSU Faculty Financial Conflict of Interest Policy

#### a. *Dr. Mitchell Terminated for a Purported Violation of Policy*

Dr. Mitchell was accused of, investigated, and ultimately terminated for an alleged violation of The Ohio State University's Faculty Financial Conflict of Interest Policy. (ECF 86-1: Makhija Dep. p. 95:13- 24, Ex F). The Faculty Financial Conflict of Interest Policy is the overarching policy that provides a non-exhaustive list of conflicts of interest, such as: having significant financial involvement or interest in an entity that does business with the university; participating in research funded by an entity in which the faculty member (or their family) holds a significant interest; entering into agreements that purport to transfer intellectual property belonging to the university; and, using one's professional expertise to provide services that compete with services provided by an academic entity within the university. (*Id*. at Ex F).

More specifically[1], Dr. Mitchell was ultimately terminated for an "ongoing failure to comply with the OAA Faculty Paid Consulting Policy and the Patterns of Administration in the Department of Marking and Logistics was flagrant, egregious, and willful and DOES rise to the level of grave misconduct." (ECF 123-2: Ex. OOOO, Section IV(2)). This Faculty Paid Consulting Policy establishes "guidelines and reporting requirements for paid consulting, external to the university," undertaken by faculty members that are related to their areas of professional expertise. (ECF 86-1: Makhija Dep., Ex G, Preamble). A faculty member's reporting requirements – the mechanism for compliance – is to file a Paid External Consulting Approval Form for each and every "paid external consulting related to one's area of expertise." *Id.* at Section III(1)(a).   The Approval Form referenced and incorporated into this policy is called a "Form 201". ECF 124-1: Noe Dep., Ex. YYYYY (Dr. Mitchell's Form 201s from 2018-2019). Given the similarity in policy names, this Memorandum will refer to the Faculty Paid Consulting Policy – the specific policy Dr. Mitchell was ultimately terminated for violating – as the "Form 201 Policy."

Virtually none of the Fisher College Business professors complied with this Form 201 Policy. Dean Makhija confirms the lack of compliance:

Q. If a faculty member at Fisher engages
in outside consulting activity, are they required to
fill out and submit a Form 201?

A.   That was the expectation, but I think
the practice of that may have been spotty.

---

[1] There was much internal confusion and inconsistency regarding what policy OSU believed Dr. Mitchell to have violated, which will be discussed in detail below.

ECF 86-1: Makhija Dep. p. 80:20-24.

"Spotty" is an understatement; compliance was virtually nonexistent. Dr. Mitchell's public records request between January 2012 through January 3, 2017 (the date of Mr. Velasco's formal complaint to Dean Makhija) produced a total of only six Form-201 filings from four separate professors. ECF 146-12: Pl. Decl., Ex. 12 (Excerpted from production in response to August 22, 2018 Public Records Request, 201 response portion only).[2] But private consulting within Fisher College of Business was rampant, and in fact, encouraged by the Form 201 Policy itself: "Faculty members, including administrators with faculty appointments, are encouraged to engage in paid external consulting to the extent that these activities are clearly related to the mission of the university and the expertise of the faculty member, provide direct or indirect benefits to the university, and do not entail a conflict of interest as defined in the Conflict of Interest Policy." (ECF 86-1: Makhija Dep., Ex. G at 1). Dean Makhija confirmed that all Fisher professors are encouraged to engage in private consulting. (ECF 86-1: Makhija Dep. p. 22:3-5).[3]

The written policy further describes the importance of such work, stating, "Participation by faculty members of The Ohio State University in activities of government, in industry and in other private institutions generally serves the

_____

[2] Note that this exhibit does not contain the entire production in response to Mr. Marshall's August 2018 Public Records Requests. However, this exhibit does contain all of the Form-201's produced pursuant to said requests, which covers submissions through 2018.

[3] See also (ECF 126-1: Velasco Dep. pp. 37:19-38:5), and (ECF 125-1: Schwalbe Dep. pp. 67:21-68:3), and (ECF 86-1: Makhija Dep. pp. 21:24-22:5).

academic interests of the university. As a result of such activities, the people of Ohio benefit from the dissemination of knowledge and technology developed within the university and students benefit from experiences faculty bring to the classroom." *Id.* at Preamble.

### b. *Form 201 Policy's Written Parameters*

While the Form 201 Policy encourages private consulting, it does not establish specific thresholds for compliance, such as money earned by the faculty member or whether or not the outside client was a former or current client of OSU's.  In terms of applying the policy, as opposed to an ultimate finding of the faculty's member guilt or violation of policy[4], Dean Makhija testified:

> Q […] This faculty
> financial conflict of interest policy applies
> equally to all full-time faculty?
> A. Correct.
>
> Q.    And it applies whether -- it's
> independent of the amount of money involved,
> correct?
>
> A.    Correct.
>
> Q.    And it's independent of whether or not
> the agency or company involved has been a -- or is a
> Fisher executive client, correct?
>
> A.    Correct.

ECF 86-1: Makhija Dep. pp. 104:16-105:3

---

[4] An ultimate finding of a violation requires the need to examine a totality of circumstances through an investigation. (ECF 86-1: Makhija Dep. p. 99:3-17).

A financial conflict of interest issue, quite simply, boils down to whether OSU lost out on a financial opportunity due to the faculty member's private engagement. The policy "is silent on any quantum of financial." (ECF 86-1: Makhija Dep. p. 97:13-14). Moreover, Dean Makhija admits that this financial conflict of interest policy applies equally to all full-time professors at Fisher College of Business. These include all full-time professors at Fisher: clinical professors, tenured professors, tenure track professors, and senior lecturers.[5] (ECF 86-1: Makhija Dep. p. 104:14-19, Ex F). These policies apply "equally" and "the same" for each category of professor. Dean Makhija agreed there were no exceptions in application of the policies, explaining that any full-time professor at The Fisher College should be treated the same under the policy. (*Id*. at 59:1-7, 104: 14-19).

Dean Makhija claims, "There have been literally no accusation cases of the violation of the faculty financial conflict of interest that have been brought up to me." (ECF 86-1: Makhija Dep. p. 93:3-6). However, Dr. Roy J. Lewicki, Professor Emeritus, wrote in a declaration in support of Dr. Mitchell, that "there have been occasional past conflicts between Executive Education and faculty regarding similar situations (a faculty member taking on assignments from a client following initial contact through a formal Executive Education Program), but these situations have typically been worked out at the individual faculty—EE level, or with involvement by the Department Chair. I see this case as comparable to those situations, […] I am stunned

---

[5] Senior lecturers are full time, on one- or two-year contracts (ECF 86-1: Makhija Dep. p. 27:13-24).

that this case has proceeded to this level of review and with recommendations as serious and dramatic as they appear here." (ECF 142-2: Phillips Dep. Ex HHHH, Lewicki Declaration, ¶8). Dr. Lewicki has standing to make such claims. He's been a faculty member at Fisher for 35 years, he served as an Associate Dean of the college, and he has originated several of the Executive Education programs. *Id*. at ¶4. Dr. Lewicki also had personal experience with the allegations against Dr. Mitchell given he was one of the instructors in the 2014 Fisher Executive Education program for the Ohio Department of Medicaid.

### c. *Upon an alleged violation of this policy, an 04-process would begin*

For faculty accused of grave misconduct, the Ohio Administrative Code § 3335-5-04 is the controlling code (colloquially referred to as the "04" complaint, process, or investigation). *See* ECF 86-1: Makhija Dep., **Exhibit E** (Note: this Exhibit reflects the Code's language at the time of Dr. Mitchell's investigation; the Code language has changed since Dr. Mitchell's tenure with Ohio State). Dr. Mitchell's process began with a complaint.

### B. A THOROUGHLY CRAFTED COMPLAINT

### 1. The Purported Timeline of the Complaint Against Dr. Mitchell

OSU claims the complaint against Dr. Mitchell began on January 3, 2017, with a thoroughly crafted letter from Mr. Paul Velasco. Dean Makhija testified that (a) he didn't know about the allegations against Dr. Mitchell until he received the formal,

written complaint from Paul Velasco on January 3, 2017, and (b) that he had hoped, given Dr. Mitchell's standing in the school, that they could resolve this issue short of an '04-investigation (*See* ECF 86-1: Makhija Dep. pp. 109-113). Dean Makhija testified regarding his knowledge:

> Q. We know that Executive Director Velasco's letter to you with the formal complaint came on January -- in January of 2017, right?
>
> A. January 3rd. Yeah.
>
> Q. What, if anything, did you hear about this situation before January of 2017?
>
> A. That letter was the first time that I heard of this matter.
>
> Q. Did you have any knowledge that Paul Velasco was conducting some kind of investigation?
>
> A. None.
>
> Q. Did you have any knowledge that Marty Schwalbe was involved in that investigation?
>
> A. None.

(ECF 86-1: Makhija Dep. p. 109:10-24).

It was important for Dean Makhija and OSU to appear neutral and objective for Dr. Mitchell's imminent investigation, and he reiterated his position that he only learned of the allegation once Mr. Velasco fully formed and submitted his written complaint:

> Q. So you knew nothing about the investigation before you got Velasco's January 23, 2017, letter; is that correct?

12

A. That's right.

Q. He hadn't talked to you about it at all?

A. No. There was no conversation until that point.

Q. And Marty Schwalbe didn't mention it at all?

A. No, not to my recall.

(ECF 86-1: Makhija Dep. p. 110:12-22).

## 2.  Dean Makhija's Standards for Applying the Policy

Dean Makhija presented himself as a hands-off recipient of a fully formed

complaint from Mr. Velasco:

> Q. Given the gravity of the situation,
> would you have expected them or wanted them to tell
> you this was going on?
>
> A.   Well, I imagine that making a charge
> of this kind is fairly serious. So they may not
> have brought it to me until, you know, they had
> substance because they may have well discovered in
> the process that it was not worth taking it up.
>
> Q. Yeah. Was it your understanding of
> the 04 process, and we can walk through it in a
> minute, but was it your understanding in the 04
> process that once -- once it got to your desk, so to
> speak, which would have been I think you said
> sometime around January 3rd of 2017?
>
> A. Correct.
>
> Q. With the letter from Mr. Velasco,
> what -- what did you -- what were you required to do
> with it at that point?
>
> A.   To pass it along to the department

13

chair to examine for probable cause.

(ECF 86-1: Makhija Dep. pp. 110:23-111:18).

To be a proper complaint, Dean Makhija required the complainant to cite proper Code, and to be well-drafted. Id. at 150:5-18 and 150:24:151:4. (*See also* ECF 127-1: Wolf Dep. p. 40:4-7). Additionally, any faculty member may file her own 04-complaint even if she is the subject of an active 04-complaint. (ECF 127-1: Wolf Dep. p. 57:15-19).

### 3. Dean Makhija "Had No Choice" But To Proceed With Investigation (see Dep. at 113:2-17)

Dean Makhija testified that he regrets his inability to work with Dr. Mitchell to avoid a formal action against her, but that "I did not have a choice on the matter." (ECF 86-1: Makhija Dep. p. 113:16-17). The case must go forward when grave misconduct is alleged. (See ECF 143-2: Clark Dep. Ex. RRRR at 85:16-86:5). Dean Makhija, however, did not meet his own *post hoc* standards in the case against Dr. Mitchell, because his involvement actually began with a verbal complaint from Paul Velasco six months earlier.

