## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DEBORAH MITCHELL, Ph.D.,**

    **Plaintiff,**    :

 **v.**

**THE OHIO STATE**
**UNIVERSITY,**      :

    **Defendant.**

     **Case No. 2:19-cv-4162**
     **Judge Sarah D. Morrison**
     **Magistrate Judge Chelsey M.**
     **Vascura**

### OPINION AND ORDER

Following the termination of her employment at The Ohio State University's Fischer College of Business ("FCB"), Deborah Mitchell filed the instant suit. According to Mitchell, she was singled out for enforcement of a rarely invoked University policy because of her gender. This matter is before the Court on OSU's Motion for Summary Judgment, which is ripe for consideration. (ECF Nos. 135, 147, 153.) For the reasons below, the Motion is **DENIED**.

### I. STATEMENT OF ESSENTIAL FACTS

Mitchell was a non-tenured clinical associate professor of marketing at FCB from 2012 until 2019, during which time, she was a substantial contributor to FCB's Executive Education Program (the "EE Program". (Mitchell Depo., ECF No 119-1, PAGEID # 2708–11.) The EE Program is an administrative unit of FCB that facilitates University engagement with industry through the provision of educational services. (Makhija Depo., ECF No. 86-1, PAGEID # 1030.) The Program

provides two types of services to clients: (1) open enrollment educational programs for individual executives and (2) custom leadership development and strategic planning programs for organizations. (*Id.* at 1033–34.) As a faculty contributor, Mitchell provided leadership education and training to EE Program clients and was expected to help retain clients and win business for OSU. (*Id.* at 1035; Mitchell Depo., ECF No. 119-1, PAGEID # 2711.)

Mitchell also owned and operated a private consulting business called CypressTree, Corp., through which she performed private consulting. (Mitchell Depo., ECF No. 119-1, PAGEID # 2716.) It was a common practice for FCB faculty to engage in outside consulting and, in fact, OSU encouraged its faculty to do so. (*See* Faculty Paid External Consulting Policy, ECF No. 86-1, PAGEID # 1125.)

### A. OSU contracts with ODM to provide education and training services for executive-level leadership.

In June 2014, the EE Program contracted with the Ohio Department of Medicaid (ODM) to provide custom organizational programming for ODM's executive-level leadership. The programming was tailored to fit ODM's needs and included a wide array of services, including leadership education, strategy mapping, guest speakers, and on-site visits to other organizations. (ODM Programming Proposal, ECF No. 107-1.)

Mitchell was selected as the Academic Director for ODM's contract. As Academic Director, she was ODM's point of contact with the EE Program and had standing meetings with ODM's executive leadership to give and receive feedback

2

about the programming. (Mitchell Depo., ECF 119-1, PAGEID # 2710.) As a result, Mitchell established close professional relationships with ODM staff and gained insight into ODM's organizational needs. (*Id.* at 2714–15.)

While the executive-level training was ongoing, ODM approached Mitchell about training its mid-level management. (Mitchell Depo., ECF No. 119-1, PAGEID # 2714.) Following conversations with ODM, Mitchell determined that it was looking for services that were not typically provided by the EE Program, but she told no one at OSU about ODM's interest in additional training. (*Id.* at 2722, 2742.)

**B.  CypressTree contracts with ODM to provide education and training services for mid-level managers.**

Around the time ODM's executive-level training was winding down, Mitchell agreed to provide a multiyear training program to ODM's mid-level managers through CypressTree. (Mitchell Depo., ECF No. 119-1, PAGEID # 2714; CypressTree Programming Proposal, ECF No. 135-2, PAGEID # 3811–41.). ODM's $1.8 million engagement with CypressTree was presented to the Ohio Controlling Board in three pieces: one smaller no-bid contract and two larger amendments. (ODM/CypressTree Contract, ECF No. 135-2, PAGEID # 3843–55; First Amendment, ECF No. 135-2, PAGEID # 3891–92; Second Amendment, ECF No. 135-2, PAGEID # 3946–48.)