### C. DR. MITCHELL'S COMPLAINANT REFUTES MAKHIJA'S TIMELINE

### 1. The Conversation That Launched An Investigation

The Actual Timeline did not begin with a well-crafted complaint in 2017, but rather with a verbal complaint from Paul Velasco to Dean Makhija in 2016. In May

of 2016, Paul Velasco became aware of CypressTree's consulting job for Ohio

Department of Medicaid and within a few days he told Dean Makhija about it.

> Q. And who did you -- once you found
> [the CypressTree contract], what did you do?
>
> A. I went and had a conversation with
> Dean Makhija noting that, you know, this existed.
> It was a relationship that we had prior and, you
> know, should we go any further.
>
> Q. What did he say?
>
> A. I don't recall specifically what he
> said. He said that we should look into the matter,
> to that effect, but I can't remember any specific
> verbiage.
>
> Q. When he said we should look into it,
> did he mean he, the dean, would look into it? Did
> he want you to look into it? How did you take that?
>
> A. I took it that I had to look into it.
> I took it that he would contact appropriate people
> within the University to advise us as to whether or
> how we should look into it further.
>
> Q. And I'm trying to get a sense, you
> know, you may not know the specific date, but like
> approximately when did you go to Dean Makhija to
> talk about this contract between Cypress Tree and
> Ohio Department of Medicaid?
>
> A. It would have been within a couple
> days when I found the materials.

(ECF 126-1: Velasco Dep. pp. 48:12-49:12)

Shortly after his meeting with Dean Makhija, Velasco spoke with OSU

Legal. (ECF 126-1: Velasco Dep. pp. 49:15-22, "Lester's predecessor"). Over the

next six months, multiple conversations occurred between Velasco, Dean Makhija, and OSU Legal as they crafted the complaint against Dr. Mitchell. (ECF 126-1: Velasco Dep. p. 50:11-24).

Because Velasco's timeline directly contradicted Dean Makhija's sworn testimony, Velasco was asked no fewer than eight (8) additional times during his deposition to confirm Dean Makhija's involvement beginning in May of 2016. (See ECF 126-1: Velasco Dep. 50:11-24; 51:7-13; 57:18-23; 58:2-7; 72:10-18; 77:10-14; 77:23-78:20; and, 83:2-15). Mr. Velasco's timeline is unambiguous:

> Q. So, again, I just want to make sure
> the record is clear on this. The parties you
> consulted with in drafting this letter included Dean
> Makhija, right?
> A. Yes.

(*Id.* p. 77:10-14)

Mr. Velasco was also unequivocal about the origins of the complaint against Dr. Mitchell. It was a verbal complaint; Dean Makhija accepted it.

> Q. What did -- what specifically do you
> recall Dean Makhija told you about this letter prior
> to you completing it and submitting it to him
> formally?
>
> A. The only thing at the moment, absent
> any refresher, that I recall specifically is that
> Dean Makhija told me that it had to be a written
> complaint to go forward.
>
> Q. Because you first brought it to him verbally?
>
> A. Yes.

16

(*Id*. pp. 77:23-78:9)

Dean Makhija acted on this verbal complaint by shepherding Velasco

through the process of crafting the written complaint.

> A. He introduced me to various people
> where we had discussions, many of which would be
> privileged, but included the general counsel's
> office. And then eventually he told me it would
> have to be written up.
>
> Q. And at any point --
>
> A. He couldn't carry it forward independently of my writing it up.

(*Id*. pp. 78:13-20).

### 2.  Makhija's Misleading Testimony

The discrepancy between Dean Makhija responding to a perfectly crafted

complaint versus orchestrating the drafting of that complaint will matter to a

reasonable juror because Ohio State justifies passivity towards similarly situated

faculty by the absence of a complaint. From discovery and evidentiary rulings, it

appears this Court has accepted the initiation of a 04 investigation against Dr.

Mitchell as a distinguishing factor. In light of the evidence, however, reliance on that

factor is misplaced. Dean Makhija, Ohio State counsel, and unnamed others ensured

that the Velasco complaint was "perfectly" crafted.

Under Dean Makhija's watch, no men in Fisher have gone through the 04

process that Dr. Mitchell was subjected to, even though multiple male professors have

been accused of — or conspicuously engaged in — similar behavior. A reasonable jury

could find that fact, and the differential treatment, taints what happened after

17

Velasco's complaint was formally received. That jury could reason the existence and extent of pre-complaint machinations shows the absence of 04 processes for male professors was not because of their relative innocence but because Ohio State did not target them and develop a complaint against them. Singling out Dr. Mitchell for such special treatment undermines Ohio State's claim to gender neutrality.

### D. DR. MITCHELL'S "MERE ACCUSATIONS"

#### 1. Male Professors at Fisher Performed Comparable Outside Work

Dr. Mitchell steadfastly maintains that what she did was not education but rather consulting work. She did not engage in any financial conflict of interest or disclosure issues nor did OSU offer similar services. Indeed, her Department Chair, Dr. Goldsby, signed a declaration in support of her position and two distinguished professors also submitted declarations in support of her defense (Professors Lewicki and Rucci). The CIC curiously asserted that it was hesitant to interview Professor Rucci because he seemed too eager to defend his colleague. (ECF 124-1: Noe Dep. p. 112:2-23). Moreover, the former client at issue here, the Ohio Department of Medicaid (ODM), specifically told Ohio State that the services it needed were not educational, and that OSU could not provide what it needed. Ohio State ignored that, and in the case of Dr. Caroline Clark, misquoted or misapplied the ODM letters.

In fact, ODM's Chief of Staff, Jennifer Demory, explicitly told OSU that ODM solicited Dr. Mitchell and her CypressTree consulting company for services OSU could not provide:

> "ODM approached Ms. Mitchel (sic) to provide consulting services to help us develop solutions unique to ODM culture and processes. We asked Ms. Mitchel (sic) to provide consulting services around developing unit strategy maps for each office within the agency and assist in developing researched based initiatives to promote better alignment of the agencies overall goals. The work is not general training or education and I can personally say from participating in the 2014 class with OSU, this consulting engagement is substantively different. The current engagement has gone beyond interaction with our Executive Management, but extends to our entire organization and has given us insight specific to ODM. We as an organization are grateful for the knowledge we gained from working with OSU, and only wanted to continue improve our organization with help of consulting services, but view the programs as very different in their nature.

(ECF 145-2: Ben-David Dep., Ex. AAAAA).

Mr. John McCarthy, ODM's Director reiterates this sentiment in his letter, writing:

> "When ODM first contracted with the Fisher College of business, the contract was for basic executive learning. Those classes for the most part were very good. One of the issues we encountered was that two of the three professors were excellent, but one was very poor. So i asked if ODM decided to do the same classes for the next group of managers, could we exclude the one professor. That lead to further discussions about the curriculum of the classes. While the curriculum worked for senior managers it did not work for middle managers. ODM HR staff asked for a new curriculum that focusing on two areas one. how to manage. and two how to implement what the senior leaders developed. What came out of those asks was a training highly focused on ODM needs through the above conversations Dr. Mitchell did not solicit this work."

(ECF 145-3: Ben-David Dep., Ex. BBBBB)

ODM, the client, had a specific need and knew OSU's educational services were not what it needed. ODM completed its engagement with OSU and Exec Ed did not follow up with ODM, ever. ODM is a sophisticated agency who understood its needs and decided to contract with CypressTree for highly specific work that went beyond

the classroom. OSU characterizes CypressTree's engagement as "ODM II" but any implication that such services were an extension or continuation of the educational courses taught by Exec Ed is misleading.

If Dr. Mitchell committed grave misconduct, then the male professors who engaged in similar behavior committed grave misconduct, but at the very least, OSU should have investigated her claims. Moreover, the CIC's own chair (Dr. Raymond Noe) testified that the magnitude of overlap between consulting and educational services was inconsequential. Dr. Noe stated that even a 1% overlap of educational services versus 99% consulting would still be an actionable issue as far as the investigation committee was concerned.

> Q.[F]rom a committee standpoint, does it matter how
> from a proportion standpoint, a percentage
> standpoint, does it matter how much of the engagement
> is education or is consulting?
> So in other words, here's an example, if
> the education was one percent of the engagement and
> the consulting was 99 percent of the engagement,
> would a committee find that that is actually
> competing with the University?
>
> A.  That's a hypothetical, but that would be
> up to the committee. I would guess they would say
> yes. Yes, they would say it would be competing with
> the University.

(ECF 124-1: Noe Dep. p. 118:1-14)

If that were the case, and if males were subjected to the same scrutiny as Dr. Mitchell, a significant number of male professors should have also been investigated. Dr. Lawrence Inks admitted in his testimony that his external consulting services were identical to the services he would perform on behalf of Ohio State Fisher's Exec

Ed. Dr. Inks made a distinction that such external clients of his were never Fisher Exec Ed clients. But that distinction does not exist in the conflict of interest policy. It does not matter whether a client was a previous Fisher Exec Ed client or not, but rather whether the services were provided in conflict with what Ohio State could provide.

In other words, the relevant question is: were funds diverted from OSU to an individual professor? (ECF 86-1: Makhija Dep. p. 162:5-10). And Dr. Inks in fact admitted that his services were of a nature that could have been provided by OSU. But Dr. Inks was not investigated despite Dr. Mitchell's complaint that he and other male professors were externally consulting in much the way she was.

Ohio State's Vice Provost, Kay Wolf, would later determine that Dr. Mitchell's complaints were not of an "04" nature but instead were, "brought forward as discrimination." *(ECF 127-1: Wolf Dep. at 33:23-34:2).* But Dean Makhija determined her complaints were not discrimination because "a mere allegation would not take it to that level." (ECF 86-1: Makhija Dep. at 184:5-10).[6] It did not matter what Dr. Mitchell filed, and as shown below, it did not matter how many times she tried.

### 2. Dr. Mitchell's Extensive History of Her Own Complaints

Dr. Mitchell first raised potential gender discrimination verbally with Dean Makhija in her meeting on February 20, 2017. This meeting was memorable for her because it came on the heels of the Velasco Letter. She delivered voluminous

---

[6] Dean Makhija acknowledges that gender discrimination is, in fact, covered under Title IX. (ECF 86-1: Makhija Dep. p. 183:21-24).

materials for Dean Makhija's review, including a letter and hard-copy binders of documents as well as core-board exhibits. (ECF 86-1: Makhija Dep. p. 124:1-5, Ex M.).