On September 4, 2015, the Controlling Board approved ODM's initial no-bid contract with CypressTree for $189,000. (Mitchell Depo., ECF 119-1, PAGEID # 2737.) Several months later, ODM and Mitchell signed the first amendment to the

no-bid contract, which provided for a seven-month training program titled "Medicaid University" for $972,000. (Medicaid University Proposal, ECF No. 135-2, PAGEID # 3893–3923; First Amendment, ECF No. 135-2.)

Mitchell says that the EE Program did not offer the type of services she provided ODM though CypressTree. (ECF No. 147, PAGEID # 5037; Mitchell Depo. ECF No. 119-1, PAGEID # 2729.) Even so, there are some undeniable similarities. For example, Medicaid University began with assessments called "Everything DiSC Workplace" and "Everything DiSC 363 for Leaders" that were delivered by an outside contractor; DiSC assessments were frequently used by the EE Program and CypressTree hired the same DiSC contractor used by OSU. (Mitchell Depo. ECF No. 119-1, PAGEID # 2730; CypressTree Programming Overview, ECF No. 135-2, PAGEID # 3929.) Like the ODM participants in the EE Program, Medicaid University participants went on site visits and heard from the CEO of Lutheran Social Services. (Schwalbe Letter, ECF No. 125-2, PAGEID # 3083; Mitchell Depo, ECF No. 119-1, PAGEID # 2729–31; CypressTree Programming Overview, ECF No. 135-2, PAGEID # 3929.) And strategy mapping was a frequent topic in both Medicaid University and EE Program services. (Mitchell Depo, ECF No. 119-1, PAGEID # 2729–31; *see also* Medicaid University Proposal, ECF No. 135-2, PAGEID # 3893–3923; ODM Programming Proposal, ECF No. 107-1.)

### C.   OSU learns of Mitchell's contract with ODM and Velasco prepares a formal complaint.

The EE Program's Director of Growth and Learning, Marty Schwalbe, was on the board of directors of Lutheran Social Services. (Schwalbe Depo., ECF No. 125-1, PAGEID # 3030–31; *see also* Schwalbe Letter, ECF No. 125-2, PAGEID # 3083–86.) It was through this connection that Schwalbe learned that ODM had continued its leadership training independent of the EE Program. (*Id.*)

Schwalbe immediately reported what he learned to the Executive Director of the EE Program, Paul Velasco. (*Id.*) Mr. Velasco then obtained a copy of the contract between ODM and CypressTree, from which he learned that Mitchell was consulting for a former EE Program client. (Velasco Depo, ECF No. 126-1, PAGEID # 3133.) There are conflicting accounts on what actions Velasco took next.

According to Velasco, he immediately shared what he knew with Anil Makhija, the Dean of FCB. (*Id.*) During that initial conversation, Dean Makhija told Velasco that they should look deeper into what Velasco had learned. (*Id.*) The Dean then introduced Velasco to various University personnel, including OSU's general counsel, to discuss appropriate next steps. (*Id.* at 3141.) Together with the Dean, OSU Legal, and Schwalbe, Velasco collected additional information about Mitchell's involvement with ODM. (*Id.* at 3134–36.) Eventually, Dean Makhija told Velasco that the matter could not proceed any further without a written complaint so, at the Dean's direction, Velasco drafted a formal complaint against Mitchell. (*Id.* at 3140–41.)

Dean Makhija denies that any of the aforementioned communication with Velasco occurred, claiming that he first learned that Mitchell was consulting with ODM when he received Velasco's formal written complaint. (Makhija Depo., ECF No. 86-1, PAGEID # 1053.)

### D. Velasco submits his complaint and Dean Makhija initiates a formal investigation.

On January 3, 2017, Velasco submitted a formal complaint to Dean Makhija alleging that Mitchell engaged in "grave misconduct." (Velasco Complaint, ECF 126-2, PAGEID # 3174.) "Grave misconduct" by OSU faculty is defined as "flagrant, egregious, and willful misbehavior in violation of law or established University rules or policies." (Faculty Rule 3335-5-04, ECF No. 1102, PAGEID # 1102.)