As discussed below, Dean Makhija did not act on these materials. But it was not just Dean Makhija who failed to act: Dr. Mitchell's complaints were ignored at every level. Dr. Mitchell would submit **an additional twelve (12) written complaints** referencing sex discrimination:

(1) March 13, 2017. Just two months after Mr. Velasco's written complaint, Dr. Mitchell sent an email to Dean Makhija with seven pages of materials and a letter addressing how she is being treated differently: "I know of many Fisher faulty who do consulting and follow-up work with clients… NO ONE has ever sought permission or disclosed their consulting and related activities to Fisher Executive Education." (March 13, 2017) (ECF 86-1: Makhija Dep., Ex. C). Dr. Mitchell then specifically says, "For me to be singled out […] when (a) there is no rule or requirement to do so, and (b) my colleagues are not doing it, seems unfair and as if I am being treated differently from other faculty." *Id*. Interestingly, Dr. Mitchell writes "You shared that some Fisher faculty do fill out the [201s] because on occasion you have been asked to sign one." *Id*. However, per the public records production, Dean Makhija *never* filed a Form-201 from 2012-2018, which does encompass a time-period prior to his deanship. Ms. DeYoung testified that Dean Makhija made a lot more money as a faculty member, prior to his deanship, because of his private consulting for AEP. (ECF 139: DeYoung Dep. at 15:10-16:6).

(2) July 27, 2018. In this email to Dean Makhija, Dr. Mitchell wrote, "I do feel that if you were to find that I committed grave misconduct, this could be viewed as discrimination against me, as a female professor, for external consulting work in which my male colleagues are routinely and openly engaged."   (ECF 140: Makhija Dep., Ex. M, p.006).  She supported this assertion with over 175 pages of materials. Id.

(3) September 5, 2018. In this email to Provost McPheron, Dr. Mitchell discusses the male faculty members, including those acting as Academic Directors, who engage in extensive consulting, sometimes even concurrently with clients of Exec Ed. (ECF 121-1: McPheron Dep. at 36:11-39:4; and see ECF 140: Makhija Dep., Ex. P., page 8, bates OSU_025329). Dr. Mitchell writes, "These behaviors on the part of my male colleagues also illustrate that my being attacked for such behavior, when male faculty members suffer no such allegations or sanction, constitutes gender discrimination on the part of Fisher and The Ohio State University." *Id.*

(4) September 21, 2018. Hand-delivered and emailed to Provost McPheron, this complaint analyzed about twenty-three male professors with substantial external consulting. (ECF 121-1: McPheron Dep. at, 39:7-44:4, Ex. Q). Dr. Mitchell produced over 400 pages of information detailing publicly available information including clientele, active consulting services, company names, CV information, and positions with Fisher or Exec Ed. *Id*. (ECF 111-1)

(5) October 26, 2018. Letter to Provost McPheron, with copy of filed EEOC complaint, re: plea for resolution and reconciliation (not sure whether this was

emailed as well as delivered hard copy to his executive assistant, with email acknowledgment of receipt. (ECF 140: Makhija Dep., Ex. R).

(6) December 7, 2018. This was an appeal of the Provost's decision to send to a faculty hearing committee. Dr. Mitchell's letter included a table of contents which contained an entire section on "Inequity in Gender-Based Discrimination. ECF 146-19: Pl. Decl., Ex. 19, Section VI.

(7) April 17, 2019: The documentation Dr. Mitchell provided to the Faculty Hearing Committee ("FHC") included the results of her Public Records Request 19-0333, illustrating virtually no compliance with Form 201 by male Fisher faculty. (ECF 146-20: Pl. Decl., Ex. 20; see also *Id.*, Ex. 12).

(8) May 6, 2019. Dr. Mitchell's appeal of the FHC's decision includes support for her claims of gender discrimination, including male faculty who engage in outside activity, and reiterated the lack of compliance of the Form-201 Policy from virtually all faculty. (ECF 140: Makhija Dep., Ex. V)

(9) July 29, 2019. Appeal letter (including charges of sex discrimination) and exhibits sent to CAFR (Scott Schricker, chair) regarding improper Reappointment #2 process and decision. (ECF 146-21: Pl. Decl., Ex. 21)

(10) August 5, 2019. Documents hand delivered to Martha Phillips, Office of Institutional Equity investigator, at intake interview. (ECF 142-1: Phillips Dep., Ex. CCCC)

(11) August 6 and 7, 2019. Supplemental information and documents emailed to Martha Phillips at her request as follow-up. (ECF 146-22: Pl. Decl., Ex. 22).

(12) August 22, 2019.  Dr. Mitchell requested the opportunity to speak to the Board of Trustees in person, but she was limited to a letter.  This plea ended with Dr. Mitchell writing, "I have been fighting against this kind of duplicitousness for the last three years of my life. I don't know how else to be rational about it. I don't know how else to introduce facts into a system that refuses to hear them." (ECF 146-23: Pl. Decl., Ex. 23).

### a. *Makhija Applies Different Standard for Dr. Mitchell's Complaints*

On June 27, 2018, Dr. Mitchell provided Dean Makhija a letter with many pages of attachments in response to the reports of the College Investigation Committee. (ECF 86-1: Makhija Dep. p. 124:1-5, Ex M).  In her letter, Dr. Mitchell wrote, "I do feel that if you were to find that I committed grave misconduct this could be viewed as discrimination against me, as a female professor, for external consulting work in which my male colleagues are routinely and openly engaged." (ECF 86-1: Makhija Dep., Exhibit M to Dean Makhija depo, p. 5). This was not a bald statement; the many pages of attachments with the letter provided substantial evidentiary support: attached to her letter (ECF 86-1: Makhija Dep., Ex. M) were more than 60 pages of materials including many names of several male faculty with Dr. Mitchell's brief summary of their consulting activities, screenshots from the websites of several male faculty showing some of their private consulting work including with some Fisher Executive Education clients, and the CV's of several male professors, some of

which listed conflicting activity, and some of which concealed conflicting activity.(ECF 86-1: Makhija Dep., Ex. M).

Dean Makhija agreed that Dr. Mitchell's allegations were "sincere and serious" (*Id*. at 145:5-11). Among the evidence she submitted, Dr. Mitchell noted that "three Fisher College of Business faculty members (Charles Buchanan Roy Lewicki and Dan Oglevee) are founders and partners in a firm named Positive Leadership Solutions. Within Fisher Executive Education, Dr. Oglevee is the academic director of the EMBA program and Dr. Lewicki was the co-academic director of the Bright Program." She also provided several documents including screenshots from Positive Leadership Solutions website. (ECF 86-1: Makhija Dep. at 126:6-15; Exhibit M). These screenshots reflected the names of the company's clients, some of which are or were Fisher Executive Education clients. (*See* ECF 87-1, Declaration of Plaintiff, at Ex. A, with attached listing of Executive Education clients taken from Fisher Executive Education website).

Dr. Mitchell also provided documents showing that Professor Anthony Rucci had served as an academic director in the Executive Education program and also performed substantial outside consulting services for those entities: in her letter Dr. Mitchell informed the Dean that Professor Rucci was providing private services to Executive Education clients Scott's Miracle Grow, the State Teachers Retirement System and Alliance Data, all current or former Fisher Executive Education clients of Professor Rucci. (ECF 86-1: Makhija Dep. at 141:3-10; Exhibit M).

Despite this and other evidence that male professors were diverting business from the Executive Education unit, Dean Makhija took no steps to investigate. Instead, incredibly, he testified that he did not direct any investigation into Professors Rucci, Ankerman, or Veech or any of the others named because "no accusation came to me." (*Id*. at 140: 2-7, 165:14-23) When pressed that Dr. Mitchell's letter was in fact an accusation of violations of the conflict-of-interest policy, Dean Makhija said: "[B]ut she was accusing lots of people. I mean, there is a document with, you know, name after name." (*Id*. at 140: 10-12).

Had Dean Makhija undertaken or directed an investigation, Defendant OSU would have learned that Professor Veech earned more than $600,000 in outside consulting income in 2018 and 2019 alone. ECF 146-18: Pl. Decl., Ex. 18 and see (ECF 86-1: Makhija Dep. pp. 165:22-166:8). Ohio State would have learned that the professors named here had earned income, either individually, through their companies, or both, for private consulting work with current or former Fisher Executive Education clients. (ECF 87-1, Declaration of Plaintiff (Ex. 1); ECF 87-2, Declaration of Samuel Schlein (Ex. 2); ECF 86-1: Makhija Dep., Exhibits M and X). Ohio State would have learned that each of the professors had significant influence over Fisher Executive Education clients and did private consulting work for many of those clients. (*Id*.) It would have learned that Professor Dial had been an academic director for multiple Executive Education programs and engaged in private consulting with some of those clients. (Declaration of Plaintiff, Ex 1). This was likely known to Dean Makhija from the outset of the process but certainly no later than

July of 2018 when presented with the evidence by Dr. Mitchell. What is indisputable now is that the Dean of the College did nothing with that evidence of discrimination.

In a public records request, Dr. Mitchell obtained a partial listing of Executive Education income earned by some of the male professors she named in her communications with Dean Makhija. That document was identified as **<u>Exhibit X</u>** in Dean Makhija's deposition (ECF 86-1: Makhija Dep., Ex. X). It shows significant income earned by Professors Rucci, Ankerman, Oglevee and Veech over several years—2014—2017. It has only a partial list for Professor Greenberger, from 2016. It shows that these Professors were very active in Executive Education.

Even given Dean Makhija's narrow and *post hoc* interpretation of the conflict-of-interest policy, there is significant evidence Professors James Dial, Marc Ankerman, Dan Oglevee, David Veech, Lawrence Inks, and Anthony Rucci were in fact similarly situated to Dr. Mitchell. Executive Education is not a department, which means any professor from any department within Fisher is permitted to teach within it. (ECF 86-1: Makhija Dep. at 16:14-24).

And in fact, just like Dr. Mitchell, each of these men did work in Executive Education, had influence over Executive Education clients, and did private consulting work for some of those same clients. All of these men are subject to the same conflict of interest policies, and specifically the Form 201 policy, that Dr. Mitchell was ultimately terminated for violating.

### b. *The Other Woman*

On September 20, 2022, Dr. Mitchell submitted public records request for "Any complaints pursuant to OAC § 3335-5-04 against any faculty member, regardless of final disposition, in the calendar years 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 and year-to-date." ECF 146-4: Pl. Decl., Ex. 4 (Public Records Request dated September 20, 2022). Only two records were produced: Dr. Mitchell's, of course, and a second against a Dr. Gokce Esenduran. *Id*. In a college with a predominately male faculty, it's remarkable that the only two professors to face this serious of a charge under Dean Makhija are both women.

In any event, the bare-bones complaint against Dr. Gokce makes no reference to § 3335-5-04, and no mention of "grave misconduct." The letter barely contains any actionable language, except for "the review of this matter should be strictly followed." In short, it does not contain any of the formalities that OSU, including Dean Makhija and Kay Wolf, state need to exist. Notably, Dr. Wolf testified that she "can't accept 04's" yet Dr. Gokce's complaint is literally addressed to Dr. Wolf. *(ECF 127-1: Wolf Dep. at 33:6); ECF 146-4: Pl. Decl., Ex. 4.* The 04-complaint against a woman was accepted; Dr. Mitchell's complaints against men were not.

Although Dean Makhija refused to investigate Dr. Mitchell's complaints, this lawsuit has provided some insight into what he should, or could, have uncovered.