Velasco identified three instances of alleged misconduct.

First, Velasco alleged that Mitchell's consulting for ODM violated the Faculty Financial Conflict of Interest Policy ("COI Policy"). (Velasco Complaint, ECF 126-2, PAGEID # 3175.) The COI Policy requires University faculty members and administrators to "avoid activities that entail or create a conflict of interest." (ECF No. 86-1, PAGEID # 85.) The COI Policy explains that a "conflict of interest exists if financial interests or other opportunities for tangible personal benefit may exert a substantial and improper influence upon a faculty member or administrator's professional judgment in exercising any institutional responsibility." (*Id.*) For example, "use of one's professional expertise to provide services that compete with services provided by an academic entity within the University." (*Id.*)

6

Second, Velasco alleged that Mitchell violated the Faculty Conflict of Commitment Policy ("COC Policy") by performing private services that could interfere with her ability to keep up with her University duties. (Velasco Complaint, ECF 126-2, PAGEID # 3175.) The COC Policy prohibits faculty members from engaging in activities that "cannot be managed by the faculty member and his/her chair or dean to avoid a conflict of commitment or the reasonable appearance of a conflict of commitment." (ECF No. 86-1, PAGEID # 1133.) Conflicts of commitment "generally involve issues of allocation of time" and exist when "external or other activities are so substantial or demanding as to interfere with the individual's teaching, research, scholarship or service responsibilities to the University or its students." (*Id.*)

Velasco's third and final allegation was that Mitchell breached the "no poaching clause" of her EE Program contracts, which prohibited her from soliciting other training business from ODM without involving the EE Program. (Velasco Complaint, ECF No. 126-2, PAGEID # 3176; *see also id.* at 3177–86 (Supplemental Contracts).)

After receiving Velasco's complaint, Dean Makhija referred the matter to Thomas Goldsby (the Chair of Mitchell's academic department) for a probable cause determination. (Makhija Depo., ECF No. 86-1, PAGEID # 1078) After Goldsby determined that probable cause existed to advance Velasco's complaint, Dean Makhija launched a formal investigation into Mitchell's dealings with ODM (the "04-investigation"). (*Id.*; *see also* Goldsby Letter to Dean Makhija, ECF No. 86-1,

PAGEID # 1086–87.) Faculty investigators were appointed, and the 04-investigation proceeded through the University's review process.

### E.    Mitchell appeals intermediate decisions and submits evidence in her defense.

Throughout the 04-investigation, all of the intermediate decisionmakers found that Mitchell had engaged in grave misconduct and recommended her termination. (College of Business Investigative Committee, ECF 124-3, sealed; Dean Makhija, ECF 86-2, PAGEID # 1311–13; Provost McPheron, ECF 127-2; Faculty Hearing Committee, ECF 123-3.) Mitchell appealed each of these findings and recommendations. (*See* Letters to Dean Makhija, ECF Nos. 86-1, 130-1; Letters to Provost McPheron, ECF Nos. 140-4, 140-5; Letter to Faculty Hearing Committee, ECF No. 140-6.)

In each of her appeals, Mitchell argued that it was common practice and encouraged by the University for FCB faculty to engage in paid external consulting. She provided information that other, male faculty members similarly "consulted" for EE Program clients and others. Though she was steadfast that neither she nor her colleagues had done anything wrong, Mitchell argued that if decisionmakers believed she violated University policy, then her male colleagues did as well.

Mitchell also supported her appeals with a declaration from fellow FCB Faculty member Ray Lewicki stating that: (1) he did not believe her actions constituted a conflict of interest, (2) in his 35 years with FCB, he had not seen another faculty member investigated for similar conduct, and (3) he was "stunned"

at the recommendations for termination. (Lewicki Decl., ECF No. 142-2, sealed.)

Mitchell submitted over 400 pages of publicly available information that catalogued

the consulting activities performed by twenty-three of her male colleagues. (ECF

Nos. 130-1, 131-1, 132-1, 133-1, 134-1.) To rebut the allegation that she breached

the no-poaching clause of her EE Program contracts, Mitchell submitted letters

from ODM employees stating that she did not solicit their business and that

CypressTree's services were different than those provided by the EE Program.