## E. THE COMPARABLES

### 1. The Thresholds of Policy

Dr. Mitchell has argued from the outset that no similarly-situated male employee has been accused of engaging in any misconduct, let alone grave misconduct, and that no similarly-situated male employee has had a 3335-5-04 complaint filed against him. (*See* ECF 38, Pl's Second Amended Complaint, ¶¶170-171, 181, 200). Her point is that OSU refuses to look into male professors in any way, regardless of any final dispositions. While Mr. Velasco's oral complaint generated a teamwork effort to produce a thorough complaint, Dr. Mitchell's submission of hundreds of pages of support for her claims were summarily dismissed as "mere allegations."

An ultimate finding of a violation requires the need to examine a totality of circumstances which can only occur through an investigation. (ECF 86-1: Makhija Dep. p. 99:3-17).  But Dean Makhija refused to follow-up on Dr. Mitchell's claims because the "comparability between [the cases] is not obvious to me." *Id*. at 128:11-14.

> Q. Well, it's not obvious because you
> didn't have the benefit of an investigation?
>
> A. Correct.

(Makhija Dep. at 128:15-17).

<u>An investigation</u> into her male counterparts, however, would have revealed money that should or could have come into Ohio State (under the Defendant's own theory), including the faculty members below.[7] Dr. Mitchell was able to uncover the

---

[7] Plaintiff was limited to a 3-hour deposition of Professor Lawrence Inks, and to seven questions via written depositions for Professors Veech, Dial, Rucci and Ankerman.

lack of any consistency regarding how various males try to avoid conflict of interest issues within Fisher and Exec Ed.

Dr. Lawrence Inks, like Dr. Mitchell, is an associate professor in a clinical position. (ECF 120-1: Inks Dep., p. 7:12-18). Dr. Inks, like Dr. Mitchell, is subject to the Faculty Financial Conflict of Interest Policy. Dr. Inks, like Mitchell, participated in Executive Education. (*Id.*, at 11:4-10). But unlike Dr. Mitchell's protestations that she provided different work from Exec. Ed's capabilities, Dr. Inks admitted he provides the exact same educational services in his private engagements. *Id.* at 34:3-36:20, 33:4-19, 42-46, 41:17-23, and 47:2-9). Dr. Inks holds the position that providing the same education services is not a conflict of interest if that client was never a client of Exec Ed. *Id.*

As a Senior Lecturer, Dr. Veech is a full-time professor who, like Dr. Mitchell, is subject to OSU's Faculty Financial Conflict of Interest policy.  Like Dr. Mitchell, Dr. Veech taught in Exec Ed and he consulted externally.  From 2014 through 2019, Dr. Veech engaged in substantial private consulting, earning approximately $1,076,400.00. (ECF 146-18: Pl. Decl., Ex. 18, Veech Answers to Written Deposition #2). When asked what steps he undertook to avoid a potential conflict of interest with Exec Ed, Dr. Veech replied:

> For any work I did outside of OSU as a full-time employee, I routinely consulted my associate dean or the staff in Executive Education, describing the work the client had in mind, to reduce the risk of having a conflict of interest. As a part-time employee, it was my practice not to offer educational workshops in favor of hands-on consulting services primarily focused on solving real problems on-site, but would still inform my leadership.

(Id. at #6).

31

Dr. James Dial, like Dr. Mitchell, was a clinical professor and taught in Exec Ed. Dr. Dial engaged in frequent external consulting from 2014 through 2019, earning over $120,000. (ECF 146-17: Pl. Decl., Ex. 17, Dial Answers to Written Deposition #2). When asked what steps he undertook to avoid a potential conflict of interest with Exec Ed, Dr. Dial stated:

> I did not do any work for a client that might represent a conflict with any program in which I was a direct participant. I did not attempt to verify from Exec Ed which other programs they delivered in which I was not a participant as they are notoriously opaque with faculty about the work they do. I undertook no formal process of verification other than remembering the work I was involved with.

(Id. at #6.)

Professor Rucci has experience in virtually every aspect or role within Fisher or Exec. Ed during his illustrious career at Ohio State. In his responses to Plaintiff's Written Depositions, Professor Rucci stated he earned about $212,955.00 from 2014 through 2019 in external consulting engagements. See ECF 146-16: Pl. Decl., Ex. 16, Rucci Written Deposition #2).

Finally, Dr. Marc Ankerman earned about $40,207.00 in private consulting during a two-year period from 2018-2019. (ECF 146-15: Pl. Decl., Ex. 15, Written Depositions #2). Dr. Ankerman explained that he avoids conflicts of interest by orally asking Exec Ed's permission and generally avoided private consulting while he was teaching courses. *Id.* at #s 2-6.

Notwithstanding the professors' explanations above, including Dr. Rucci's extensive answer, none of these professors filed the Form-201 prior to the action taken against Dr. Mitchell. ECF 146-12: Pl. Decl., Ex. 12.

### 2. OSU Asserts Amorphous "Unwritten Policies"

OSU argues the above professors are not comparables, and that Dr. Mitchell cannot produce any comparables. To reach that conclusion, however, OSU implements at least three unwritten thresholds (which do not exist outside this lawsuit). The Defendant asserts that Dr. Mitchell needs to show a male comparable who: (1) engaged in a financial conflict of interest rising to the level of "substantial; (2) acted as an Academic Director in an Executive Education program; and (3) privately consulted for a former Executive Education client.

But the written policy is silent as to all three of these factors. Certainly, these may be circumstances to help evaluate ultimate guilt or culpability *during* the course of an investigation, but these are not factors to be used in whether to "accept" or "deny" an 04-complaint from a faculty member. The latter is not a discretionary option for OSU and, at best, is a conflation of the written policy.

### 3. Nobody Did Anything Wrong

The issue of whether Dr. Mitchell's repeated complaints were, or should have been treated as, formal 04-Complaints is a material fact in dispute that should be determined by the ultimate trier-of-fact. Dr. Mitchell has never shied away from this argument: she has always maintained that (a) no male Fisher colleague has ever been through a formal 04-investigation, let alone ultimately disciplined for it; and (b) that her own complaints were not treated in the same manner as the allegations against her.

33

Regarding the latter point, Dr. Mitchell's position is (i) her private consulting was not improper, (ii) it is the same kind of consulting her male counterparts regularly engage in, and (iii) if OSU finds her guilty of violating the policy then they must also find the other male professors similarly guilty. OSU acknowledges Dr. Mitchell's allegation that a "tremendous amount of similar private consulting work [was] completed by my male colleagues," but OSU bizarrely concludes because she said she did nothing wrong, then this is not an actual 04-allegation. (ECF 127-1: Wolf Dep. at 61:14-15). On her re-direct examination, OSU's counsel asked Dr. Wolf, "So was there anything about saying that your colleagues aren't doing anything wrong that would have suggested grave misconduct to you, an 04 violation?" (*Id.* at 61:16-19). Dr. Wolf said "No." (*Id.* at 20).

There is nothing fallacious about Dr. Mitchell's position. She maintains these male professors did not do anything wrong, just as she fiercely maintains she did nothing wrong. But *if* Ohio State were to apply such standards against her situation, then it needs to apply them equally to her male counterparts. Ohio State is trying to distract from this basic fact with a circus act of pretextual arguments and falsehoods, and pointing to its "*eight layers of review.*" ECF 135, Section II: Statement of Material Facts. For years, Ohio State has promoted the idea that Dr. Mitchell was provided a *thorough* and *multilayered* investigative process by her peers as proof of her guilt, but the entire process was nothing more than theater.

Through all "eight" layers, OSU relied on a <u>single</u> witness[8] to analyze whether Dr. Mitchell's services actually conflicted with what OSU might be able to provide: Mr. Martin Schwalbe. Mr. Schwalbe testified that (a) he is not an expert in such matters, (b) he simply checked terms which were reminiscent to ones he had seen used in Exec Ed programs, and (c) he did not follow up with ODM whatsoever (Schwalbe Dep. 155:16-24, 190 and 223 (not an expert); 152:2-153:20 (checked reminiscent words); and 115:4-24 (did not follow up). On the last point, Mr. Schwalbe explains that he never contacted ODM because "my days were mostly responding to what opportunities are right in front of me as opposed to circling back to once promising opportunities." (*Id.* at 115:8-18).

## F. EIGHT LAYERS OF REVIEW MASK PRETEXT

Ohio State trumpets "eight layers of review" that "unanimously determined that Plaintiff should be dismissed." ECF 135. Here are the layers:

1. Layer One: The formal complaint

As previously established here, the case against Dr. Mitchell began with a verbal complaint from Paul Velasco to Dean Makhija. Dean Makhija then collaborated with Paul Velasco and OSU Legal to craft a formal complaint.

2. Layer Two: The Dean's Review

---

[8] See ECF 124-1: Noe Dep. at 116:10-13 (no other interviewee looked at Dr. Mitchell's materials).

Dean Makhija deliberated over the merits of the formal complaint he himself helped draft. He would have preferred to informally settle the matter with Dr. Mitchell, but his hands were tied. (ECF 86-1: Makhija Dep. pp. 110:23-111:18).[9]

3. Layer Three: The College Investigative Committee (CIC)

Expectedly, Dean Makhija found merit in his complaint. The next layer of review was the CIC. The Committee consisted of 4 professors, three whom had no choice to be on the committee but one was a special appointee, "the Dean's nominee!!!" (ECF 124-1: Noe Dep., Ex VVVVV, page 2). For the entirety of the CIC's review, they interviewed only one witness to analyze Dr. Mitchell's materials: Martin Schwalbe.

> Q. Regarding Mr. Schwalbe, it seems like no interviewee looked at any documentation of CypressTree other than Mr. Schwalbe; is that fair?
>
> A. That's accurate.

(ECF 124-1: Noe Dep at 116:10-13).

Mr. Schwalbe based his entire analysis on a single (1) attachment. Attachment C.

> Q. Okay. And it just begins – after the introduction it just says, "I went through the file Attachment C," and you determined generally the program scope is – as described is within the scope of work and programs that we do at Executive Education, that was your conclusion?
>
> A. Correct.

---

[9] Dr. Clark pointed out during the hearing that because the complaint alleged grave misconduct, it would have proceeded to an investigation regardless. (See ECF 143-2: Clark Dep. Ex. RRRR at 85:16-86:5); Goldsby would later retract his finding, but the FHC did not include that in its report. ECF 146-14: Pl. Decl., Ex. 14.

Q. From looking solely at Attachment C?

A. Correct.

(ECF 125-1: Schwalbe Dep. at 134:8-16).

This is despite the fact that Dr. Mitchell informed the CIC that Attachment C cannot be analyzed in a vacuum. The work described in C "does not stand alone" and is conditional on the work covered in B. "Together they constitute an integrated consulting engagement." (ECF 124-1: Noe Dep., Exhibit JJJJJ). Not only did Mr. Schwalbe not analyze Dr. Mitchell's work in its entirety, it appears the CIC did not provide Mr. Schwalbe with the materials he needed to do so.

Q. What was Attachment B?

A. I'm not aware of an Attachment B, other than in some of the documentation I reviewed it says Mr. Schwalbe apparently didn't see or ignored Schedule B. I don't know what that is.