(ODM Letters, ECF Nos. 145-2, 145-3.)

### F.    The 04-investigation concludes, and Mitchell is terminated.

At the penultimate stage of review, OSU President Michael Drake found that

Mitchell engaged in grave misconduct by violating the COI Policy. (Drake Letter to

Board of Trustees, ECF No. 135-3, PAGEID # 3951–55, sealed.) In addition, he

found that Mitchell engaged in standard misconduct by violating the COC Policy,

though he concluded that she did not violate the no-poaching clause of her EE

Program contracts. President Drake recommended immediate termination for

Mitchell's grave misconduct.

The Board of Trustees adopted President Drake's findings and

recommendation without modification, and, on August 30, 2019, Mitchell was

terminated from OSU. (Minutes for Board of Trustees Meeting, ECF No. 135-3,

PAGEID # 3960–61, sealed.)

### G.   Mitchell complains to OSU's Office of Institutional Equity.

Less than a month before she was terminated, Mitchell submitted a complaint of gender discrimination to OSU's Office of Institutional Equity ("OIE"). (Phillips Depo., ECF No. 122-1, PAGEID # 2833.) Her primary allegation was that the 04-investigation, without similar scrutiny of her male colleagues, constituted gender discrimination.

After a complaint is received by OIE, a preliminary investigator is assigned to perform an initial review. (*Id.* at 2829–30.) This initial review involves an interview with the complainant, a review of evidence, and interviews of potential witnesses. (*Id.* at 2833.) If a complaint lacks evidence or specificity, the preliminary investigator will prepare a memo closing the case without a formal investigation. (*Id.* at 2865, 2869.)

Martha Phillips was appointed as the preliminary investigator for Mitchell's complaint. She interviewed Mitchell and potential witnesses and reviewed the evidence Mitchell submitted, but she did not look into the consulting practices of Mitchell's male colleagues. (*Id.* at 2836–38, 2847–48, 2859.) Phillips determined that Mitchell's complaint lacked support, and the case was closed without a formal investigation. (*Id.* at 2869.)

To date, no one at OSU has investigated the consulting practices of FCB's male faculty.

### H. OSU did not renew Mitchell's contract before she was terminated.

Mitchell's contract was set to expire the day after she was terminated. (Makhija Depo., ECF No. 86-1, PAGEID # 1073–74; Non-Renewal Letter, ECF No. 86-1, PAGEID # 1088.) A little over a year before the Board's termination decision, eleven members of Mitchell's department met to discuss her reappointment, at which time nine members abstained from the vote and the remaining two voted against her reappointment. (*Id.*) Because of this meeting, Dean Makhija did not renew her contract. (*Id.*)

## II. PROCEDURAL BACKGROUND

Mitchell filed a discrimination charge with the Equal Employment Opportunity Commission and received a Right to Sue Letter. (Second Am. Compl., ECF No. 38, ¶ 2.) She timely filed suit alleging gender discrimination in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq*. Mitchell also brought equal protection and due process claims pursuant to 42 U.S.C. § 1983 and a retaliation claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. The § 1983 and Title IX claims were dismissed by the Court for failure to state a claim. (Opinion and Order, ECF No. 54.)

Following discovery, OSU filed the instant Motion for Summary Judgment on Mitchell's remaining claim. (ECF No. 135.)

## III. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### B. *McDonnell Douglas* Inquiry

Mitchell does not have direct evidence of gender discrimination, so she "must first establish a prima facie case of discrimination." *Pio v. Benteler Auto. Corp.*, No.

21-1231, 2022 WL 351772, at *3 (6th Cir. Feb. 7, 2022); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). To establish her prima facie case, Mitchell must show that she: 1) is a member of a protected class; 2) is qualified for the job; 3) suffered an adverse employment decision; and 4) was treated differently than a similarly situated employee who was not a member of the protected class. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell* Douglas, at 802). If Mitchell establishes a prima facie case, OSU must then "articulate some legitimate, nondiscriminatory reason for the termination. If [OSU] meets this burden, then the burden of production shifts back to [Mitchell] to demonstrate that the proffered reason is a pretext." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citations and quotations omitted).