Q. What about Attachment A, did you look at that?

A. No awareness of an attachment A either.

Q. Would you agree with me that the description of attachments imply that there's some main document that these attachments are attached to, right? Did you get some underlying document to look at, or just Attachment C?

A. Just Attachment C is all I can recall. It was a proposal end to end from an introductory page in the statement to a pricing page, and so that is a very familiar like document that we do all the time.

Q. Do you know if there were subsequent attachments like a D, an E, so forth?

A. I do not know. My attention was directed to the Attachment C at that request.

(ECF ____ Schwalbe Dep. at 133:1-22)

Mr. Schwalbe was the sole interviewee to view CypressTree documentation, but by his own admissions he is not an expert. (ECF 125-1: Schwalbe Dep. at 155:16-24; 190:4-5, and 223)

4. Layer Four: The Dean Reviews the CIC Report

Dean Makhija terminates Dr. Mitchell based on the CIC report.

5. Layer Five: Dr. Mitchell Appeals to the Provost

Ohio State does not call a witness or provide information outside of the CIC Report. The Provost rubber stamps the CIC Report.

6. Layer Six: The Faculty Hearing Committee

Ohio State does not call a witness or provide information outside of the CIC Report. The Faculty Hearing Committee issues report with facts against Dr. Mitchell derived solely from the CIC Report.

7. Layer Seven: The President of Ohio State

The President does not interview any witnesses or present any new information. The President rubber stamps the Faculty Hearing Committee's Report.

8. Layer Eight: The Board of Trustees

The Board of Trustees rubber stamps the Faculty Hearing Committee's Report.

Professor Emeritus Roy Lewicki summed up the process simply: "The handling of the 3555–5–04 complaint against Dr. Mitchell by the Fisher College of Business is a travesty of procedural fairness and due process." ECF 146-10: Pl. Decl., Ex. 10 (Lewicki Letter to Drake, ¶2).

## G. BEHIND THE CURTAIN: EXTENSIVE INVOLVMENT OF OSU LEGAL

### 1. An Orchestrated Assault on Dr. Mitchell

While Dr. Mitchell attempted to defend herself against an 04 process with a predetermined outcome, OSU was working behind the scenes as well. OSU caused the commencement of the Ohio Ethics Commission ("OEC") investigation of Dr. Mitchell, at least as early as August 2018, but in any case, well before her section 3335-5-04 matter ("04 proceeding") had even been fully adjudicated. ECF 146-5: Pl. Decl., Ex. 5. Ohio State tried to the use the criminal charges it orchestrated to gain an advantage over Dr. Mitchell in *this* litigation. Ohio State's October 13, 2021 letter to Magistrate Judge Vascura stated: "[w]hat's more, the recent criminal charges filed against Plaintiff concerning the contracting practices at issue in this case, Case No.

39

2021 CR B011947 (Exhibit B), should make clear that even if Plaintiff had been reappointed, she would have been dismissed."

The discovery Dr. Mitchell uncovered in this case reveal that Ohio State has served as a "state actor" for purposes of the criminal investigation and prosecution of Dr. Mitchell. Brandon Lester and others collaborated closely with OEC investigator Mark Ranck and others at OEC to ensure Dr. Mitchell was investigated and prosecuted for an alleged conflict of interest. Notably, Mr. Lester initiated the OEC investigation before Dr. Mitchell's "04 proceeding" had concluded. This expressly violated the rules of section 3335-5-04 which state that it is not a legal process, the respondent is guaranteed confidentiality and the burden of proof is on the complainant.

Despite those assurances, Mr. Lester was intricately involved in the proceedings, including exchanging numerous emails with the four Fisher College professors who served on the "04 proceeding" committee. For example, according to the privilege log Ohio State provided, Mr. Lester exchanged over a hundred emails in May 2018, which was before Dean Makhija even made a decision on the "04 proceeding," including 68 of which occurred before the committee even met with Dr. Mitchell on May 18, 2018. Mr. Lester was so involved in the "04 proceeding" that the four professors listed Lester as a "stakeholder" in an earlier draft of their Committee Report before apparently deleting that reference from the final Report. It is now apparent that the committee members, who were academics in a college business school, had been coached to ask questions directed to Ohio ethics laws during the May

18th meeting with Dr. Mitchell. The following table summarizes the communications logged in the recent privilege log:

| Month/Year | Number of Emails Withheld or Redacted involving Lester/OSU Legal |
|---|---|
| January 2017 | 9 |
| March 2017 | 1 |
| May 2017 | 1 |
| June 2017 | 1 |
| October 2017 | 2 |
| January 2018 | 14 |
| February 2018 | 3 |
| March 2018 | 7 |
| April 2018 | 69 |
| May 2018 | 117 |
| June 2018 | 26 |
| July 2018 | 40 |
| August 2018 | 8 |
| October 2018 | 2 |
| November 2018 | 1 |
| April 2019 | 1 |
| **TOTAL** | **302** |

ECF 146-5: Pl. Decl., Ex. 5.

Armed with the fruits of the "04 Proceeding" but without letting Dr. Mitchell's process proceed through appeal and conclusion, Mr. Lester contacted the Executive Director of the OEC by telephone on August 29, 2018 to initiate a complaint against Dr. Mitchell. This contact was not only premature but also violated the tenets of the "04 proceeding" which guaranteed confidentiality until conclusion.

OEC Investigator Mark Ranck then began interviewing witnesses and conducted at least 14 interviews while Dr. Mitchell was still employed at Ohio State

and still involved in the "04 proceeding." Mr. Lester and other Ohio State legal personnel shepherded Dr. Mitchell's termination from the moment Paul Velasco verbally complained to Dean Makhija, and they were intimately involved throughout her entire criminal investigation, which resulted in a quick dismissal of two misdemeanors. This is just one more example that the process afforded to Dr. Mitchell was never about an objective investigation into genuine allegations, but rather exposes the pretextual orchestration of her termination.

## H. OHIO STATE DOES NOT KNOW WHY IT FIRED DR. MITCHELL

### 1. Dr. Inks and His Interpretation of What Constitutes a Conflict of Interest

Dr. Lawrence Inks, like Dr. Mitchell, is an associate professor in a clinical position. (ECF 120-1: Inks Dep., p. 7:12-18). Dr. Inks, like Dr. Mitchell, is subject to the Faculty Financial Conflict of Interest Policy. Dr. Inks, like Dr. Mitchell, participated in Executive Education. (*Id.*, at 11:4-10). In fact, he participated in over 200 Exec Ed programs during his career at OSU. (*Id.* at 14:16-17).

However, for purposes of his own external consulting, Dr. Inks does not distinguish between education and consulting services as the demarcation line regarding conflict of interests, but rather his own two-factor analysis: (i) whether that private client was ever a client of Exec Ed, and (ii) whether they could afford the more expensive services he believes Exec Ed offers. (*Id.* at 34:3-36:20). If these two questions are answered in the negative, without conferring with Exec Ed, Dr. Inks believes he is able to provide such private consultation services and still avoid a

conflict of interest. (*Id.*; *see also*, *Id.* at 33:4-19).  This deposition testimony discusses two large and substantial entities: Park National Bank, a bank with 94 locations and $9.9 Billion in total assets; and, the Ohio Fire Chiefs' Association.  (Id at 42-46, and ; *See also* ECF 146-7: Pl. Decl., Ex. 7, screenshot of Park National Bank website: https://parknationalbank.com/about/ from April 24, 2023).

Dr. Inks admits his private consulting is substantially and materially the same as it would be if conducted for Exec Ed. Regarding his consulting for Park National Bank, Dr. Inks testified:

> Q.   And were any of those three, three-hour
> sessions, if Marty Schwalbe came to you and said, Larry,
> Park National Bank wants us to do this series of sessions
> and we have identified you as the professor most – best
> situated to do these sessions, would your sessions have been materially
> different if done for Exec Ed versus what you
> provided?
>
> A.   Probably not.

(ECF 120-1: Inks Dep. p. 47:2-9).

Regarding his consulting for the Ohio Fire Chiefs' Association, Dr. Inks testified:

> Q.   If Marty Schwalbe came up to you and said, we
> have got the Fire Chiefs' Association wants to do a
> module, one-day module on leadership.  You know, we have
> selected you as the best person to do that.  Would your
> instruction have been materially different if you were
> doing an Exec Ed classroom versus what you did for them?
>
> A.   No, probably the same.  Pretty much the same.

(*Id.* p. 41:17-23).

Dr. Inks' distinction that these clients were never Exec Ed clients is irrelevant when the services he is providing are identical to those that would have been offered at Exec Ed. Dr. Inks is literally defining a conflict of interest. The difference with Dr. Mitchell's case, however, is that Exec Ed never had the opportunity to serve his clients in the first place, because Dr. Inks self-determined the client would not want to pay for the higher fees. As shown by Dr. Inks's own words:

> Q. How do you know that? Did you make that determination?
>
> A. I made that assumption. I made the assumption that the Ohio Fire Chiefs' Association was probably not going to want to spend $30,000 or whatever it would be on a one-day program.

(*Id.* p. 34:13-18).

And,

> Q. And assuming this is something that they could have afforded with Executive Education, is this the kind of program that Executive Education could have done?
>
> A. I suppose they could have. It would still have been me. It would have been just me with the additional fees on top of it.

(*Id.* p. 40:13-18).

Notably, OSU used this exact logic against Dr. Mitchell in her termination. ODM wrote two letters in defense of Dr. Mitchell essentially stating that ODM solicited her and that they wanted highly customizable consulting services. In its findings to President Drake dated May 1, 2019 (ECF 123-2, **Ex. OOOO**), the Faculty Hearing Committee of the University Senate (FHC) wrote:

44

Additionally, both letters suggest that ODM would have considered working directly with the OSU Executive Leadership Program again if it could afford to do so. For example, Ms. Demory's letter notes, "…ODM examined the costs associated with the work being requested and was not able to budget for the exact same engagement we had in 2014 for the Executive Leadership for our organization as a whole" (emphasis added). Likewise, Mr. McCarthy notes that "ODM was pushing for both a reduction in cost and highly tailored training for ODM," that ODM HR staff had "asked for other options in order to meet those two objectives," and that "[t]he solution that came out of the discussions was to move to a different vendor".

But ODM did not want the exact same services. (See ECF 145-2, Ex. AAAAA and ECF 145-3, Ex. BBBBB. ODM is a highly sophisticated client, enough to know that it no longer needed Exec Ed's services. This is in stark contrast to what Dr. Inks presents as acceptable behavior: that he alone determines what a client may want and what it could afford. (*See* ECF 120-1: Inks Dep. p. 45:9-12, "So it was not the kind of scope that I wanted to – that I would even bother Marty [Schwalbe] with. Again, we have the discretion on what we decide to do."). Dr. Mitchell, unfortunately, was not afforded such discretion, and while she maintains that OSU could not have provided the services CypressTree provided ODM, Dr. Inks unequivocally confirms that OSU could have provided his consulting services. Yet OSU refused to investigate the matter. Dr. Inks did not submit any of these external consultations in a Form 201. (*See* ECF 120-1: Inks Dep. Ex KKKKKK).