"Defendant's burden on the intermediate step is one of production; the 'ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Lambright v. Kidney Servs. of Ohio*, 998 F. Supp. 2d 676, 683 (S.D. Ohio 2014) (Marbley, J.) (quoting *Burdine*, 450 U.S. at 253). On a motion for summary judgment, the Court "considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### C.    Prima Facie Case

OSU disputes only element four of Mitchell's prima facie case. To show that she was treated differently than employees who were not members of her protected

class, Mitchell must show that she is similarly situated in all relevant respects to the employees to whom she compares herself. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Mitchell v. Toledo*, 964 F.2d 577, 583 (6th Cir. 1992). She "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated'"; rather "the plaintiff and the employee with whom the plaintiff seeks to compare [herself] must be similar in 'all relevant aspects.'" *Ercegovich*, 154 F.3d at 352 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)). To determine relevance, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and the comparator employee." *Id.*

In the disciplinary context, courts generally consider whether the plaintiff and her comparators "dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. "Exact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury." *Moore v. City of Clarksville*, No. 3:10-0141, 2011 WL 2938459, at *6–7 (M.D. Tenn. July 19, 2011). Rather, the Sixth Circuit has "held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citation omitted).

14

If a reasonable jury could find that the named comparators were similarly situated, then it is improper to find that a plaintiff has failed to establish a prima facie case. *Moore*, 2011 WL 2938459, at \*6–7; *see, e.g.*, *Jones v. Potter,* 488 F.3d 397, 405 (6th Cir. 2007) (citation omitted) (jury question where "reasonable minds could differ as to whether a preponderance of the evidence establishes that [plaintiff] was treated more harshly than similarly situated employees").

### 1.    **Comparators**

Mitchell identified five comparators: Lawrence Inks, David Veech, James Dial, Marc Ankerman, and Anthony Rucci.[1] (ECF No. 147, PAGEID # 5048–51.) She argues that each comparator performed similar consulting activities to those she performed for ODM, but none was investigated, disciplined, or terminated for violating the COI Policy.

It is undisputed that Mitchell's comparators are similar in many respects. For example, as full-time faculty of the Fischer College of Business, all five were subject to the same COI Policy as Mitchell. And, like Mitchell, Dean Makhija would have been responsible for initiating formal investigations into any alleged misconduct by the comparators. Had investigations been initiated against the comparators, they would have undergone the same review process with many of the same intermediate and final decisionmakers as Mitchell. The disagreement is

---

[1]Mitchell also identified Dan Oglevee. (ECF No. 147, PAGEID # 5047.) However, Oglevee is not included in Mitchell's comparator discussion, and she does not cite evidence of specific consulting services that he performed. (*See id.* at 5048–51.) Thus, Mitchell has not shown that Oglevee is similarly situated to her.

15

whether OSU had enough information about the comparators to justify an investigation and whether the comparators similarly violated the COI Policy through private consulting arrangements.

Mitchell's evidence of the private consulting performed by each comparator is summarized below.

### Lawrence Inks

Lawrence Inks was a University employee for seventeen years. During his time at FCB, Inks served over 200 EE Program clients as both an instructor and an Academic Director. (Inks Depo., ECF No. 120-1, PAGEID # 2781.) Aside from his University responsibilities, Inks performed private consulting. He would often provide the same educational services in his private engagements as he did through the EE Program, but none of Inks's private clients was a past or present EE Program client. (*Id.* at 2786–90 (discussing consulting performed for the Ohio Fire Chiefs' Association, Park National Bank, and NGK).)

Inks believed that paid external consulting services did not pose conflicts of interest if the client was not a past or present EE Program client. (*Id.*) He did not seek permission before consulting for non-EE Program clients.