## 2. Clear Confusion Regarding Duty to Report

Professor Lewicki, Professor Rucci, and Dr. Mitchell's own Department Chair, Dr. Thomas Goldsby, did not believe she committed conflict of interest. If the

university does not, or can not, perform consulting services, can a conflict of interest

exist?  Professor Lewicki did not believe a Conflict of Interest existed:

> I have been a faculty member at Fisher for 35 years… I have
> taught in innumerable Fisher EE programs… and served as the
> Academic director of those programs… I am also very familiar with
> the performance of external paid consulting work by members of the Fisher
> faculty. I have some further personal knowledge of some of the factual
> circumstances giving rise to this matter insofar as I was a participating
> faculty instructor in the 2014 Fisher EE program conducted for the Ohio
> Department of Medicaid… The work performed by Dr. Mitchell and her
> firm CypressTree beginning in July of 2015 was not work that has been
> performed by Fisher EE in the past, nor is it work being performed by
> Fisher EE now… I believe that the Fisher College Investigations
> Committee's finding that Dr. Mitchell's consulting work competed with
> services provided by Fisher EE was erroneous.

(ECF 122-1: Phillips Dep., Ex. HHHH.)

A reasonable jury could credit, under Fed.R.Evid. 701, these opinions as

probative lay testimony.  The testimony is not merely about a difference of opinion,

but rather a radical departure from the appropriate standards and thus probative

evidence of pretext.  Not only was the more likely motive sex, but Dr. Mitchell's

conduct was insufficient to justify termination and, when characterized as terminable

misconduct, lacked a basis in fact.  Indeed, in fact, she did what other male professors

had been allowed and even encouraged to do, though her financial success coupled

with her female gender and stereotyping put a target on her back.

Despite confusion about policies and onboarding new faculty members, the

FHC opinion still held Dr. Mitchell liable responsible for the policu. ECF 123-2: Clark

Dep. Ex. OOOO. The FHC letter to President Drake provided an additional

recommendation that, "Fisher College of Business must take greater steps to ensure

that all employees are informed of and in compliance with laws and policies related to business ethics, paid consulting, and conflicts of interest. Having such clear, documented policies and procedures in place (*e.g.*, an online system that tracks compliance) might alleviate similar situations in the future." *Id*. at p. 5, bates OSU_021924.). In fact, Dr. Clark commented on record during the FHC hearing that "there seemed to be some surprise about the faculty rules and so I would that as part of any onboarding process, we need to point to those and…recommend to faculty that they are aware of their rights." ECF 123-2: Clark Dep., Ex. RRRR. at FHC Transcript at 256:6-18.

Dr. Goldsby, wrote in his declaration that, "In my general experience within the Fisher College of Business and in my capacity as a Department Chair and as a faculty member, I am not aware of any form of standard training of Fisher faculty members on the rules for disclosures of external paid consulting." ECF 146-14: Pl. Decl., Ex. 14, Goldsby Declaration, bates OSU_001407-OSU_001409.

### 3. Form 201s – More "Spotty" Issues

Makhija and the CIC's findings essentially hold Dr. Mitchell liable for a failure to disclose, but the CIC Report generically finds Dr. Mitchell guilty of violating the broad policy of the Faculty Financial Conflict of Interest requirement. The omission of Dr. Mitchell's failure to file her Form 201s is conspicuous. This policy is not the same as the External Consulting Policy (*i.e.*, the Form 201 Policy). In fact, CIC's Report states that the Form 201 issue is another "discovered" issue, and that the 201

47

Policy was "potentially violated." (ECF 124-1 Noe Dep., Ex. ZZZZZ Report Page 18, Section 4.1.) Dean Makhija, however, unambiguously clarified that Dr. Mitchell did not violate the Form 201 Policy:

> Q. Ultimately I think the committees that reviewed Dr. Mitchell's situation determined that she did not engage in misconduct when it came to the Form 201. Do you remember that?
>
> A. Yes, I very much do. And, in fact, I formed that, you know, which it falls under the conflict of commitment, and my own assertion and my reading of the report and my own standing on it was that that was not the driving aspect, the form itself. Still desirable, but it wasn't —
>
> Q.   In fact, I think you affirmed that there was no misconduct with respect to the -- her not filling out a Form 201?
>
> A. I did.
>
> Q. Is that fair?
>
> A. Yeah, I did.
>
> Q. And was part of your reasoning for that the compliance with filling out Form 201s was, at least at that time, rather spotty within the College?
>
> A.   Correct.
>
> Q.   And by "rather spotty," we mean that sometimes people did it and sometimes when they should have, they just didn't?
>
> A. Yes.
>
> Q. And that was true for a number of Fisher faculty members, right?

48

A. Yes.

(ECF 86-1: Makhija Dep. pp. 83:7-84:10)

But it was not simply "spotty" due to an unintentional oversight. Fisher College of Business's former CFO, Ms. Barbara DeYoung, who reported directly to Dean Makhija, testified that Dean Makhija specifically told her not to "bother" the professors about reporting their external consulting services. (ECF 139: DeYoung Dep. at 13:22-14:21).

How then, did the CIC recommend Dr. Mitchell be terminated if it exonerated her regarding the Forms 201? The two policies that require some affirmative disclosure are the Form 201 Policy and the eCOI. See ECF 86-1: Makhija Dep., Ex. H. Jessica Tobias confirmed Mitchell was not obligated file, and, that Dr. Mitchell's subsequent Forms 201 were annotated that she didn't believe she had to file eCOI, and Makhija confirms this on her form; ECF 144-3: Ex. ZZZZZ; *and see* ECF 144-2: Ex YYYYY, Mitchell 201s).  Dean Makhija clearly says she did not violate the former, and that decision most likely attempted to avoid the obvious discrimination claim. In other words, Dr. Mitchell revealed that virtually no one complied with the Form 201 Policy, so finding her guilty of that policy would open Pandora's box. Regarding the latter, the eCOI policy, the CIC Report admits that Dr. Mitchell was not obligated to disclosure under the COI policy, but Dean Makhija testified that the Faculty Activity Reports ("FARs") places an affirmative duty to disclose external consulting.  ECF 86-1: Makhija Dep. at 68:6-7. However, the written policy itself is entirely silent as to external consulting activities.  ECF 146-1: Pl. Decl., Ex. 9. Dean Makhija and the CIC

do not know what policy Dr. Mitchell violated, if any, but it did not matter if the goal was termination.

### 4. **FHC Contradicts CIC Finding**

While Dean Makhija and the CIC sidestepped the Form 201 issue, the FHC in contrast found that Dr. Mitchell did, in fact, violate this policy: "The hearing panel concurred that Dr. Mitchell was clearly obligated to comply with the OAA Faculty Paid Consulting Policy which applies to all faculty members. It is worth quoting directly from this policy to make the extent of Dr. Mitchell's grave misconduct clear." (ECF 123-2, Ex. OOOO, Section IV(2), Page 4).  The FHC pointed out that it was not bound by the CIC's investigative report and recommendations, however, it also did not present any case of its own.  (*Id*. Section V, Page 4, citing Faculty Rule 3335-5-04(C)(9)).

By finding Dr. Mitchell of grave misconduct for failing to file Form-201s, just as countless male colleagues failed to do, the FHC drew a line in the sand. This highlights the failure of Dean Makhija (and every person after him) for refusing to investigate Dr. Mitchell's own complaints against the male professors.  Ohio State cannot have its cake and eat it, too.

### 5. **Unintentional versus Flagrant, Egregious, and Willful**

Dr. Mitchell was accused of, and ultimately terminated for, grave misconduct, which OAC § 3335-5-04 defines as "flagrant, egregious, and willful misbehavior in violation of the law or established university rules or policies." OAC § 3335-5-04(A)(4); (See ECF 86-1: Makhija Dep., Ex. E, page 1 [original notation is page 26]).  The code

also states that such a finding of grave misconduct must be based on "clear and convincing" evidence. OAC § 3335-5-04(E)(2); Id. at 4[original notation is page 29]. However, in a rare moment of candor, Dean Makhija questioned the notion of Dr. Mitchell's willful behavior:

> Q. But you came to the sad conclusion that she had, in fact, engaged in grave misconduct once you got that report?
>
> A. Yeah. And it's quite possible that it was unintentional on her part, something that still bothers me.

(ECF 86-1: Makhija Dep. pp. 143:21-144:2).


### III.   Law & Argument

In considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008) ("viewing the record in the light most favorable to White, as we must, we find that a jury could reasonably disbelieve both of these proffered explanations"). The moving party must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *See id*. "[T]he

judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

These standards are especially important at bar because a fundamental issue is whether the male professors Dr. Mitchell painstakingly identified as violating the same policies she was investigated and disciplined for were similarly situated, rendering probative evidence of their lenient treatment. "[T]he appropriate test is to look at those [similarity] factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity in all respects." *Jackson v. FedEx Corp. Servs.*, 518 F.3d 388, 394 (6th Cir. 2008). *Strickland v. City of Detroit*, 995 F.3d 495, 514 (6th Cir. 2021), recognized that "there is a genuine dispute of material fact as to whether the differences in position and applicable regulations justify the differential treatment that Plaintiff and Officer Murdock received for not completing an activity log." That genuine dispute precluded summary judgment.

The core rationale is that the weight accorded to differential treatment should be measured by the jury unless there is no reasonable way to find that putative comparators were similarly situated. "[I]nasmuch as the explanations do not rationally explain the difference, ... a jury could reasonably reject the stated reasons and find that the difference in treatment was instead motivated by" a prohibited motivation. *Redlin v. Gross Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). After all, evidence of unjustified differential treatment is sufficient "to withstand summary judgment on the issue of pretext" and is itself evidence that the "proffered

explanation ... may not have actually motivated [the employer's] conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1023 (6th Cir. 2000). The established principle is that "showing that a similarly situated employee outside the protected class committed the same misconduct but was not subject to the same consequences—and insinuating that the reason for that disparate treatment is" prohibited may support a finding of pretext. *Miles v. S. Cen. Hum. Res. Agency, Inc.*, 946 F.3d 883, 892 (6th Cir. 2020).

### A. Dr. Mitchell has established a prima facie case and evidence from which a jury could infer discrimination because of sex.

For her Title VII claim against Ohio State, Dr. Mitchell alleged that "[b]y recommending her termination, stripping her ability to teach, and subjecting her to more harsh discipline than any male employee for engaging in substantially similar conduct, Defendant has committed sex discrimination[.]" Second Amended Complaint, ¶253 (ECF 38, PAGEID#: 419). Dr. Mitchell provided a list of similarly situated male professors in the body of her Complaint who did not face termination and retaliation. *Id.*, ¶¶166-167 (ECF 38, PAGEID#: 404-405).

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). To prove her case, Dr. Mitchell must show that: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the

position;[10] and (4) similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)." Opinion and Order on Ohio State's Motion to Dismiss, ECF 54 at 8-9.