### David Veech

David Veech is a senior lecturer at FCB and a frequent contributor to the EE Program. From 2014 through 2019, Veech earned around $1,076,400 for substantial private consulting. (Veech Written Depo., ECF No. 146-18, PAGIED # 4838.) Veech's highest value services were for the Arizona Department of Economic

Security and, over three years, he was paid $426,000 in consulting fees from that single client. (*Id.*)

### James Dial

James Dial was a clinical professor at FCB. Although Mitchell recalls that Dial served as an Academic Director in the EE Program, Dial denied ever doing so. (*Compare* Dial Written Depo., ECF No. 146-17, PAGEID # 4833, Response No. 5 *with* Mitchell Decl., ECF No. 87-1, PAGEID # 1377–78, ¶ 13.) Nevertheless, Dial did participate in the EE Program as an instructor. He engaged in private consulting while employed at OSU, earning more than $120,000 in consulting fees in five years. (Dial Written Depo., ECF No. 146-17, PAGEID # 4831.) One of Dial's highest value consulting engagements was for a former EE Program client. (*Id.*)

### Marc Ankerman

Marc Ankerman was a Senior Lecturer at FCB and, in two years, he earned approximately $40,207 from private consulting, including a multiday engagement valued at $19,569. (Ankerman Written Depo., ECF 146-15, PAGEID # 4794.)

### Anthony Rucci

Anthony Rucci served as an EE Program Academic Director while also providing private consulting services. From 2014 through 2019, Rucci earned $212,955 in external consulting fees. (Rucci Written Depo. ECF No. See ECF 146-16, PAGEID # 4815–16.) On at least three occasions, Rucci performed multiday board development training for his private clients. (*Id.*) In the information she gave OSU about the consulting practices of her male colleagues, Mitchell identified that

Rucci has consulted for numerous EE Program clients. (ECF No. 86-1, PAGEID # 1169.) Rucci admits that he has consulted for EE Program clients but states that he always sought permission before doing so. To avoid taking business away from OSU, Rucci routinely referred clients seeking education or training services to the EE Program, regardless of whether those clients had worked with OSU in the past. (*Id.* at 4810–11.)

### 2. Analysis

OSU has two arguments for why Mitchell's comparators are inapt.

### a. Whether OSU had sufficient cause to act on allegations about Mitchell's comparators is a jury question.

OSU first argues that, unlike with Mitchell, the University did not receive a formal complaint and did not have probable cause to investigate her comparators. (ECF No. 135, PAGEID # 3715–17.) In response, Mitchell argues that the conflicting testimony by Velasco and Dean Makhija creates a material dispute of fact as to whether OSU began investigating her without a formal complaint or probable cause. (ECF No. 5082–83.) If OSU acted on informal allegations against her, Mitchell argues that it should have done the same for her comparators. (*Id.*)

Dean Makhija testified that he did not look into the allegations Mitchell made about her male colleagues because he did not believe they "rose to the level of an investigation." (Makhija Depo., ECF No. 86-1, PAGEID # 1070.) The Dean acknowledged that Mitchell could initiate an 04-investigation against her

colleagues, but he did not advise her of that ability or suggest that she do so when he learned of her informal allegations. Instead, he did nothing.

In contrast, there is evidence that when Velasco informed Dean Makhija about Mitchell's potential conflicts arising from an ODM contract, the Dean encouraged Velasco to collect more information about Mitchell, introduced Velasco to OSU Legal, attended joint meetings with Velasco and OSU Legal, and told Velasco to draft a formal complaint so the matter could proceed to an 04-investigation. Although Dean Makhija disputes that he played such an active role in the lead-up to the formal complaint against Mitchell, a reasonable jury could find that he treated Mitchell differently than her comparators.

> ### b.    Whether Mitchell's conduct is distinguishable from that of her comparators is a jury question.

OSU next argues that Mitchell's violation of the COI Policy was "singularly egregious" and that none of her comparators similarly competed with OSU. (ECF No. 135, PAGEID # 3714.) It identifies three areas in which it claims that Mitchell's conduct is distinguishable from her comparators'.