As detailed above, Dr. Mitchell has convincingly demonstrated that similarly situated male professors were treated more favorably than her when they engaged in outside consulting and other business ventures without investigation or termination. Having done so, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White*, 533 F.3d at 391 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). OSU has failed to offer a legitimate, non-discriminatory reason for investigating and terminating Dr. Mitchell, but even if the Court finds OSU has triggered the *McDonnell Douglas* burden-shift, Dr. Mitchell can still establish a genuine issue of material fact by showing either that (1) OSU's stated reason had no basis in fact; (2) OSU's stated reason was not its actual motivation for investigating and terminating her; or (3) OSU's stated reason was insufficient to motivate the adverse action. *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008). The evidence here establishes that OSU's purported reasons were pretextual. Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White*, 533 F.3d at 393 (citing *Burdine*, 450 U.S. at 256).

---

[10] OSU concedes, for the purposes of its Motion, that Dr. Mitchell is a member of a protected class, was qualified for the position she held, and suffered an adverse employment action. (ECF Doc. 135 at 32-33).

### B.     Ohio State's comparability argument is both factually flawed and wrong as a matter of law.

The Motion blithely ignores key facts revealing favorable treatment given to male Fisher College of Business professors and conveniently overlooks the proper legal standard for the similarly situated inquiry. First, the facts.

OSU builds its argument on a fabricated foundation, that is, the existence of what the Motion dubs "ODM-I" and "ODM-II." (*See* ECF 145-1: Ben-David Dep.). In fact, the Ohio Department of Medicaid completed its OSU Exec Ed program before entering into a contract with CypressTree.  ODM at that point was a former client of Fisher's Exec Ed.  Not only was ODM a former client of Exec Ed at this point, but as made clear by Chief of Staff Demory, it was not interested in another OSU Exec Ed program.[11] (See ECF 110-1). Indeed, the acting head of Exec Ed, Martin Schwalbe, testified that he never even bothered to follow up with ODM after the end of their Exec Ed program. ECF 125-1: p.115:4-24. The record is clear: there was never going to be an "ODM-II." The "ODM II" term is merely a rhetorical device first created for use in the CIC Report, possibly crafted with input from OSU legal. (ECF 145-1: Ben-David Dep., p. 40:8-16).

---

[11] OSU also intimates that CypressTree somehow improperly recruited or poached two Exec Ed employees, further providing evidence of malfeasance. But as to the employees in question: one left Exec Ed due to its hostile work environment and Dr. Mitchell actually helped the other regain employment at OSU, but Dean Makhija refused to bring her back.  In any event, neither employee worked for CypressTree when its contract with ODM was signed. (Declaration of Deborah Mitchell, at 17, see also ECF 141-1: Ex. FFFFF, email to Peter Ward regarding hiring Michelle Norris).

But the defendant would like this Court to believe that Dr. Mitchell cast a spell on a large state of Ohio agency, with its own controlling board and legal counsel, and duped them into hiring her consulting company when they actually should have preferred OSU. Keep in mind, this is the same agency that had previously displayed the sophistication to locate and hire "[c]onsulting powerhouse Deloitte." (ECF 135 at 13). In reality, ODM was more than capable of determining what they needed to accomplish going forward and selecting a consulting firm based on those needs. They chose CypressTree.[12]

Casting aside the straw argument of "ODM I vs. ODM II," the Court is left with a factual record that demonstrates that numerous male Fisher College of Business professors engaged in outside business of a similar nature to Dr. Mitchell.[13] (*See* Section II.E above "The Comparables"). These male professors were subject to the same conflict of interest policies as Dr. Mitchell and shared the same supervisor,

---

[12] OSU uses the inflammatory term "conversion" to describe Dr. Mitchell's conduct but fails to even mention or prove the elements of conversion. Of course, it is totally inaccurate to suggest CypressTree "converted" an opportunity from Exec Ed when ODM's Chief of Staff made clear her agency was not interested in another Exec Ed program.

[13] Another red herring is OSU's argument that the CypressTree work for ODM involved an appreciable amount of "education" rather than "consulting." But the chair of the CIC, Dr. Noe, explained that even a contract that involved a mere 1% education component would be a conflict of interest with Exec Ed. It strains the imagination to conceive of a consulting arrangement that would not involve at least a marginal education component, meaning essentially any outside consulting contract could be a conflict of interest with OSU under the CIC Chair's formulation. But that distinction is not germane to evaluating the Motion because no male professors were investigated even when they were admittedly competing with Exec Ed. (*See e.g.*, ECF 120-1: Inks Dep.).

Dean Makhija. For his part, Dean Makhija was aware these male professors also engaged in outside consulting opportunities, sometimes with OSU Exec Ed clients. ECF 86-1: Makhija Dep., p. 62:15-20. A rational jury could clearly conclude that similarly situated male professors were treated more favorably than Dr. Mitchell.

Second, with respect to the applicable legal standard, OSU's narrow view of "similarly-situated" has been flatly rejected. "A court's formulation of the similarly situated inquiry should not be exceedingly narrow." *Lynch v. ITT Ed. Servs., Inc.*, 571 Fed.Appx. 440, 444 (6th Cir. 2014). "[T]he requirements for finding a similarly situated comparator are not so onerous." *Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019). A plaintiff is not required to show "an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In each case, a court must make "an individualized determination of which factors are relevant based on the factual context of the case." *Lynch*, 571 Fed.Appx. at 444.

The Sixth Circuit in *Bobo* stressed that differences between other supervisors are "only apposite where they are meaningful to the particular claim of discrimination presented." *Bobo v. United Parcel Service*, 655 F.3d 741, 751 (6th Cir. 2012), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). The holding was clear: "*Bobo* was not required to demonstrate an exact

correlation between himself and others similarly situated; rather, he had to show only that he and his proposed comparators were similar in all relevant respects, and that he and his proposed comparators engaged in acts of comparable seriousness." *Id.* (citations omitted).

The error was the district court's "framing of the similarly-situated standard [as] too narrow and necessitat[ing] an exact correlation not required by the law of this circuit." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). Similarly situated employees need only be "similar in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998). Especially when the sample size of comparators is small, courts must not apply the "similarly-situated" requirement so stringently that it "deprive[s a plaintiff] of any remedy to which he may be entitled under the law." *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396–97 (6th Cir. 2008).

The discovery context in *Bobo* was not dispositive. The Sixth Circuit used merits, rather than discovery, precedent, and discoverability hinged on what a plaintiff must show on the merits. Since *Bobo*, the Sixth Circuit has not confined, or even distinguished, its holding to discovery disputes. Recently, *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255–56 (6th Cir. 2023), applied *Bobo* on review of summary judgment. The putative comparators did not, however, report to the same decisionmaker and "were reprimanded for different conduct: in one case, taking University equipment off campus; and in the other, sharing confidential information with a co-worker." *Id.* At bar, the same primary decisionmaker was involved,

coloring the rest of the process, and the conduct involved the same policies on conflict of interest and reporting outside income.

*Bobo* was also applied to the summary judgment review in *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 586–87 (6th Cir. 2022), where "questions of fact remain[ed]" about the comparators. The employer argued, though, that the putative comparators "were teaching programs with different licensing requirements than the programs in which their sons were enrolled," but that was a distinction that did not make a conclusive difference because the concern for nepotism remained. *Id.* "[A]t trial, a juror will be able to weigh the competing testimony and determine whether the similarities between the licensed and unlicensed programs are relevant enough." *Id.* at 587. In general, for disciplinary actions "[f]actors to consider include whether the individuals 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Arnold v. City of Columbus*, 515 Fed.Appx. 524, 532 (6th Cir. 2013) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Ultimately "[w]hether the comparison between similarly situated individuals is sufficiently relevant is itself a jury question." *Bledsoe*, 42 F.4th at 586 (citing *Strickland*, 995 F.3d at 514).

Dr. Mitchell has articulated specific facts that refute the aggravating or mitigating circumstances that would render the other Fisher College faculty who engaged in outside consulting work and were not even charged dissimilar

comparators. More to the point, whether a non-protected employee is similarly situated is a jury question of fact. *Jones v. Johnson, 801 Fed.Appx.* 338, 349 (6th Cir. 2020) (citing *Bobo*); *Dawson v. Assured Partners*, NL, LLC, No. 1:17-CV-00676, 2021 WL 1854884, at *8 (S.D. Ohio May 10, 2021) ("[The Court finds that Plaintiff demonstrates that there is a genuine issue of material fact as to whether Ms. Howard and Ms. Jeffries are apt comparators, as they had similar job titles, responsibilities, expectations, and each reported to Ms. Bach."). Under Title VII, there can be difference in some respects without eliminating sex as a motivating factor in Dr. Mitchell's termination. Pursuant to 42 U.S.C. § 2000e-2(m), "an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."

Consequently, that similarly situated male professors were never even charged despite engaging in conduct similar to hers is telling. "[W]hat is at issue in this case is [the comparator's] lack of punishment." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 611 (6th Cir. 2019) (emphasis in original). In *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012), the employer argued that "other instances of horseplay were not similar in all relevant aspects" to the horseplay for which the Plaintiff was disciplined. The Plaintiff argued "that his conduct was no more severe than that of other, white employees," explaining "that his bear hug of Johnson was in line with the punching and other acts of physical horseplay by white employees that took place on the plant floor, including: giving another employee a wedgie; punching

another employee on multiple occasions, producing a bruise at least once; pretending to run over another employee with a forklift; and grabbing another employee to scare him or joke with him." *Id*. Discovery revealed that the aggravating circumstance the employers alleged rendered the plaintiff dissimilar -- the filing by an employee of a workers' compensation claim relating to the Plaintiff's horseplay -- was known after an internal investigation to be "exaggerating the severity of the horseplay and his injuries." *Id*. at 349 (footnote omitted). "Thus, *Chattman* has created a genuine dispute of material fact as to whether other similarly situated white employees were also similarly disciplined." *Id*. Dr. Mitchell has put forth more than sufficient evidence to create a genuine dispute of material fact as to whether similar situated male professors were treated more favorably despite engaging in similar conduct.

The glaring absence of investigations and discipline are, at a minimum, admissible "background evidence" that undermines Ohio State's articulation of nondiscriminatory reasons for investigating and disciplining Dr. Mitchell. *See e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Nor does the statute [of limitations] bar an employee from using the prior acts as background evidence in support of a timely claim."). The absence actually reflects a dual standard, one for male professors and one for female professors. Only by drawing inferences and making credibility judgments can the palpably comparable conduct of male professors be determined so different that a genuine issue of material fact is precluded.

To defeat summary judgment, Dr. Mitchell need not prove by a preponderance of the evidence that the male professors were similarly situated to her. Instead, she

need only create a genuine issue of material fact on this issue, that is, one on which a reasonable juror might find in her favor.  For starters, she has three witnesses with tremendous insight and experience who will opine that her behavior was in fact similarly situated.

Beyond that, she has admissions from male professors that they engaged in conduct which, applying the standards applied to her, reflected a conflict of interest and/or ignored the reporting requirement.