OSU first claims that only Mitchell levied her position as Academic Director to divert business from an existing EE Program client. (ECF No. 135, PAGEID # 3715.) This first distinction by OSU calls for too stringent a standard of similarly situatedness. The COI Policy prohibits employees from "provid[ing]services that compete with services provided by an academic entity within the university." (COI Policy, ECF No. 86-1, PAGEID # 1110.) The Policy makes no distinction between

employees who compete with OSU by serving existing clients and those who compete by serving potential clients. In either instance, the employee has diverted work away from the University, creating a conflict of interest. Thus, Mitchell is not required to identify individuals who engaged in identical conduct. It is enough for her to show that her comparators were similar in all relevant respects (*i.e.*, that the comparators similarly violated the COI Policy).

OSU next claims that Mitchell delivered private services identical to those she would have performed as a University employee. (ECF No. 135, PAGEID # 3715.) But Mitchell disputes this, saying that the services she provided to ODM through CypressTree were different than those provided by the EE Program. (Mitchell Depo., ECF No. 119-1, PAGEID # 2722.) Moreover, even if the services were the same, performing similar services for private clients was not uncommon for FCB faculty—Inks testified that he provided the same services to his private clients that he provided through the EE Program. (Inks Depo., ECF No. 120-1, PAGEID # 2789–90; *see also* Lewicki Decl., ECF No. 142-2, sealed.)

OSU's third argument is that it made "financial sense" for the EE Program to bid on the consulting services performed by Mitchell, implying that the consulting done by her comparators were too small to compete with OSU. (ECF No. 135, PAGEID # 3715.) To be sure, Mitchell's $1.8 million contract with ODM is much larger than her comparators' consulting income. However, the COI Policy does not set a minimum value for services that create a conflict of interest, all that is required for a conflict to exist is that (1) the services offered by a faculty member

"compete" with services offered by OSU and that (2) the benefit derived from the competing services exerts a "substantial and improper influence" on the faculty member's professional judgment. (COI Policy, ECF No. 86-1, PAGEID # 1110.) A genuine issue of material fact exists as to both requirements.

*Compete with OSU's Services.* According to Velasco, a typical engagement for the EE Program started around $30,000 and ran upwards of $300,000 to $500,000. (Velasco Depo., ECF No. 126-1, PAGEID # 3135.) The $30,000 figure was corroborated by Inks, who has over seventeen years of experience serving EE Program clients. (Inks Depo., ECF No. 120-1, PAGEID # 2786.) Given that evidence, many of the comparators' private deals were on par with a typical EE Program contract. For example, in 2018, Veech made $200,000 from private consulting services performed for the Arizona Department of Economic Security. (No. 146-18, PAGIED # 4838.) The following year, he made $170,000 from the same client. (*Id.*) Rucci was paid $37,500 for the Farm Credit Services Counsel's board development training. (ECF No. 146-16, PAGEID # 4815.) And Dial made $47,500 when he consulted for Grief Inc. (ECF No. 146-17, PAGEID # 4831.) Thus, a jury could reasonably conclude that Mitchell's comparators similarly competed with the EE Program through their private arrangements.

*Substantial and Improper Influence.* The COI Policy's "substantial and improper" influence requirement would seem to imply a gradation of conflicts based on the value of faculty members' competing services. Even so, the Court cannot say, as a matter of law, that Mitchell's comparators were not similarly influenced by the

21

income they earned from their private consulting arrangement. That issue must be resolved by a jury.

### c. Mitchell has established her prima facie case.

In sum, Mitchell has identified suitable comparators and has established her prima facie case.

### D. Pretext

OSU meets its burden that Mitchell was terminated for a legitimate, nondiscriminatory reason by showing that (1) she was investigated because of allegations that she violated University policy and breached her employment contract and (2) that she was terminated based on the results of that investigation.