Finally, she has exposed the "ostrich defense" – we didn't look so we didn't know – as too clever by half. Ohio State actually knew from her extensive documentation and reporting to decisionmakers, as well as the boasting of male faculty members on web sites, in their C.V.s, and generally, and purposely did not look farther.  *Cf. Burwell v. City of Lansing, MI*, 7 F.4th 456, 475 (6th Cir. 2021) ("An officer "cannot escape a finding of subjective knowledge of risk because he declined to further investigate the cause of [a prisoner's] distress. It is well established that a defendant may not escape liability because he 'refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S.825, 843 n. 8 (1994)).  Were this a criminal prosecution, a "deliberate ignorance" jury instruction would be appropriate.  *See United States v. Matthews*, 31 F.4th 436, 445 (6th Cir. 2022) ("[T]he district court instructed the jury about how the government may prove knowledge through a defendant's deliberate ignorance—an instruction that was

62

based verbatim on this court's pattern instruction. *See* Sixth Circuit Pattern Crim. Jury Instructions 2.09 (2021).").

### C. Dr. Mitchell's evidence of differential treatment withstands summary judgment on the issue of pretext.

Ohio State's Motion should be denied because a reasonable jury could infer that Ohio State's proffered explanations for terminating her were merely a pretext for unlawful discrimination. A rational trier of fact could find that Ohio State discriminated against an outspoken female professor when numerous male professors were clearly laboring under potential conflicts of interest with no consequences. Her tremendous success combined with her open denunciation of the hostile environment made her a woman too big for her britches. One reasonable inference that a trier of fact could make from the facts is that all the male professors discussed above may have been violating the same policy as Dr. Mitchell, yet Ohio State did nothing about it.

OSU argues there was no basis to investigate the comparable male professors because Dr. Mitchell "failed to pursue allegations against others she believed were acting wrongfully." (ECF Doc. 135 at 36). But Dr. Mitchell presented Dean Makhija with written evidence (as much as she could locate from available public information) demonstrating that numerous male professors were, in effect, doing the same types of outside work that she was doing. A rational jury could readily compare the detailed written materials Dr. Mitchell gave to Dean Makhija with the bare oral allegation that Paul Velasco brought to Dean Makhija about the CypressTree/ODM contract

and conclude this was textbook pretext. When a mere oral complaint was raised against a female professor, Makhija instructed Velasco to investigate the matter (a process that took months) and develop an extensive written 04 Complaint. ECF 126-1: Velasco Dep., pp. 48:12-49:12 In addition, other institutional resources were immediately mustered in the form of the early and extensive involvement of OSU's General Counsel's office. (*Id.* and ECF 146-5: Pl. Decl., Ex. 5).

The actual facts grossly deviate from OSU's description of the 04 process as one of "peer review" and "[i]n contrast to top-down commercial or industrial employer-employee relationships." (ECF 135 at 20). The immediate and extensive involvement of the Dean of the Business School and the University's General Counsel's Office is about as "top-down" as a process can get. Coupled with the fact that OSU's General Counsel Office also spearheaded a criminal investigation of Dr. Mitchell by the Ohio Ethics Commission before the initial CIC Report was even handed down, the entire 04 process is further evidence of her differential treatment. This was no "bottom-up" peer review process.

On the other hand, when it came to the detailed written materials from Dr. Mitchell outlining similar conduct by male professors, nobody at OSU could be bothered to investigate. In fact, despite "spotty" compliance with the submission of required financial disclosure forms at the Fisher College of Business—a lax practice enabled by Dean Makhija—only Dr. Mitchell was investigated and terminated. Holding a technical violation of a never-enforced rule against a member of a protected class can also prove pretext for sex discrimination.

In this regard, Ohio State deviated from both how its policies were customarily enforced and, to find distinguishing aspects, what the policies actually said. Deviations are probative evidence of a forbidden animus.  As the Supreme Court explained in *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) (emphasis added), "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering. Of course, a conflict or inconsistency may be ***persuasive circumstantial evidence*** tending to show racial predomination, but there is no rule requiring challengers to present this kind of evidence in every case."  *See also Adamov v. U.S. Bank Nat'l Ass'n*, 681 Fed.Appx. 473, 480-81 (6th Cir. 2017) (circumstantial evidence included employer's deviation from how it had treated wire transfers).

*Coburn v. Rockwell Automation, Inc.*, 238 Fed.Appx. 112, 126 (6th Cir. 2007), recognized that an "arguable failure to follow its own written . . . policy can support the inference that it was determined to layoff employees on the basis of age."  In turn, that deviation is evidence of pretext. *Id.  Accord Skalka v. Fernald Envtl. Restoration Mgmt. Co.*, 178 F.3d 414, 422 (6th Cir. 1999) (jury need not accept an employer's explanation of why it deviated from its stated reduction-in-force procedure).

In *Asmo v. Keane, Inc.,* 471 F.3d 588 (6th Cir. 2006), and *DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed.Appx. 387, 393 (6th Cir. 2005), discovery established that the employer typically followed a policy and deviated from it soon after an employee had disclosed her pregnancy.  The deviation was more likely a product of intentional

discrimination than an innocent mistake or negligent human resources. At the least, a reasonable jury could find that, when a deviation ignores male wrongdoing, the employer's deviation to investigate and discipline a female's misconduct is suspicious.

"A plaintiff's *prima facie* case, together with evidence showing the employer's proffered reason is false, permits the jury to infer the ultimate fact of intentional discrimination." *Moffat v. Wal–Mart Stores, Inc.,* 620 Fed.Appx. 453, 349 (6th Cir. 2015). Any one of the alternative ways to prove pretext may be predicated on that jury inference.

Ultimately, pretext can be inferred from evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence[.]" *Fuentes v. Perskie,* 32 F.3d 759, 765 (3rd Cir. 1994). The questions for a jury are "did the employer fire the employee for the stated reason or not" and "whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009). "'[T]o survive summary judgment a plaintiff need only produce enough evidence . . . to rebut, but not to disprove, the defendant's proffered rationale.'" *Carter v. Toyota Tsusho Am., Inc.,* 529 Fed.Appx. 601, 609 (6th Cir. 2013) (quoting *Griffin v. Finkbeiner,* 689 F.3d 584, 592 (6th Cir. 2012)).

As a matter of law, discrimination statutes protect employees who have engaged even "in serious misconduct" from differential treatment. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 (1976); accord *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 794-95 (1973). In *McDonald*, 427 U.S. at 276, an employee who was discharged for "misappropriating 60 one-gallon cans of antifreeze which was part of a shipment Santa Fe was carrying for one of its customers" was permitted to state a claim for an illicit motivation. The Court rejected the employer's argument that an employee's admitted "participation in serious misconduct or crime directed against the employer" precluded statutory protection. *Id*. at 283. And in *McDonnell Douglas Corp*., 411 U.S. at 794-75, employees admitted they had "illegally stalled their cars on the main roads leading to [the employer's] plant for purpose of blocking access to it at the time of the morning shift change" without forfeiting statutory protection.

Simply put, comparable male employees were leniently treated, a fact that a jury could use to draw an inference of sex discrimination. The very fact that male faculty who engaged in private consulting under circumstances similar to her private consulting were never even investigated—much less charged—raises an inference of discrimination. *Bobo*, 665 F.3d at 752. The key relevant decisionmakers were the Dean and others who decided whether to initiate an investigation at all. The ostensible differences between the comparable male professors and Dr. Mitchell were not, according to the Dean, "in fact relevant to the Department's disciplinary decisions." *Strickland*, 995 F.3d at 513 .

Discrimination claims are essentially about differential treatment of individuals similarly situated apart from their protected class membership. Dr. Mitchell has put forth more than sufficient evidence for a jury to conclude that the most likely motive for initiating a disciplinary process and terminating her was sex

discrimination, rather than a concern about a conflict-of-interest policy that male professors were permitted to ignore with impunity.

### D. Genuine issues of material fact exist with respect to Dr. Mitchell's reappointment process and, in any event, a ruling on damages is premature.

OSU inexplicably moves the Court for partial summary judgment on the issue of damages in the event the Court denies the summary judgment on the issue of Dr. Mitchell's termination. (ECF 135 at 37-38). But this request is inappropriate for at least three independent reasons. First, expert reports on damages are not even due yet, so any ruling on damages is premature. The Court set a deadline of 30 days from the Court's decision on motions for summary judgment for primary damages reports. (ECF 26 at 2).

Second, significant factual disputes surround Dr. Mitchell reappointment process rendering summary judgment inappropriate. Most significantly, OSU's Committee on Academic Freedom and Responsibility (CAFR) voted unanimously to consider Dr. Mitchell's appeal of the denial of her reappointment because it did not follow the proper process. (ECF 146-6: Pl. Decl., Ex. 6, Letter to Plaintiff dated August 30, 2019). Dr. Mitchell won the right to appeal, but was fired anyway. Among the flaws with her reappointment process, it saw an unprecedented nine abstentions out of eleven voting faculty members, which did not provide for a quorum of members. (*Id.*) Moreover, it is apparent from the timeline of events that the reappointment process was inextricably intertwined with and adversely impacted by the 04

proceeding against Dr. Mitchell. As a result, this process is further circumstantial evidence of pretext and an adverse employment decision based on sex. For those reasons, summary judgment cannot be granted in part on damages, as OSU requests.

Third, Dr. Mitchell's damages are substantial. As outlined in her Declaration submitted in support of Plaintiff's Objections to the Magistrate Judge's Discovery Order, Dr. Mitchell explained how she has been harmed by OSU's discriminatory investigation and termination. (*See* ECF Doc. 72-1). Among other things, Dr. Mitchell explained that she has ". . . suffered numerous categories of losses including without limitation lost wages and income, emotional and physical harm, reputational harm, legal expenses, medical expenses, and a fundamental loss of the ability to earn a living in my chosen field which has been a lifelong passion and calling." (*Id*. at 2, ¶10).

Because plaintiff's damages are substantial, she contests material facts surrounding her investigation and termination, and she asserts any ruling would be premature, defendant's argument that partial summary judgment should be entered on damages should be denied.

## IV.    CONCLUSION

Because there are genuine issues of material fact and OSU is not entitled to judgment as a matter of law on any issue raised in the defendant's Motion, summary judgment should be denied in whole.

Respectfully submitted,

**COUNSEL FOR PLAINTIFF
DEBORAH MITCHELL**

/s/ Nicholas C. Vesha
Nicholas C. Vesha (0085760)
Vesha Law Firm, LLC
38 South High Street
Dublin, Ohio 43017
Office: (614) 376-0266
Fax: (614) 467-3807
nicholas@veshalaw.com

/s/ John S. Marshall
John S. Marshall (0015160)
jmarshall@marshallforman.com
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, OH 43215
(614) 463-9790
Fax: (614) 463-9780

/s/ Matthew J. Mueller
Matthew J. Mueller
Fogarty Mueller Harris, PLLC
501 Kennedy Blvd.
Suite 790
Tampa, Florida 33602
Office: (813) 682-1730
matt@fmhlegal.com
*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on April 28, 2023 which caused it to be served on the Court and the parties of record.


<u>/s/ Matthew J. Mueller</u>
Matthew J. Mueller
Counsel for Plaintiff Deborah Mitchell