Once a defendant has proffered a legitimate nondiscriminatory reason for a plaintiff's termination, the burden shifts back to the plaintiff to demonstrate that there is a genuine issue of material fact as to whether the proffered reason is mere pretext for discrimination. *Blizzard*, 698 F.3d at 283. "Demonstrating pretext often consists of raising the question of why [the plaintiff] was singled out for an adverse employment action." *Strickland v. City of Detroit*, 995 F.3d 495, 512 (6th Cir. 2021) (quotations and citations omitted). Pretext may be shown by demonstrating that OSU's stated reason (1) had no basis in fact; (2) did not actually motivate its action; or (3) was insufficient to motivate its action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire

the employee for the stated reason or not?'" *Id.*

A jury "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quotation and citation omitted). To avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired her." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The evidence must suggest that the employer acted for discriminatory reasons—more than simply revealing "a dispute over the facts upon which the discharge was based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted).

Here, Mitchell offers sufficient evidence to create a genuine issue of material fact as to whether OSU's reason for her termination is pretextual. The Sixth Circuit has found that disparate treatment of comparators is enough to establish pretext when a defendant "tolerates a certain type of misconduct, leaving it unpunished, but singles out and punishes the plaintiff for the same type of misconduct." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020); *Strickland*, 995 F.3d at 514; *see also Bledsoe v. Tennessee alley Auth. Bd. of Directors*, 42 F.4th 568, 586–87 (6th Cir. 2022) (district court improperly granted summary judgment on

issue of pretext where reasonable jury could conclude that other employees were not investigated, let alone terminated, for similar conduct). A reasonable jury could find such circumstances exist here by crediting Mitchell's evidence that she was singled out for investigation and termination despite evidence that her male colleagues were similarly violating the COI Policy.

OSU argues that Mitchell cannot meet her burden on pretext by using the same evidence she used to establish her prima facie case. (ECF No. 153, PAGEID # 5155.) However, Mitchell's comparator evidence is not her only evidence of pretext. Dr. Lewicki, who has 35 years of experience at FCB, testified that he was aware of instances in which other FCB faculty members had consulted for EE program clients, but that those situations were resolved informally. (Lewicki Decl., ECF No. 142-2, PAGEID # 4315, ¶ 8.) He stated that FCB departed from its normal practice and violated University policy by initiating a formal investigation of Mitchell without first attempting a local resolution. (*Id.* at 4315, ¶ 8, 9; (referring to Faculty Rule 3335-5-04, which requires University deans to attempt to resolve 04-complaints "through use of informal consultation" before taking formal measures).) Lewicki's declaration underscores Mitchell's argument that her conduct was insufficient to motivate the 04-investigation or her termination, a fact from which a jury could infer discriminatory motive.

Also, Dean Makhija and Velasco's conflicting testimony about the Dean's involvement in the lead-up to the 04-investigation supports a finding of pretext. According to Velasco, the Dean took significant actions in response to informal

24

allegations about Mitchell, including encouraging Velasco to collect more information and directing Velasco to prepare a formal complaint. In contrast, when the Dean received Mitchell's allegations about her male colleagues, he did nothing. A jury could reasonably conclude that the Dean lied to conceal a discriminatory motive behind his decision to act on informal allegations against Mitchell but not her comparators.

Accordingly, OSU's motion for summary judgment on Mitchell's Title VII claim is **DENIED**.

### E.    Damages

Finally, OSU argues that, even if the Court denies summary judgment on Mitchell's Title VII claim, it should limit Mitchell's economic damages because no reasonable jury could find that Mitchell's contract would have been renewed separate and apart from her termination. (ECF No. 135, PAGEID # 3718.) In response, Mitchell argues the issue is not so cut and dry because a jury could reasonably conclude that her colleagues would have supported her reappointment and her contract would have been renewed without the cloud cast by the 04-investigation. (ECF No. 147, PAGEID # 5087.) This too is a matter for a jury.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment

25

is **DENIED**. (ECF No. 135.) The Court will set this matter for trial in a forthcoming

order.

      **IT IS SO ORDERED.**

                      /s/ Sarah D. Morrison          
                      **SARAH D. MORRISON**
                      **UNITED STATES DISTRICT JUDGE**